IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| WP Steel Venture LLC, et al.,[1] | : | Case No. 12-11661 (KJC) |
| | : | |
| Debtors. | : | (Joint Administration Pending) |

------------------------------------------------------x

## DECLARATION OF RICHARD D. CARUSO IN
## SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Richard D. Caruso, of full age, being duly sworn, state that the following is true

and correct to the best of my knowledge, information and belief:

1.      I am an employee and the former Chief Financial Officer (the "**CFO**") of

the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the

"**Company**"), each of which is a limited liability corporation organized under the laws of

Delaware. I served as the CFO from March 31, 2011 to May 22, 2012. Through my roles with

the Company, I am familiar with the day-to-day operations, business and financial affairs of each

of the Debtors and the Company as a whole.[2]

2.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**"). The Debtors intend to continue in the possession of their respective

---

[1]   If applicable, the last four digits of the taxpayer identification numbers of the Debtors follow in
parentheses:  (i) WP Steel Venture LLC (7095); (ii) Metal Centers LLC; (iii) RG Steel, LLC (1806); (iv)
RG Steel Railroad Holding, LLC (4154); (v) RG Steel Sparrows Point, LLC (3633); (vi) RG Steel Warren,
LLC (0253); (vii) RG Steel Wheeling, LLC (3273); and (viii) RG Steel Wheeling Steel Group, LLC
(9927).  The Debtors' executive headquarters' address is 1430 Sparrows Point Boulevard, Sparrows Point,
MD  21219.

[2]   The Company's corporate structure is set forth in the chart annexed hereto as Exhibit A.

properties and the management of their respective businesses as debtors in possession. In order to enable the Debtors to operate effectively postpetition and to avoid the adverse effects of the chapter 11 filings, the Debtors have requested various types of relief in "first day" applications and motions (the "**First Day Motions**") filed with the Court concurrently herewith, including a motion seeking to have the Debtors' chapter 11 cases consolidated for procedural purposes and jointly administered (the "**Joint Administration Motion**").

      3.     I submit this declaration pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"):  (a) in support of the relief requested in the First Day Motions; and (b) to explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under the Bankruptcy Code.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this declaration.

      4.     Part I of this declaration provides background with respect to the Debtors' businesses and capital structure.  Part II sets forth the relevant facts in support of the Debtors' First Day Motions.

## I.     BACKGROUND

**A.**    **The Debtors and their Businesses**

    (i)    *Offices and Facilities*

      5.     RG Steel, LLC ("**RG Steel**"), formally established in March 2011, and the other Debtors comprise the fourth largest flat-rolled steel company in the United States, with capacity to produce annually 8.2 million tons of steel.  The Company is headquartered in

Sparrows Point, Maryland.  The Company's operations include three main steel producing operations located in Sparrows Point, Maryland ("**Sparrows Point**"), Warren, Ohio ("**Warren**"), and Wheeling, West Virginia ("**Wheeling**" and together with Sparrows Point and Warren, the "**Main Facilities**").  Wheeling also has facilities located in Mingo Junction, Ohio, Martins Ferry, Ohio, and Yorkville, Ohio.  As more fully described below, in March 2011, the Company acquired the Main Facilities from Severstal (as defined below).

6.       The Company also owns a 50% share of various non-debtor joint ventures. The two most significant are Mountain State Carbon, LLC ("**MSC**") and Ohio Coatings Company ("**Ohio Coatings**").  MSC is owned 50% by RG Steel Wheeling, LLC ("**RG Wheeling**") and 50% by SNA Carbon, LLC (an affiliate of Severstal).  Through RG Wheeling's equity stake and other arrangements with MSC, RG Wheeling holds a right to 50% of the production at the MSC facility, which has 1.2 million tons of metallurgical coke capacity, making it the third largest coke plant in the United States.  MSC is a key supplier of coke used in the Debtors' steel production process, and provides approximately 600,000 tons of coke to Warren annually, which is produced at a highly competitive cost per ton.  Since 2006, more than $160 million has been invested in MSC to rebuild and refurbish its coke production assets.  RG Wheeling also owns a 50% equity stake in Ohio Coatings, a world-class tin plate company.  TCC Steel owns the remaining equity interests in Ohio Coatings.

(ii)      ***The Debtors' Steel Production Facilities***

a.      *Sparrows Point*

7.       Sparrows Point is an integrated producer of a range of steel sheet, tin mill and high quality slab products.  Sparrows Point is one of the largest single site steelmaking facilities in the U.S., with an annual capacity of 3.9 million tons, and its steelmaking operations, when fully operational, are considered to be amongst the world's most efficient.  Sparrows Point

also has a self-contained tin plate mill and is one of only three main domestic tin producers, with approximately 520,000 tons of annual tin production capacity.  The Sparrows Point blast furnace was idle at the time of the Acquisition (as defined and discussed below), and was restarted in May 2011 under the Company's ownership, as part of the Company's efforts to recapture Sparrows Point's historical market share.

b.    *Warren*

8.    Warren is the Company's most specialized production facility with 1.4 million tons of crude steel production capacity.  Warren specializes in manufacturing custom products that are characterized by specialized chemistries, small order sizes, and narrow widths that the majority of other steel plants are not well-suited to produce.  Warren, which focuses on high carbon, alloy, ultra high strength and heavy gauge galvanized steel products, is able to produce 185 grades of steel.  As a result, Warren's product portfolio is among the most diversified of any U.S. steel producer.  The majority of Warren's key customers are located within 200 miles of the facility, which results in favorable logistics costs, faster order fulfillment and superior customer service.

c.    *Wheeling*

9.    Wheeling has both blast furnace and electric arc furnace ("**EAF**") production capabilities, both of which were idle on the date of the Acquisition and remain idle today.  Wheeling is a flat rolled steel producer with 2.9 million tons of annual crude steel capacity.  The EAF capabilities provide exceptional production flexibility.  Wheeling's product mix includes hot-rolled, cold-rolled, hot-dipped galvanized, tin and corrugated products, and Wheeling is particularly strong in producing wide products — up to 72 inch sheets.  Today, Wheeling operates primarily as a steel finishing plant.  Wheeling has a diverse customer base in

construction, coil coaters and pipe and tube manufacturers that, in turn, supply the energy, mechanical, and structural markets.

     (iii)   ***Employees and Related Matters***

     10.    The Company employs approximately 4,000 full-time equivalent employees. Approximately 88% of the Company's employees are employed under a master collective bargaining agreement (the "**CBA**") between RG Steel and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("**USW**"). The CBA expires September 1, 2014.

     11.    The Company has significant obligations to retirees. Each of the Main Facilities maintains medical, prescription drug, and life insurance plans for retirees (collectively, the "**Retiree Benefits**"). The aggregate cost to the Debtors of the Retiree Benefits is approximately $800,000 per month. The Company also participates in various pension plans, including a multi-employer defined benefit pension plan maintained by the United Steelworkers' Pension Trust (the "**Steelworkers' Pension Plan**"). On a monthly basis, the Company contributes $2.65 per Union Employee hour worked to the Steelworkers' Pension Plan, for a total monthly payment of approximately $1.5 million. As of the Petition Date, the Debtors estimate that their accrued but unpaid obligations in respect of the Steelworkers' Pension Plan total approximately $3.3 million. In addition, each of the Main Facilities also maintains separate 401(k) plans for hourly and salaried employees.

**B.    The 2011 Acquisition and Subsequent Events**

     12.    On March 1, 2011, RG Steel entered into a stock purchase agreement with Severstal US Holdings II, Inc., Severstal US Holdings, LLC, and Severstal Sparrows Point, LLC (collectively, "**Severstal**") to acquire (the "**Acquisition**") the stock of Severstal Sparrows Point, LLC, n/k/a RG Steel Sparrows Point, LLC ("**RG Sparrows Point**"), which directly or indirectly

owns the Main Facilities.  In connection with the Acquisition:  (a) RG Steel entered into the

Severstal Note (as defined below) in the principal amount of $100 million, as part of the

transaction consideration, (b) the existing credit facilities were repaid with proceeds from the

Prepetition Credit Facility, and (c) Severstal was required to deliver $450 million in net working

capital at closing.  Following the Acquisition, the Company restarted the previously idled

Sparrows Point blast furnace, basic oxygen furnace, caster, hot mill, sinter plant and pulverized

coal injection plant.  After the closing of the Acquisition, the Company discovered a dramatic

shortfall in the amount of working capital that was delivered by Severstal upon the closing of the

Acquisition.  Based on the working capital shortfall, RG Steel has asserted a claim for

approximately $82 million against Severstal.[3]  The working capital shortfall experienced

immediately after the Acquisition on account of Severstal's misrepresentations has greatly

exacerbated the Company's liquidity problems, which ultimately culminated in the

commencement of these cases.

13.    In addition to the $82 million claim against Severstal due to the working

capital shortfall, the Company also has material outstanding breach of representations and

warranties indemnification claims against Severstal made in connection with the Acquisition (the

"**Severstal Claims**").[4]  The most significant of Severstal's breaches include, for example,

---

[3]    RG Steel's purchase price adjustment claims are being arbitrated pursuant to an arbitration provision in the stock purchase agreement.  Severstal, however, initially refused to arbitrate many of RG Steel's claims and, in October 2011, Sevestal filed a complaint in the United States District Court for the Southern District of New York seeking a declaratory judgment that various of RG Steel's purchase price adjustment claims were not within the scope of the arbitration provision.  RG Steel responded to the complaint by moving pursuant to the Federal Arbitration Act to compel arbitration of those claims with respect to which Severstal sought a declaratory judgment.  By order dated May 25, 2012, Judge Robert W. Sweet granted RG Steel's motion to compel arbitration.

[4]    The Severstal Claims are pending in the Supreme Court of the State of New York, New York County.  RG originally filed the Severstal Claims in the United States District Court for the Southern District of New

Severstal's failure to disclose material contracts and/or amendments thereto, which resulted in significant losses for the Company due to its obligations to take on or provide supplies and services on unfavorable terms. Absent the working capital shortfall and unanticipated losses stemming from Severstal's misrepresentations and contractual breaches, the Debtors' liquidity crisis may have been surmountable. Even in chapter 11, the Severstal Claims present a significant source of value for the Company's creditors and the Company intends to resolve those claims in a manner that maximizes recoveries for all parties in interest.

**C.    The Debtors' Prepetition Capital Structure**

      (i)    *Senior Prepetition Credit Facility*

      14.    On March 31, 2011, RG Steel, LLC ("**RG Steel**"), RG Sparrows Point, RG Steel Warren, LLC ("**RG Warren**") (f/k/a Severstal Warren, LLC), and RG Steel Wheeling, LLC ("**RG Wheeling**") (f/k/a Severstal Wheeling, LLC) (collectively, the "**Borrowers**") entered into that certain Credit Agreement (as amended, modified, or supplemented, the "**Senior Prepetition Credit Agreement**") with the lenders (the "**Senior Prepetition Lenders**"), Wells Fargo Capital Finance, LLC ("**WFCF**"), as administrative agent and co-collateral agent and General Electric Capital Corporation, as syndication agent and co-collateral agent (together, the "**Senior Prepetition Agents**"), UBS Securities LLC and Bank of America, N.A., as Co-Documentation Agents, WFCF, GE Capital Markets, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and UBS Securities LLC as Joint Lead Arrangers and Joint Bookrunners, and Ableco Finance LLC as agent for the "Revolving Loan B" lenders. The Senior Prepetition

---

York, but voluntarily dismissed those claims on April 20, 2012 and filed them in New York State Court on the same day.

Credit Agreement sets forth the terms of a two-tranche revolving credit facility (the "**Senior Prepetition Credit Facility**"). The maximum availability under the "Revolving Loan A" tranche of the Senior Prepetition Credit Facility is $625,000,000, and the maximum availability under the "Revolving Loan B" tranche of the Senior Prepetition Credit Facility is $25,000,000 (in each case subject to certain borrowing base and availability restrictions). The Senior Prepetition Credit Facility also includes an $80,000,000 letter of credit sub-facility.

15.     Pursuant to that certain Security Agreement, dated as of March 31, 2011 (the "**Senior Security Agreement**"), among each of the Debtors (the "**Grantors**") and WFCF, in its capacity as a Senior Prepetition Agent, and certain mortgages executed by the Grantors in connection therewith, the Debtors' obligations under the Senior Prepetition Credit Agreement are secured by liens on and security interests in (subject to certain exclusions contained in the Senior Security Agreement) (the "**Senior Prepetition Credit Agreement Liens**") substantially all of the Grantors' assets, including all: (a) accounts; (b) books; (c) chattel paper; (d) deposit accounts; (e) equipment and fixtures; (f) general intangibles; (g) inventory; (h) investment related property (including equity interests held by the Grantors, but excluding the Severstal Collateral (defined below) until payment in full of the Severstal Note (defined below)); (i) negotiable collateral; (j) supporting obligations; (k) commercial tort claims; (l) money and cash equivalents; (m) real property; and (n) proceeds and products of the foregoing property (collectively, (a) through (n), the "**Prepetition Collateral**").

16.     Borrowings under the Senior Prepetition Credit Facility are subject to certain borrowing base restrictions, which are based on the value of the Debtors' Eligible Accounts and Eligible Inventory (each as defined in the Senior Prepetition Credit Agreement). The Debtors' Borrowing Base (as defined in the Senior Prepetition Credit Agreement) is

comprised strictly of the Debtors' accounts receivable, inventory collateral and certain cash collateral, with no inclusion of fixed asset collateral, and advance rates are low for such Borrowing Base collateral, which reduces availability under the Senior Prepetition Credit Facility. In addition, the Debtors' Borrowing Base is further reduced by various reserves established by the Senior Prepetition Agents pursuant to the Senior Prepetition Credit Agreement. As of May 30, 2012, the Debtors' Borrowing Base was approximately $430.0 million, which reflected, among other things, $29.0 million in reserves established by the Senior Prepetition Agents and $50 million of cash collateral provided by Renco, which secures the Debtors' obligations under the Senior Prepetition Credit Facility (the "**Senior Obligations**"). On the Petition Date, such reserves had been reduced to $21 million. As of the same date, the outstanding Senior Obligations totaled approximately $440.0 million, including approximately $16.9 million in outstanding letters of credit.

      (ii)    *Junior Prepetition Credit Facility*

      17.    On January 17, 2012, the Borrowers entered into that certain Credit Agreement (as amended, modified, or supplemented, the "**Junior Prepetition Credit Agreement**") with the lenders (the "**Junior Prepetition Lenders**") and Cerberus Business Finance, LLC, as agent (the "**Junior Agent**" and, together with the Senior Prepetition Agents, Senior Prepetition Lenders, and Junior Prepetition Lenders, the "**Prepetition Secured Parties**"). The Junior Prepetition Credit Agreement sets forth the terms of a three-tranche term loan credit facility (the "**Junior Prepetition Credit Facility**"). The maximum principal amount of the "Term Loan A" tranche of the Junior Prepetition Credit Facility is $62,500,000; the maximum principal amount of the "Term Loan B" tranche of the Junior Prepetition Credit Facility is $62,500,000; and the maximum principal amount of the "Term Loan C" tranche of the Junior

Prepetition Credit Facility is $100,000,000. The Borrowers' obligations under the "Term Loan A" and "Term Loan B" tranches of the Junior Prepetition Credit Facility mature on January 17, 2017. The Borrowers' obligations under the "Term Loan C" tranche of the Junior Prepetition Credit Facility mature on January 17, 2022. Pursuant to that certain General Continuing Guaranty, dated as of January 17, 2012, the non-Borrower Debtors guaranteed the Borrowers' obligations under the Junior Prepetition Credit Agreement.

18.    Pursuant to certain security agreements, dated as of January 17, 2012 (the "**Junior Security Agreements**"), among each of the Debtors and the Junior Agent, and certain mortgages executed by the Grantors in connection therewith, the Debtors' obligations under the Junior Prepetition Credit Agreement are secured by junior liens on and security interests in the Prepetition Collateral (subject to certain exclusions contained in the Junior Security Agreements) (the "**Junior Prepetition Credit Agreement Liens**"). Pursuant to that certain Intercreditor and Subordination Agreement, dated as of January 17, 2012, by and between WFCF, in its capacity as a Senior Prepetition Agent, and Cerberus, in its capacity as Junior Agent, the Debtors' obligations under the Junior Prepetition Credit Agreement are subordinated in payment to the Debtors' obligations under the Senior Prepetition Credit Agreement, and the Junior Prepetition Credit Agreement Liens are junior to the Senior Prepetition Credit Agreement Liens.

19.    As of May 30, 2012, the Debtors' outstanding obligations under the Junior Prepetition Credit Facility (the "**Second Lien Obligations**") totaled approximately $218.7 million, including interest.

(iii)    *Renco Subordinated Notes*

20.    On July 5, 2011, each of the Borrowers entered into that certain Subordinated Promissory Note (the "**First Renco Subordinated Note**") in favor of Renco.

Renco is the majority owner of the Debtors.[5]  On December 19, 2011, each of the Borrowers

executed another Subordinated Promissory Note (the "**Second Renco Subordinated Note**" and,

together with the First Renco Subordinated Note, the "**Renco Subordinated Notes**") in favor of

Renco, which Second Renco Subordinated Note governs any Subordinated Loans (defined

below) made by Renco to the Debtors on or after December 19, 2011.

      21.    Pursuant to the Renco Subordinated Notes, Renco may make subordinated

loans ("**Subordinated Loans**") to the Borrowers on the terms set forth in the respective Renco

Subordinated Notes.  Pursuant to those certain Security Agreements, dated as of July 5, 2011 and

December 19, 2011, among the Grantors and Renco (the "**Renco Security Agreements**" and,

collectively with the Senior Prepetition Credit Agreement, Senior Security Agreement, Junior

Prepetition Credit Agreement, Junior Security Agreement, and Renco Subordinated Notes, the

"**Prepetition Secured Credit Documents**"), and certain mortgages executed by the Grantors in

connection therewith, the Subordinated Loans are secured by third-priority liens on the

Prepetition Collateral (the "**Renco Liens**" and, collectively with the Senior Prepetition Credit

Agreement Liens and the Junior Prepetition Credit Agreement Liens, the "**Prepetition Liens**").

In addition, the Borrowers' obligations under the Renco Subordinated Notes are guaranteed by

each non-Borrower Debtor, on an unsecured basis.

      22.    Pursuant to that certain Intercreditor and Subordination Agreement, dated

as of January 17, 2012, by and among WFCF, in its capacity as a Senior Prepetition Agent,

Cerberus, in its capacity as Junior Agent, and Renco (which terminated, replaced and superseded

---

[5]    RG Steel Holdings LLC, which owns 100% of RG Steel, is owned 75.5% by The Renco Group, Inc. and
24.5% by Cerberus RG Investor LLC.

that certain Intercreditor and Subordination Agreement dated as of July 5, 2011, by and between WFCF, in its capacity as a Senior Prepetition Agent and Renco), the Borrowers' obligations under the Renco Subordinated Notes are subordinated in payment to the Borrowers' obligations under the Senior Prepetition Credit Agreement and the Junior Prepetition Credit Agreement, and the Renco Liens are junior to the Senior Prepetition Credit Agreement Liens and Junior Prepetition Credit Agreement Liens.

23.    Renco has made Subordinated Loans to the Borrowers under the First Renco Subordinated Note in the aggregate principal amount of approximately $109.8 million. The principal amount of Subordinated Loans under the Second Renco Subordinated Note is approximately $15.6 million.  Interest on the Debtors' obligations under the First Renco Subordinated Note accrues at the rate applicable to Base Rate Loans (as defined in the Prepetition Credit Agreement) under the Senior Prepetition Credit Agreement.  Under the Second Renco Subordinated Note, interest accrues at a rate equal to the London Interbank Offered Rate (LIBOR) plus 8.5% per annum (or 10.5% per annum after the occurrence and during the continuation of an event of default under the Second Renco Subordinated Note). Interest under the Renco Subordinated Notes generally is payable in cash, subject to certain limitations and exceptions set forth in the respective Renco Subordinated Notes.  As of the Petition Date, the Debtors' outstanding obligations under the Renco Subordinated Notes (the "**Renco Obligations**" and, collectively with the Senior Obligations and the Second Lien Obligations, the "**Prepetition Secured Obligations**") including interest paid in kind through April 30, 2012, totaled approximately $130.5 million.

(iv)    *Severstal Note*

24.    On March 31, 2011, in connection with its acquisition of the Main

Facilities from Severstal, RG Steel entered into that certain Secured Promissory Note due March

31, 2016 (the "**Severstal Note**") in favor of Severstal.  The principal amount of the Severstal

Note is $100 million.  Since March 31, 2012, interest has been accruing on the Severstal Note at

a rate of 4% per annum, and beginning on March 31, 2013, interest will accrue at a rate of 5%

per annum.  In each case, interest is payable quarterly in cash, on March 31, June 30, September

30 and December 31; however, RG Steel has elected to exercise its option to pay interest in kind

during the period from March 31, 2012 to March 31, 2013.

25.    Pursuant to the Pledge Agreement (the "**Pledge Agreement**"), dated as of

March 31, 2011, by and among Severstal Wheeling, LLC (n/k/a RG Wheeling), RG Steel, and

Severstal, RG Steel's obligations under the Severstal Note are secured by:  (a) the equity

interests held by RG Wheeling in Mountain State Carbon, LLC ("**MSC**"), a non-Debtor joint

venture owned 50% by RG Wheeling and 50% by SNA Carbon, LLC (an affiliate of Severstal);

(b) all proceeds, distributions, cash, instruments, securities and other property received or

receivable in respect of such equity interests; and (c) a segregated deposit account into which

proceeds of the MSC equity are required to be deposited (subject to certain exceptions set forth

in the Pledge Agreement) (collectively, the "**Severstal Collateral**").  Unless and until the

Severstal Note is paid in full, the Severstal Collateral is expressly excluded from the Prepetition

Collateral by the terms of the Senior Security Agreement, Junior Security Agreements and Renco

Security Agreement.  Furthermore, proceeds of the Company's MSC equity interests are required

to be segregated from the Debtors' other assets.

26.     Pursuant to that certain Subordination Agreement by and between WFCF, in its capacity as administrative agent and co-collateral agent under the Senior Prepetition Credit Agreement and Severstal, RG Steel's obligations under the Severstal Note are subordinated in right of payment to RG Steel's obligations under the Prepetition Credit Agreement, except with respect to any payments relating directly to, or proceeds of, the Severstal Collateral.  As of the Petition Date, RG Steel's outstanding obligations under the Severstal Note were approximately $100.7 million.

**D.     Events Leading to the Commencement of the Chapter 11 Cases**

27.     The Company is seeking the protection of chapter 11 of the Bankruptcy Code to provide breathing room to pursue a sale process and maximize the value of their estates, for the benefit of all estate beneficiaries.  In mid-2011, the Debtors began to experience substantial liquidity problems driven by a rapid decline in steel prices, while raw material prices remained at peak levels.  Generally, steel prices are positively correlated with the prices of the raw materials used in the production of steel (i.e., iron ore, scrap and coke); however, steel and raw material prices dislocated during the summer and fall of 2011, and the Debtors faced rising raw material costs even as steel prices declined.  In addition, the Debtors faced significant setbacks in connection with the re-commencement of work at their Sparrows Point, Maryland, facility, and discovered the previously undisclosed working capital shortfall and Severstal Claims after they took over operations of the Main Facilities.

28.     More recently, raw material prices have started to decline, however, steel prices have remained at depressed levels.  In early 2012, the Debtors sought and obtained new junior secured financing, in the form of the Junior Prepetition Credit Facility, to provide incremental liquidity as the Debtors' operating results begin to improve with the changing prices.  However, due to steel prices and sales volumes being significantly below forecasted levels, the

Junior Prepetition Credit Facility has proven insufficient to bridge the gap. Furthermore, due to

borrowing base restrictions and the availability block established under the Prepetition Credit

Agreement, the Debtors effectively have been unable to obtain meaningful advances under the

Prepetition Credit Facility.[6]

29.     In addition, the Company has begun to receive notices of default from

various vendors, including utility providers, and equipment suppliers. Furthermore, MSC and

SNA Carbon LLC (an affiliate of Severstal) have submitted an application for a temporary

restraining order, moved for a preliminary injunction, and filed an amended complaint in the

Circuit Court of Brooke County, West Virginia to prevent the shipment of coke from MSC to

RG Wheeling or any of its affiliates among other things (the "**West Virginia Litigation**"). Prior

to instituting the West Virginia Litigation, the plaintiffs asserted that RG Wheeling had defaulted

under that certain Coke Supply Agreement dated as of September 25, 2005 (the "**Coke Supply**

**Agreement**"), and allegedly terminated the agreement. RG Wheeling disputes whether the

plaintiffs properly terminated the Coke Supply Agreement under that certain Amended and

Restated Limited Liability Company Agreement of MSC dated as of September 29, 2005 (the

"**LLC Agreement**"), and, as such, also contests the restraining order and preliminary injunction

now sought in the West Virginia Litigation. On May 22, 2012 an order was entered in the West

Virginia Litigation which purports to restrict the shipment of coke to the Debtors.[7] On May 24,

2012, RG Wheeling filed a Motion to Dismiss the First Amended Complaint and Vacate, in part,

---

[6]     Prior to the Company obtaining new junior secured financing, on December 27, 2011, in order to preserve
the Senior Prepetition Lenders' rights under the Senior Prepetition Credit Agreement, WFCF served the
Company with a notice of default and demand for payment under the Prepetition Credit Agreement.

[7]     The Debtors reserve their right to argue that any enforcement of a judgment against property of the
Debtors' estates is a violation of the automatic stay imposed by section 362(a) of the Bankruptcy Code.

the May 22, 2012 Order (the "**Motion to Dismiss**"), alleging, in part, that MSC and SNA Carbon

LLC failed to comply with the alternative dispute provisions of the LLC Agreement and Coke

Supply Agreement. On May 25, 2012, MSC and SNA Carbon LLC filed their opposition to the

Motion to Dismiss. A status conference regarding the West Virginia Litigation has been

scheduled for May 31, 2012.

30.    RG Warren is also currently arbitrating claims and counterclaims by and

against Cliffs Sales Company, the Cleveland-Cliffs Iron Company, Cliffs Mining Company, and

the Northshore Mining Company (collectively, "**Cliffs**"), one of the Debtors' key suppliers of

iron ore. The claims arise in part out of an agreement between RG Warren and Cliffs concerning

the sale and purchase of iron ore pellets. On May 25, 2012, RG Warren filed a Notice Of

Substitution And Appearance And Request For Stay substituting Willkie Farr & Gallagher LLP

("**WF&G**") as counsel for Barnes & Thornburg LLP and requesting a stay of the arbitration and

all related deadlines to allow sufficient time for WF&G to appropriately review all of the

documents and filings in the matter. The same day, Cliffs filed an opposition requesting that all

deadlines remain in place.

31.    Over the past several weeks, the Company has survived on incremental

lending under the Prepetition Credit Agreement and the Junior Prepetition Credit Facility, almost

on a daily basis. In an effort to resolve the current liquidity crisis in a manner that preserves the

maximum value of the Debtors' estates for the benefit of all parties in interest, the Debtors have

actively engaged potential purchasers of various of the Debtors' assets. Though the sale process

is nascent, the interest expressed thus far has left no doubt that the Company's primary assets -

those assets that comprise the steelmaking operations - are most attractive to potential purchasers

as a going concern. As such, the Company and its advisors are optimistic that a restructuring

solution exists that would be best for all parties in interest, including the thousands of people currently employed by the Company.[8]

32.     Recognizing the substantial value for the estates that could be derived from a sale of all or certain of the Debtors' assets, the Senior Prepetition Lenders have agreed to provide incremental postpetition financing in an amount up to $50 million (the "**DIP Facility**") on the terms and conditions set forth in the Prepetition Secured Credit Agreement, as modified by that certain Ratification and Amendment Agreement, dated May 31, 2012 (the "**DIP Agreement**"), in order to provide liquidity to support the Debtors' pursuit of a sales process and the administration of these cases. The DIP Agreement requires that the Debtors retain a Chief Restructuring Officer ("**CRO**"), so the Debtors have filed, or intend to file an application to retain Donald MacKenzie of Conway MacKenzie, Inc. as the Debtors' CRO. The DIP Agreement also contains various sale process milestones and deadlines with which the Debtors must comply. These milestones require the Debtors to, among other things, consummate a sale of their assets no later than July 27, 2012. Thus, the Debtors' sale process must move forward on an expedited basis to ensure the Debtors have continued access to the financing they need to preserve the value of the Main Facilities and avoid a "fire sale" liquidation.

33.     To that end, although the Debtors have not yet received a "stalking horse" bid for the bulk of their assets, the Debtors have filed with their chapter 11 petitions a motion seeking this Court's approval of the sale(s) of all or certain of their assets free and clear of claims, liens, interests and encumbrances, as well as procedures for the submission of bids (and,

---

[8]     Nevertheless, with the path of the Debtors' reorganization efforts and these cases uncertain, and to comply with its obligations under the Worker Adjustment and Retraining Notification (WARN) Act and other applicable law, the Company recently sent notices of potential plant shutdowns to certain employees of Company.

if appropriate, the designation of a "stalking horse" bidder) in connection with such a sale or sales. The Company is confident that it will be able to negotiate the sale of certain or all of its assets, and use the proceeds of such a sale to finance the orderly liquidation of the Debtors' estates for the benefit of all creditors and parties in interest.

## II.    SUMMARY OF FIRST DAY MOTIONS[9]

34.    To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have filed, or will file upon scheduling of a further hearing by this Court, the motions described below.

35.    In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance, or the input and assistance of employees or advisors working under my supervision. I believe the information contained in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and assist in their reorganization efforts.

### A.    Motions Related to Case Management

#### *Joint Administration Motion*

36.    Concurrently herewith, the Debtors have filed a motion seeking the joint administration of their chapter 11 cases, eight in total, for procedural purposes only. I believe that it would be far more practical and expedient for the administration of these chapter 11 cases if the Court were to authorize their joint administration. Many of the motions, hearings, and

---

[9]    Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

other matters involved in these chapter 11 cases will affect all of the Debtors. Hence, joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications, and orders.

### *Motion to Extend Deadline to File Schedules and Statements*

37.    Concurrently herewith, the Debtors have filed a motion seeking a 60-day extension of time to file their Schedules of Assets and Liabilities (the "**Schedules**") and Statements of Financial Affairs ("**Statements**").

38.    Due to the complexity of the Debtors' businesses, the number of Debtor entities, and the breadth of their financial and contractual arrangements, the Debtors will be unable to complete their Schedules and Statements by the deadline set forth pursuant to the Bankruptcy Rules. Therefore, I believe that good cause exists for extending the deadline by which the Debtors must filed their Schedules and Statements. Granting this motion is in the best interests of the Debtors' estates as it will enable the Debtors and their professionals to concentrate their resources towards an efficient and timely reorganization process.

**B.    Applications and Motion Related to the Retention of Professionals**

39.    The Debtors intend to file applications to retain the following professionals, among others:

### *Application to Employ and Retain Willkie Farr & Gallagher LLP*

40.    Concurrently herewith, the Debtors have filed an application to retain WF&G as bankruptcy co-counsel with regard to the filing and administration of these chapter 11 cases. On or about December 9, 2011, WF&G was retained by the Debtors to represent them in connection with general restructuring matters, including the preparation and commencement of these cases. The Debtors desire to employ WF&G to continue to provide such restructuring advice as is necessary and requested by the Debtors, including, without limitation, bankruptcy,

debt restructuring and related corporate and litigation services, in each case, relating to the Debtors' reorganization.

41.     I understand that WF&G's attorneys have extensive experience and knowledge in the fields of debtors' and creditors' rights, debt restructuring and corporate reorganizations, tax, employee benefits and commercial litigation, among others. In addition, WF&G has become familiar with the Debtors' operations and businesses as a result of the services it provided to the Debtors prior to the commencement of these cases. Accordingly, I believe that WF&G is well-qualified to represent the Debtors in these chapter 11 cases.

### *Application to Employ and Retain Morris, Nichols, Arsht & Tunnell LLP*

42.     The Debtors intend to file and serve an application to retain Morris, Nichols, Arsht & Tunnell LLP ("**MNAT**") as bankruptcy co-counsel with regard to the filing and administration of these chapter 11 cases. On or about May 21, 2012, the Debtors retained MNAT to represent them in connection with general restructuring matters, including the preparation and commencement of these cases. The Debtors desire to employ MNAT to continue to provide such restructuring advice as is necessary and requested by the Debtors, including, without limitation, bankruptcy, debt restructuring and related corporate and litigation services, in each case, relating to the Debtors' reorganization.

43.     I understand that MNAT's attorneys have extensive experience and knowledge in the fields of debtors' and creditors' rights, debt restructuring and corporate reorganizations, and commercial litigation, among others. In addition, MNAT has become familiar with the Debtors' operations and businesses as a result of the services it provided to the Debtors prior to the commencement of these cases. Accordingly, I believe that MNAT is well-qualified to represent the Debtors in these chapter 11 cases.

*Application to Employ and Retain Conway MacKenzie, Inc.*

44.     The Debtors intend to file and serve an application to employ and retain Mr. Donald MacKenzie as CRO for the Debtors and certain other professionals of Conway MacKenzie, Inc. ("**Conway**") as temporary personnel.  On or about October 25, 2011, the Debtors retained Conway to provide advice in connection with the Company's refinancing and restructuring initiatives.  I understand that Conway has extensive experience in the fields of restructuring and providing financial and operational guidance to companies in distressed situations and has provided financial advisory services to many debtors, creditors and other constituents in chapter 11 cases.  I believe that Donald MacKenzie is well-qualified to serve as CRO, and Conway is well-qualified to serve as restructuring advisors to the Debtors by virtue of this experience and the knowledge of the Debtors, their operations and their capital structure that Conway acquired through its prepetition representation of the Debtors.

*Application to Employ and Retain Kurtzman Carson Consultants LLC*

45.     Concurrently herewith, the Debtors have filed a motion for orders (i) appointing Kurtzman Carson Consultants LLC ("**KCC**") as this Court's claims and noticing agent for the Debtors' chapter 11 cases pursuant to sections 156(c) and 105(a) of the Bankruptcy Code, Rule 2002(f) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and (ii) authorizing the debtors to employ and retain KCC to provide administrative services to the Debtors pursuant to sections 327(a), 328 and 1107(b) of the Bankruptcy Code, and Bankruptcy Rule 2014.  I believe that the appointment and retention of KCC is critical because of the large number of creditors identified in these cases.

46.    I understand that KCC is a data processing firm with extensive experience in noticing, claims processing, balloting and other administrative tasks in chapter 11 cases. Given the need for the services described above and KCC's expertise in providing such services, I believe that retaining KCC will expedite service of notices, streamline the claims administration and balloting processes, and permit the Debtors to focus on their reorganization efforts.

### *Motion to Authorize the Employment of Ordinary Course Professionals*

47.    In the ordinary course of their businesses prior to the Petition Date, the Debtors retained certain professionals to provide, among other services, legal and accounting advice and services (the "**OCP Professionals**"). The Debtors intend to seek authority to retain and, up to certain limits, pay their OCP Professionals without the submission of separate retention applications and the issuance of separate orders approving the retention of each such individual professional.

48.    I believe that the retention of these OCP Professionals is vital to the Debtors' businesses and is in the best interest of the Debtors' creditors and parties in interest.

**C.    Motions Related to Financing of Operations**

### *Motion to Authorize Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Forms*

49.    In the ordinary course of their business prior to the Petition Date, and as is typical with business organizations of similar size and scope, the Debtors maintained a centralized cash management system for each of its Main Facilities to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions accurately (the "**Cash Management System**").

50.    It is my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts which must be designated debtor in possession bank accounts and obtain, establish and maintain separate debtor in possession accounts, and utilize new checks for all debtor in possession accounts, which bear the designation "Debtor in Possession" and contain certain other information related to the chapter 11 case. The Debtors intend to request a waiver of the requirement that the Debtors open new bank accounts.

51.    I believe that the Debtors' existing cash management and intercompany accounting procedures are essential to the orderly operation of the Debtors' businesses. The cost and expense of changing bank accounts and related business forms and creating a new Cash Management System would not only cause the Debtors to incur significant and unnecessary costs and expenses, but could weaken the Debtors' operations at a time when the Debtors and their Management should be focused primarily on operational stability. A new Cash Management System could also cause confusion, diminish the prospects for a successful outcome in these cases, disrupt payroll, introduce inefficiency when efficiency is most essential, and strain the Debtors' relationships with critical third parties. Thus, by the motion, the Debtors seek authorization to continue the management of their cash receipts and disbursements in the manner in which they were handled immediately prior to the Petition Date.

52.    In addition, I understand that there are deposit, investment and reporting requirements under section 345(b) of the Bankruptcy Code. The Debtors have requested a forty-five day waiver of such requirements, while they discuss with the U.S. Trustee potential arrangements to adequately protect estate funds.

53.    I believe that allowing the Debtors to maintain their Cash Management System and continue to use their customary Business Forms would be in the best interests of the Debtors' estates and creditors.

### *Motion Authorizing Debtors to Obtain Postpetition Financing*

(i)    *Debtor-in-Possession Financing and Use of Cash Collateral*

54.    Concurrently herewith, the Debtors have filed a motion (the "**DIP Motion**") seeking authority to obtain postpetition loans, advances and other financial accommodations pursuant to the DIP Credit Agreement and use cash constituting Prepetition Collateral ("**Cash Collateral**"), as well as to grant senior liens and superpriority administrative expense claims, to provide "adequate protection" to prepetition secured lenders, all as more fully described in the DIP Motion. The DIP Motion also requests that a final hearing be scheduled with respect to the relief requested. Pursuant to the terms of the DIP Credit Agreement, the Senior Prepetition Obligations will be "rolled up" into the DIP Facility, and the Debtors' postpetition cash receipts will first be applied to pay down the Senior Prepetition Obligations, and then the Debtors' obligations under the DIP Facility. During these cases, the Debtors intend to support their operations pending the sale or orderly liquidation of their assets through the use of Cash Collateral and borrowings under the DIP Facility, which provides incremental postpetition borrowing capacity of up to $50 million in supplemental loans and the removal of approximately $21 million of reserves previously imposed on the Debtors prior to the Petition Date. The proposed DIP Facility and use of Cash Collateral are the Debtors' only available liquidity to fund operating and working capital expenditure needs during the course of these chapter 11 cases.

(ii)    *Adequate Protection*

55.    In consideration of the Prepetition Secured Parties' consent to the Debtors' use of the Prepetition Collateral, including Cash Collateral, the Debtors have agreed to provide certain adequate protection to the Prepetition Secured Parties.  To that end, the Debtors and the DIP Lenders have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain protections of the Prepetition Secured Parties' interests in the Prepetition Collateral from diminution in value, including from the use of the Cash Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  Such protections include granting of replacement liens and superpriority claims to the Prepetition Secured Parties, as well as the Debtors' current payment of interest, fees and other amounts (including costs and expenses of the Senior Prepetition Agents and Senior Prepetition Lenders) owing under the Senior Prepetition Credit Facility.

(iii)    *Alternatives to the DIP Credit Facility*

56.    It is my understanding and belief that the postpetition financing proposal submitted by the DIP Lenders is the best available under these circumstances and that entry into the DIP Credit Agreement is in the best interests of the Debtors and their estates.  In the weeks leading up to the Debtors' negotiation of the DIP Facility, the Debtors contacted potential financing sources in an effort to obtain financing on a junior lien basis and on otherwise more favorable terms than those provided in the DIP Credit Agreement.  The Debtors' efforts were ultimately unsuccessful.  Nevertheless, the Debtors have also attempted to identify other sources of postpetition financing to determine whether they could obtain debtor in possession financing on better terms (if at all).  Significantly, the Senior Prepetition Agents and Senior Prepetition Lenders advised the Debtors that they would not consent to the granting of senior or pari passu

liens to a new third party debtor in possession lender. Moreover, the Debtors have no significant

unencumbered assets that could serve as collateral for alternative financing. For these and other

reasons, the Debtors and their advisors determined that it would not be a prudent, economical or

productive exercise to extensively solicit interest from third party financing sources to provide

debtor in possession financing on a junior or unsecured basis.

57.     Based on their efforts and the Debtors' circumstances, the Debtors

determined that postpetition financing on an unsecured basis or on a junior priority basis to the

Senior Prepetition Lenders would be unobtainable. Nevertheless, it was clear to the Debtors and

their advisors that entry into the DIP Facility was the most feasible alternative available to avoid

significant deterioration of the value of the Debtors' assets postpetition, and the likely attendant

immediate and irreparable harm to the Debtors' estate. Accordingly, the Debtors have obtained

postpetition financing from the Senior Prepetition Lenders on the terms described herein in order

to prevent significant impairment to the value of the Debtors' assets, and under the

circumstances to maximize recoveries to the Debtors' creditors. Additionally, the Debtors

believe that the terms of the DIP Credit Agreement are fair and reasonable, and will provide the

Debtors with adequate liquidity to bridge to a sale or orderly liquidation of their assets.

**D.     Motion Related to Employee Matters**

> *Motion for Authorization to Pay Certain Prepetition*
> *Claims of Employees and Continue Employee Benefit Programs*

58.     Concurrently herewith, the Debtors have filed a motion seeking authority

to, among other things, satisfy their prepetition obligations to their current employees (the

"**Employees**"), reimburse Employees for prepetition expenses that were incurred on behalf of the

Debtors and pay prepetition withholdings and payroll-related taxes associated with the

Company's employee wage claims and the employee benefit obligations, and other similar tax

obligations, and to continue and employee benefit programs in place as of the Petition Date (including satisfying any prepetition obligations associated with such programs). This relief is critical to the Debtors' businesses and efforts to achieve the best result possible in these cases for the Debtors' creditors and other parties in interest.

59.     It is essential that the Employees work with the same or greater degree of commitment and diligence as they did prior to the Petition Date in order for the Debtors to preserve the value of their steelmaking assets. The requested authority to continue to pay the Employees' prepetition salaries and wages and to maintain the current employee benefits programs is critical to ensure that: (a) the Debtors can retain personnel knowledgeable about the Debtors' businesses; (b) the Debtors' Employees continue to provide quality services to the Debtors at a time when they are needed most; (c) the Debtors remain competitive with comparable employers; and (d) the value of the Debtors' assets are maximized during a sales process.

60.     If this motion were not granted, I believe that it would result in a significant deterioration in morale among Employees at this critical time, which undoubtedly would have a devastating impact on the Debtors, their customers, and the value of estate assets. The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the importance of the Employees to the maximization of the value of the Debtors' assets. I believe authorizing the Debtors to pay these obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, the creditors, and all parties in interest, and will enable the Debtors to implement these cases' value maximizing strategy in an economic and efficient manner.

E.     **Certain Other Motions**

> *Motion to Authorize Payment of Prepetition*
> *Claims of Certain Critical Vendors and Priority Vendors*

61.     In order to continue operating their businesses, the Debtors must rely on certain suppliers (the "**Critical Vendors**") that provide the Debtors with certain specialized goods and services that are critical to the Debtors' operations.  Absent these Critical Vendors, the Debtors may be unable to continue their operations without materially inflated costs or substantial interruptions.  Unless their prepetition claims are satisfied, I believe the Critical Vendors will refuse to supply the Debtors postpetition.  Furthermore, replacing the Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible.  Accordingly, the Debtors seek authorization to pay the Critical Vendors in the ordinary course of business.

62.     In addition, certain of the Critical Vendors have provided the Debtors within twenty (20) days prior to the Petition Date with materials, supplies, goods, products and related items that are essential to sustained operations of the Debtors.  The Debtors believe that by altering the timing of payments that such Critical Vendors are already entitled to receive as a matter of statute, such payments can induce such Critical Vendors to adhere to favorable trade terms and do business with the Debtors on a going-forward basis.

63.     For the reasons stated above, and explained more fully in the motion, I believe that the relief sought therein is necessary for a successful reorganization and is in the best interests of the Debtors and their estates.

> *Motion for Authorization to Pay Prepetition Common Carrier, Warehouse*
> *Provider, Steel Processor, Customs Service Provider and Related Obligations*

64.     In connection with the day-to-day operation of their business, the Debtors' supply and delivery system depends upon the use of numerous freight carriers operated by third

parties (collectively, the "**Common Carriers**") to transport materials and goods throughout their manufacturing process. The Debtors rely on such Common Carriers to ensure that their supply-chain runs smoothly. As a result, the Common Carriers regularly have possession of certain of the Debtors' materials or products in the ordinary course of their businesses. As of the Petition Date, the Common Carriers held approximately $5.1 million worth of the Debtors' materials and products, and such Common Carriers were owed an approximate aggregate amount of $8.7 million on account of shipping and transportation services provided prior to the Petition Date (collectively, the "**Carrier Claims**"). In addition the Debtors utilize warehouse providers and steel processors (the "**Warehouses and Processors**") to both store goods and inventory and to finalize the Debtors product according to the specifications of the Debtors' customers. As of the Petition Date, the Warehouses and Processors held approximately $41.1 million worth of the Debtors' materials and products, and such Warehouses and Processors were owed an approximate aggregate amount of $2.9 million on account of storage and processing services provided prior to the Petition Date (collectively, the "**Warehouse and Processor Claims**").

65.    I believe it is essential for the Debtors' continuing business viability and the success of their restructuring efforts that they maintain the reliable and efficient flow of materials and goods through their manufacturing and distribution systems. The Debtors' manufacturing capabilities are dependant upon their Common Carriers, and Warehouses and Processors, as is their ability to distribute products to their customers. Even a minor delay could undermine the Debtors' ability to meet internal production schedules or fulfill their customers' supply needs. Such disruptions also would likely cause the Debtors' relationships with their customers to be severely, and possibly irreparably, impaired.

66.    As of the Petition Date, the Debtors estimate that the aggregate Carrier

Claims and Warehouse and Processor Claims do not exceed $12 million.  I believe that if these

claims are not paid, it is likely that holders of such claims will cease providing services, and, in

any event, may be entitled to assert possessory liens under applicable state law with respect to

the goods and materials in their possession.  Therefore, I believe it is in the best interests of these

estates that the Debtors be permitted to pay any such prepetition amounts owing to the Common

Carriers, Warehouses and Processors, and Customs Service Providers.

*Motion to Authorize Debtors to Continue*
*Insurance Policies and Agreements Relating Thereto*

67.    In connection with the operation of their businesses, the Debtors maintain

various insurance programs, including those providing coverage for liability related to property

damage, automobile use and directors and officers through different insurance carriers.  If these

insurance policies are allowed to lapse, the Debtors would be exposed to substantial liability for

any damages or loss resulting to persons and/or property of the Debtors and others.  In addition,

absent certain types of coverage the Debtors would not be able to continue to conduct business.

Moreover, maintenance of the directors' and officers' liability policy is necessary to retain the

Debtors' senior management who are critical to the success of the Debtors' business and

reorganization.  Accordingly, I believe that the relief requested in the Debtors' motion is

necessary to avoid immediate and irreparable harm to the Debtors and their estates.

*Motion for Authority to Pay Certain*
*Prepetition Sales and Use Tax Obligations*

68.    Concurrently herewith, the Debtors have filed a motion seeking an order:

(a) authorizing, but not directing, the Debtors to pay sales and use taxes (the "**Taxes**") to various

federal, state and local taxing authorities (collectively, the "**Taxing Authorities**"); and

(b) authorizing all banks and other financial institutions on which such checks or other fund

transfers to the Taxing Authorities are drawn to receive, process, honor and pay any and all such checks or other transfers, whether issued or presented prior to or after the Petition Date.

69.     Payment of the Taxes is necessary for the Debtors to remain in good standing and operate in the various jurisdictions in which they do business.  Furthermore, the Taxes may be considered "trust fund taxes" that are collected or withheld by the Debtors and then held in trust for the benefit of those third parties to whom payment is owed or on behalf of whom such payment is being made, and therefore such Taxes are not property of the Debtors' estates.  Accordingly, I believe that payment of any unpaid Taxes would be consistent with the Debtors' duty to maximize the value of their estates.

## CONCLUSION

In furtherance of their reorganization efforts, the Debtors respectfully request that orders granting the relief requested in the First Day Motions be entered.

Dated: Baltimore, Maryland
    _MAY_    _30_, 2012

              WP Steel Venture LLC, et al.,
              Debtors and Debtors in Possession


              Richard D. Caruso