# EXHIBIT A

SUCCESSFUL BIDDER

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

CJ BETTERS ENTERPRISES, INC. and BDM WARREN STEEL HOLDINGS, LLC

as Purchaser,

and

RG STEEL WARREN, LLC

as Seller

Dated as of August 7, 2012

## TABLE OF CONTENTS

Page

### ARTICLE I.

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

| | | |
|---|---|---|
| 1.1. | Purchase and Sale of Assets | 1 |
| 1.2. | Excluded Assets | 2 |
| 1.3. | Assumption of Liabilities | 4 |
| 1.4. | Excluded Liabilities | 4 |
| 1.5. | Purchaser Acknowledgment | 5 |
| 1.6. | "As Is" Transaction | 5 |

### ARTICLE II.

### CONSIDERATION; DEPOSIT; ADJUSTMENTS TO PURCHASE PRICE

| | | |
|---|---|---|
| 2.1. | Consideration | 5 |
| 2.2. | Deposit | 5 |
| 2.3. | No Withholding | 6 |

### ARTICLE III.

### CLOSING AND TERMINATION

| | | |
|---|---|---|
| 3.1. | Closing | 6 |
| 3.2. | Closing Deliveries by Seller | 6 |
| 3.3. | Closing Deliveries by Purchaser | 6 |
| 3.4. | Termination of Agreement | 7 |
| 3.5. | Procedure Upon Termination | 8 |
| 3.6. | Effect of Termination | 8 |

### ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF SELLER

| | | |
|---|---|---|
| 4.1. | Corporate Organization | 9 |
| 4.2. | Intentionally Omitted | 10 |
| 4.3. | Authority Relative to This Agreement | 10 |
| 4.4. | Absence of Certain Developments | 11 |
| 4.5. | Litigation | 11 |
| 4.6. | Intentionally Omitted | 12 |
| 4.7. | Intentionally Omitted | 12 |
| 4.8. | Permits | 12 |
| 4.9. | Brokers and Finders | 12 |
| 4.10. | Title to Assets; Condition of Assets | 12 |
| 4.11. | Intentionally Omitted | 12 |
| 4.12. | Real Property | 12 |
| 4.13. | Compliance with Law | 13 |

4.14.   Insurance Policies .............................................................................................................13
4.15.   Environmental Matters........................................................................................................13
4.16.   No Other Representations or Warranties ............................................................................13

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1.   Corporate Organization.......................................................................................................14
5.2.   Authority Relative to This Agreement.................................................................................14
5.3.   Consents and Approvals; No Violation ...............................................................................14
5.4.   Brokers and Finders ............................................................................................................15
5.5.   Sufficiency of Funds ...........................................................................................................15
5.6.   Investigation........................................................................................................................15

## ARTICLE VI.

## BANKRUPTCY COURT MATTERS

6.1.   Certain Motions and Orders................................................................................................15

## ARTICLE VII.

## COVENANTS AND AGREEMENTS

7.1.   Operation of the Purchased Assets .....................................................................................16
7.2.   Pre-Closing Access to Information......................................................................................17
7.3.   Assignability of Certain Contracts, Etc .............................................................................17
7.4.   Further Agreements .............................................................................................................18
7.5.   Consent and Approvals .......................................................................................................18
7.6.   Preservation of Records; Post-Closing Access to Information...........................................18
7.7.   Publicity ..............................................................................................................................20
7.8.   Notification of Certain Matters...........................................................................................20
7.9.   Mineral Interests .................................................................................................................20
7.10.   Insurance Policies ...............................................................................................................21
7.11.   Inventory Maintenance .......................................................................................................21
7.12.   Production at the Facility ....................................................................................................21
7.13.   Further Assurances..............................................................................................................21
7.14.   Pre-Closing Security ...........................................................................................................22
7.15.   Certain Contractual Rights..................................................................................................22
7.16.   Letter of Credit....................................................................................................................22

## ARTICLE VIII.

## CONDITIONS TO CLOSING

8.1.   Conditions Precedent to the Obligations of Purchaser and Seller .....................................23
8.2.   Conditions Precedent to the Obligations of Seller..............................................................23
8.3.   Conditions Precedent to the Obligations of Purchaser .......................................................24

# ARTICLE IX.

## DEFINITIONS

9.1.   Certain Definitions ................................................................................................24
9.2.   Additional Defined Terms ......................................................................................30

# ARTICLE X.

## TAXES

10.1.  Additional Tax Matters ...........................................................................................31

# ARTICLE XI.

## MISCELLANEOUS

11.1.   Payment of Expenses ..............................................................................................31
11.2.   Survival of Representations and Warranties; Survival of Post-Closing Covenants ..........32
11.3.   Entire Agreement; Amendments and Waivers ...............................................................32
11.4.   Counterparts ............................................................................................................32
11.5.   Governing Law ........................................................................................................32
11.6.   Jurisdiction, Waiver of Jury Trial .............................................................................32
11.7.   Notices ...................................................................................................................33
11.8.   Binding Effect; Assignment.....................................................................................34
11.9.   Severability ............................................................................................................34
11.10.  Injunctive Relief.....................................................................................................34
11.11.  Time of the Essence ................................................................................................35
11.12.  Third Party Beneficiaries ........................................................................................35
11.13.  Certain Interpretations ...........................................................................................35

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of August 7, 2012 (the "Execution Date"), by and between RG Steel Warren, LLC, a Delaware limited liability company ("Seller"), and CJ Betters Enterprises, Inc., a Pennsylvania corporation ("Purchaser 1") and BDM Warren Steel Holdings, LLC, an Ohio limited liability company ("Purchaser 2", and together with Purchaser 1, "Purchaser"). Article 9 contains definitions of certain capitalized terms used herein and also provides cross-references to certain capitalized terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, Seller operates the Facility and owns certain assets related thereto and Purchaser desires to purchase certain assets used in the operation of the Facility and assumes certain liabilities related thereto;

WHEREAS, Seller is a debtor and debtor-in-possession in that certain bankruptcy case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), filed on May 31, 2012 (the "Filing Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 12-11661(KJC) and Case No. 12-11666(KJC) (such bankruptcy cases, the "Chapter 11 Case"); and

WHEREAS, Purchaser desires to purchase and assume from Seller, and Seller desires to sell, transfer and assign to Purchaser, the Purchased Assets and the Assumed Liabilities associated with the Facility approved to be sold to Purchaser under the Bid Procedures Order approved by order of the Bankruptcy Court, dated June 21, 2012, (Docket #354), in accordance with this Agreement and in accordance with and subject to the Sale Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Seller hereby agree as follows:

## ARTICLE I.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1.    Purchase and Sale of Assets. Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, on the Closing Date, all of Seller's right, title and interest in, to and under, free and clear of all Encumbrances (other than Permitted Encumbrances), the following assets, properties, rights and interests of any nature, tangible or intangible, real or personal, now existing or hereafter acquired on or prior to the Closing Date, as the same shall exist on the Closing Date, but in all cases excluding the Excluded Assets (collectively, the "Purchased Assets"):

(a)     all Equipment and all other tangible personal property located at the Facility as of the date hereof, except as otherwise contemplated by this Agreement (including Section 7.11), and all personal property identified on Schedule B of Sellers' Schedule of Assets and Liabilities (Docket #720) filed in the Chapter 11 Cases located on the Owned Real Property as of the date hereof, except as otherwise contemplated by this Agreement (including Section 7.11);

(b)     all Documents in respect of the Purchased Assets and the Assumed Liabilities; provided, however, that Seller may retain copies of any such Documents that also relate to the Excluded Assets or claims or causes of actions in connection with the Purchased Assets;

(c)     all real property, including Mineral Interests, that is owned by Seller (including all buildings, structures and improvements thereon and appurtenances thereto) set forth on Schedule A of Seller's Schedule of Assets and Liabilities (Docket # 0720) filed in the Chapter 11 Case, together with any and all other real property owned by Seller or its Affiliates situated in Trumbull County, Ohio (the "Owned Real Property");

(d)     solely to the extent transferable under applicable Law, all Permits and all pending applications therefor and all rights and incidents of interest therein, including, without limitation, the Material Permits solely or primarily used, or held in use, in connection with the Purchased Assets (the "Assumed Permits");

(e)     rights under lessees', vendors' and manufacturers' warranties, indemnities and guaranties, relating solely to the Purchased Assets or the Assumed Liabilities; and

(f)     (i) in the event the Letter of Credit (the "LOC") of Citi Group Bank in favor of the Ohio Environmental Protection Agency ("Ohio EPA") has not been drawn prior to Closing, all right, title and interest in any deposits (but only to the extent of the face value of the Letter of Credit) securing the LOC or any funds from such deposits (but only to the extent of the face value of the Letter of Credit) that have been remitted to Seller upon cancellation or expiration of the LOC, and (ii) in the event the LOC is drawn prior to Closing, all right, title and interest in any escrow or trust account established to secure closure and post-closure on the landfill located on the Owned Real Property; including any trust account established by the Ohio Environmental Protection Agency.

1.2.     Excluded Assets. Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall Seller be deemed to sell, transfer, assign or convey, and Seller shall retain all of its right, title and interest to, in and under all of its assets, properties, rights and interests other than the Purchased Assets (collectively, the "Excluded Assets"), including the following:

(a)     All Contracts of Seller;

(b)     all Documents (whether copies or originals) (i) to the extent they relate to any of the Excluded Assets or the Excluded Liabilities, or (ii) that Seller is required by Law to retain or is prohibited by Law from providing a copy thereof to Purchaser;

(c)     all shares of capital stock or other equity interests of Seller, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests;

(d)     any of Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of Seller's rights, claims, demands, proceedings, causes of action or rights of set off thereunder, other than any of the foregoing maintained or held by Seller that provide coverage for directors and/or officers of any Person with which Seller engaged in an acquisition transaction (whether by merger, consolidation or acquisition of stock or assets);

(e)     any avoidance claims or causes of action under the Bankruptcy Code or applicable state Law, including, without limitation, all rights and avoidance claims of Seller arising under Chapter 5 of the Bankruptcy Code; any claims or causes of action against directors and officers of Seller and its Affiliates or against Severstal US Holdings, LLC or its Affiliates;

(f)     all claims that Seller may have against any Person;

(g)     Seller's rights under this Agreement and the Ancillary Agreements;

(h)     all Documents (whether copies or originals) relating to formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws and other documents relating to the organization and existence of Seller as a corporation or other legal entity, as applicable (together with analogous documentation);

(i)     all deposits and all prepaid charges, Taxes and expenses of Seller solely related to any Excluded Asset or Excluded Liability, including, without limitation, (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments, in each case of clauses (i) through (v), solely related to any Excluded Asset or Excluded Liability;

(j)     all right, title and interest in or to the assets of any trust or fund maintained with respect to any "employee benefit plan" within the meaning of Section 3(3) of ERISA or any other employee compensation and benefit plans, policies, programs, arrangement or payroll practices, in each case that is sponsored, maintained, contributed or required to be contributed to by Seller or its Affiliates;

(k)     cash and cash equivalents (including checking accounts, bank accounts, certificates of deposit and other securities of Seller), account receivables, other receivables and any cash collateral that is collateralizing any letter of credit issued pursuant to the DIP Credit Agreement (other than the LOC) and other receivables;

(l)     all rights, claims, actions, refunds causes of action, suits or proceedings, including rights of refunds and rights of recovery, set off, recoupment, indemnity and

3

contribution and other similar rights (known or unknown, matured and unmatured, accrued or contingent, regardless of whether such claims are currently exercisable) of Seller, except those rights transferred to Purchaser under 1.1(f);

(m)    all refunds or credits of Taxes due to Seller or its Affiliates by reason of Seller's ownership of the Purchased Assets prior to Closing; and

(n)    all Excluded IT Assets;

(o)    all Inventory; and

(p)    the Purchase Price (other than the Assumed Liabilities).

1.3.    Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume and discharge when due all Liabilities related to or arising out of the Purchased Assets arising after the Closing (collectively, but in all cases excluding the Excluded Liabilities, the "Assumed Liabilities") including, without limitation, all Liabilities arising out of the operations or ownership of the Purchased Assets by Purchaser or its Affiliates after the Closing.

1.4.    Excluded Liabilities.  Except for the Assumed Liabilities set forth in Section 1.3 (which shall, in no event, be Excluded Liabilities), Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of Seller of any nature whatsoever, whether accrued or unaccrued (collectively, the "Excluded Liabilities"), including, without limitation, the following Liabilities, all of which shall remain Liabilities of Seller:

(a)    all Liabilities of Seller relating solely to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)    all Liabilities relating to (i) the DIP Credit Agreement and (ii) any Indebtedness of Seller, including (A) that certain credit agreement dated March 31, 2011 with the lenders thereto, Wells Fargo Capital Finance, LLC as administrative agent and General Electric Capital Corporation, as syndication agent and co-collateral agent, UBS Securities LLC and Bank of America, N.A., as Co-Documentation Agents, Wells Fargo Capital Finance, LLC, GE Capital Markets, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and UBS Securities LLC as Joint Lead Arrangers and Joint Bookrunners, and Ableco Finance LLC as agent for the "Revolving Loan B" lenders, (B) that certain credit agreement dated January 17, 2012 with the lenders thereto and Cerberus Business Finance, LLC, as agent and (C) the subordinated promissory notes entered into with the Renco Group on July 15, 2011 and December 19, 2011.

(c)    all Liabilities of Seller to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities of Seller, including all Liabilities of Seller related to the right to or issuance of any capital stock or other equity securities;

(d)    any Liabilities, obligations and duties of Seller and Seller's Affiliates, whether or not related to the Division, that arise or arose out of any "employee benefit plan" within the meaning of Section 3(3) of ERISA or any other employee compensation and benefit plans, policies, programs, arrangement or payroll practices, in each case that is sponsored,

maintained, contributed or required to be contributed to by Seller or its Affiliates (each being, a "Benefit Arrangement"); and

(e)     all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Case or otherwise.

1.5.     Purchaser Acknowledgment.     Purchaser acknowledges that Seller and  its Affiliates are in the process of selling all or substantially all of their assets in a series of transactions and that certain assets used, or held for use, by Seller in connection with the business or operation of the Facility may relate more directly to other businesses and operations of other facilities of Seller and its Affiliates and may therefore be sold in such other transactions

1.6.     "As Is" Transaction.     PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 4 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.  ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE II.

## CONSIDERATION; DEPOSIT; ADJUSTMENTS TO PURCHASE PRICE

2.1.     Consideration.     The aggregate purchase price for the purchase of the Purchased Assets and the assumption of the Assumed Liabilities is $16,000,000 (the "Purchase Price"). The Purchase Price shall be paid on the Closing Date in accordance with Section 3.3(a). Notwithstanding anything to the contrary herein, each of Purchaser 1 and Purchaser 2, shall be jointly and severally liable for all obligations under this Agreement, including the payment of the Purchase Price.

2.2.     Deposit.

(a)     On or prior to the Execution Date, Purchaser and Seller have entered into an escrow agreement (as amended, supplemented or otherwise modified from time to time, the "Escrow Agreement") with a mutually agreed escrow agent (the "Escrow Agent"). Concurrently with the execution and delivery of the Escrow Agreement by Seller, Purchaser and the Escrow Agent, Purchaser deposited $320,000 (the "Deposit") with the Escrow Agent by wire transfer of immediately available funds. The Escrow Agent shall hold the Deposit in a segregated, interest-bearing account (the "Escrow Account") pursuant to the Escrow Agreement. All interest or other earnings on amounts held in the Escrow Account pursuant to the Escrow Agreement shall automatically become a part of the Deposit as such interest or earnings accrue.

(b)    If this Agreement is validly terminated prior to the Closing, the Deposit in the Escrow Account shall be released and distributed to Purchaser or Seller in accordance with Section 3.6(b), Section 3.6(c) and/or Section 3.6(d), as applicable.

2.3.    No Withholding. Any amounts payable pursuant to this Agreement to Seller will be made free and clear of any withholding or other Tax.

## ARTICLE III.

### CLOSING AND TERMINATION

3.1.    Closing. Subject to the satisfaction of the conditions set forth in Section 8.1, Section 8.2 and Section 8.3, or the waiver thereof by the party entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Willkie Farr & Gallagher LLP at 787 Seventh Avenue, New York, New York 10019 (or at such other place as the parties may mutually designate in writing) on the date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in Section 8.1, Section 8.2 and Section 8.3 are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing). The date on which the Closing is held is referred to in this Agreement as the "Closing Date".

3.2.    Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed bill of sale, in customary form, with respect to conveyances by Seller of the Purchased Assets to Purchaser;

(b)    a duly executed assignment and assumption agreement, in customary form, with respect to the assignment by Seller and the assumption by Purchaser of the Assumed Liabilities by Purchaser;

(c)    one or more duly executed quitclaim deeds, in customary form, conveying the Owned Real Property to Purchaser, including, for the avoidance of doubt, all Mineral Interests;

(d)    a true and correct copy of the Sale Order and case docket reflecting that the Sale Order is in effect;

(e)    the officer's certificates required to be delivered pursuant to Sections 8.3(a) and 8.3(b);

(f)    all other previously undelivered Seller Ancillary Agreements required by this Agreement to be delivered by Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement; and

3.3.    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

6

(a) an amount equal to (i) the Purchase Price minus (ii) the Deposit, by wire transfer of immediately available funds to the account of Seller in accordance with written instructions delivered by Seller to Purchaser at least two (2) Business Days prior to the Closing Date;

(b) a duly executed assignment and assumption agreement, in customary form, with respect to the assignment by Seller and the assumption by Purchaser of the Assumed Liabilities by Purchaser;

(c) the officer's certificates required to be delivered pursuant to Sections 8.2(a) and 8.2(b); and

(d) all other previously undelivered Purchaser Ancillary Agreements required by this Agreement to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4. Termination of Agreement. This Agreement may be terminated as follows:

(a) by the mutual written consent of Seller and Purchaser at any time prior to the Closing;

(b) by Purchaser or Seller, if the Closing shall not have been consummated on or prior to thirty (30) days from entry of the Sale Order (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 3.4(b) shall not be available to Purchaser or Seller, as applicable, if Purchaser is or Seller is, as applicable, in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement;

(c) by Purchaser or Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d) by Purchaser, if, as a result of Seller's acts or failures to act, any Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Seller is appointed in any Chapter 11 Case;

(e) by Purchaser, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on August 23, 2012 or (ii) following entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days, or (D) have been modified or amended in any manner adverse to Purchaser without the prior written consent of Purchaser;

7

(f)  by Seller, if all of the conditions set forth in Section 8.1, Section 8.2 and Section 8.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and Purchaser fails to deliver any portion of the Purchase Price (other than the Deposit) at the Closing;

(g)  by Purchaser, if all of the conditions set forth in Section 8.1, Section 8.2 and Section 8.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and Seller fails to consummate the transactions contemplated hereby at the Closing;

(h)  by Purchaser, (i) if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 8.3(a), Section 8.3(b) or Section 8.3(c) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to Seller by Purchaser; provided, that the right of Purchaser to terminate this Agreement under this Section 3.4(h) shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement; or

(i)  by Seller, (i) if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 8.2(a) or Section 8.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to the Purchaser by Seller; provided, that the right of Seller to terminate this Agreement under this Section 3.4(i) shall not be available if Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement; or

3.5.  Procedure Upon Termination. In the event of a termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 3.4, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) except as set forth in Section 3.6, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto. Any termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto.

3.6.  Effect of Termination.

(a)      In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Purchaser or Seller or any of their respective Affiliates, except as expressly set forth in this Agreement. The provisions of Section 3.4, Section 3.5, this Section 3.6 and Article 11 shall survive any termination of this Agreement and shall remain in full force and effect.

(b)      In the event this Agreement is terminated pursuant to Section 3.4 (other than pursuant to Section 3.4(b), 3.4(f) or 3.4(i)) then Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account.

(c)      If Seller terminates this Agreement pursuant to Section 3.4(b), 3.4(f) or 3.4(i), then Seller shall be entitled to the sum of (i) disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account and (ii) a payment from Purchaser of an amount in cash equal to $680,000.

(d)      In the event that this Agreement is terminated pursuant to Section 3.4 and Seller are or Purchaser is entitled to receive the Deposit, then Seller or Purchaser may deliver to the Escrow Agent, at any time following the effective date of any such termination, a letter instructing the Escrow Agent to pay to Seller or Purchaser, as applicable, the Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Agent shall be subject to the terms of the Escrow Agreement.

(e)      Notwithstanding anything to the contrary, Seller and Purchaser agree that in the event of termination of this Agreement the disbursements set forth in Section 3.6(c) shall be the extent of any of Seller's liquidated damages. Prior to termination of this Agreement, Seller and Purchaser shall be entitled to the rights and remedies described in Section 11.10.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the representations and warranties in this Article 4 to Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date). Each Section of the Seller Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article 4. Any event, item or matter disclosed in any Section or numbered part of the Seller Disclosure Schedule shall be deemed to be disclosed with respect to every other representation and warranty in this Article 4 to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such event, item or matter is applicable to such other representations or warranties.

4.1.     Corporate Organization. Seller is a limited liability company, duly organized, and validly existing under the Laws of the State of Delaware. Seller has all requisite power and

authority to own, lease and operate the Purchased Assets, subject to the provisions of the Bankruptcy Code.

4.2.    Intentionally Omitted.

4.3.    Authority Relative to This Agreement. Except for such authorization as is required from the Bankruptcy Court, Seller has all requisite limited liability company power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver Seller Ancillary Agreements to be executed by Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Seller Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Seller. This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Bid Procedures Order and Sale Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "Bankruptcy Exceptions").

        (a)     Except as set forth in Section 4.3(a) of the Seller Disclosure Schedule or as permitted by the Sale Order, none of the execution and delivery by Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will (i) conflict with, result in a violation of, or default (with or without notice or lapse of time, or both) under, cause additional fees or other payments to be due under, increase, change or modify rights, benefits or obligations under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of (A) any of the organizational documents of Seller; (B) subject to and assuming entry of the Sale Order, any Contract or Permit that is a Purchased Asset; or (C) subject to and assuming entry of the Sale Order, any applicable Law, other than, in the case of clauses (B) and (C), such conflicts, violations, defaults, fees, payments, increases, charges, modifications, terminations, cancellations, accelerations or losses that would not have, individually or in the aggregate, materially and adversely effect the value or the intended use of the Purchased Assets taken as a whole or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon any of the Purchased Assets.

        (b)     Except as set forth in Section 4.3(b) of the Seller Disclosure Schedule, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of Seller in connection with the execution and delivery of this Agreement or any of the Seller Ancillary Agreements, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the

transactions contemplated hereby or thereby, or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order and (ii) such other approvals, orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not, individually or in the aggregate, materially and adversely effect the Purchaser's ability to use the Purchased Assets for their intended purposes.

4.4.    Absence of Certain Developments.  Except (w) for actions taken in connection with the Chapter 11 Case, (x) as expressly required or permitted by this Agreement, (y) as disclosed in the consolidated financial statements of Seller for the period ended April 30, 2012 or (z) as set forth in Section 4.4 of the Seller Disclosure Schedule, since April 30, 2012 to the date hereof, Seller has not, in each case with respect to the operations of the Facility:

(a)    acquired any material assets, tangible or intangible, other than acquisitions of Equipment or Inventory in the Ordinary Course of Business;

(b)    sold, leased, transferred or assigned any material assets, tangible or intangible, other than (i) sales of Inventory in the Ordinary Course of Business, or (ii) the disposition of obsolete or immaterial assets;

(c)    imposed, suffered or created any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets, tangible or intangible, except for Encumbrances arising in the Ordinary Course of Business that do not, individually or in the aggregate, interfere in any material respect with the use or, operation of the Purchased Assets;

(d)    created, incurred, assumed or guaranteed any Indebtedness, other than Indebtedness under the DIP Credit Agreement;

(e)    made any distributions or dividends of the Purchased Assets in respect of outstanding securities of Seller;

(f)    canceled or terminated any insurance policy covering the Purchased Assets naming Seller as a beneficiary or a loss payable payee; or

(g)    entered into any Contract or made (in writing, orally or otherwise) any promise or commitment to do any of the foregoing.

4.5.    Litigation.  Except as set forth in Section 4.5 of the Seller Disclosure Schedule, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (except as filed as part of the Bankruptcy Case) related to the Purchased Assets (collectively, "Actions"), pending or, to the Knowledge of Seller, threatened which would reasonably be expected to or materially increase an Assumed Liability or which seeks to prevent or is reasonably likely to have the effect of preventing Seller from consummating the transactions contemplated by this Agreement.  Except as set forth in Section 4.5 of the Seller Disclosure Schedule, Seller is not subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other

11

Governmental Body that relates to the Purchased Assets or the Assumed Liabilities and for which Seller has continuing material obligations or Liabilities.

4.6.    Intentionally Omitted.

4.7.    Intentionally Omitted.

4.8.    Permits.

(a)    All of the material Permits that are required for the ownership or use of the Purchased Assets (collectively, the "Material Permits") are held by Seller in full force and effect.

(b)    Seller or its applicable Subsidiary is in compliance with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such failures to be in compliance or defaults that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to Seller's or Purchaser's ability to own or use the Purchased Assets.

4.9.    Brokers and Finders. Seller has not employed, and to the Knowledge of Seller, no other Person has made any arrangement by or on behalf of Seller with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would give rise to any valid claim against the Purchaser for any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.10.    Title to Assets; Condition of Assets.

(a)    At the Closing, Seller will have (and, subject to Section 7.3 and after giving effect thereto, shall convey to Purchaser at the Closing) good and marketable title or a valid leasehold interest in and to each of the Purchased Assets, free and clear of all Encumbrances (except Permitted Encumbrances).

(b)    All of the Purchased Assets are in good order and repair in all material respects for assets of comparable age and past use and are capable of being used for their intended purposes.

4.11.    Intentionally Omitted.

4.12.    Real Property.

(a)    Section 4.12(a) of the Seller Disclosure Schedule sets forth a complete and correct list of all Owned Real Property specifying the address or other information sufficient to identify all such Owned Real Property. Seller has good, marketable and insurable fee simple title to the Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances. Notwithstanding anything herein to the contrary, the term Owned Real Property

12

shall include all real property (including for Mineral Interests) owned by the Seller in Trumbull County, Ohio, regardless of whether a street address is identified.

(b)     Seller has not received any written notice of condemnation or eminent domain proceedings pending or threatened that affect any of the Owned Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to Seller's or Purchaser's ability to operate the Facility for its intended purpose.

4.13. Compliance with Law. Seller is in compliance in all material respects with all applicable Laws relating to the Purchased Assets. As of the Execution Date, Seller has not received any written notice of any alleged violation of any Law applicable to the Purchased Assets. Seller is not subject to, or in default in any respect with, any order of any Governmental Body applicable to the Purchased Assets or the transactions contemplated under this Agreement. Except as set forth in Section 4.13 of the Seller Disclosure Schedule, to the Knowledge of Seller, no investigations, inquiries or reviews by any Governmental Body with respect to the Purchased Assets have been commenced nor, are any contemplated that would impose any material Liability on the Purchased Assets.

4.14. Insurance Policies. Section 4.14 of the Seller Disclosure Schedule lists all insurance policies covering the Purchased Assets or the Assumed Liabilities (the "Insurance Policies"). All Insurance Policies (or substitute policies with substantially similar terms and underwritten by insurance carriers with substantially similar or higher ratings than the insurance carriers that underwrote the policy(ies) substituted for) are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid, and no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such policy. Except as set forth in Section 4.14 of the Seller Disclosure Schedule, there are no pending or, to the Knowledge of Seller, threatened claims under any Insurance Policy.

4.15. Environmental Matters. Except as set forth in Section 4.15 of the Seller Disclosure Schedule, to the Knowledge of Seller (a) Seller is in material compliance with all applicable Environmental Laws related to the Purchased Assets (b) there is no material investigation, suit, claim, judicial or administrative proceeding or other Action relating to or arising under Environmental Laws that is pending or, to the Knowledge of Seller, threatened the Purchased Assets, (c) Seller has not received any written notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws.

4.16. No Other Representations or Warranties. Except for the representations and warranties contained in this Article 4, neither Seller nor or any other Person on behalf of Seller makes any express or implied representation or warranty with respect to any of Seller or with respect to any other information provided to Purchaser in connection with the transactions contemplated hereby, including, without limitation, as to the probable success or profitability of the ownership, use or operation of the Purchased Assets, and the Purchased Assets following the Closing. Seller shall not be subject to any liability to Purchaser resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents,

13

projections, forecasts or other materials made available to Purchaser in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 4.16.

## ARTICLE V.

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser, jointly and severally, hereby makes the representations and warranties in this Article 5 to Seller as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1.    Corporate Organization.  Purchaser is a corporation or limited liability company, duly incorporated or organized (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation (as applicable).

5.2.    Authority Relative to This Agreement.  Purchaser has the requisite corporate or limited liability company (as applicable) power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each of the Purchaser Ancillary Agreements have been duly authorized by all necessary corporate or limited liability company (as applicable) action on behalf of Purchaser.  This Agreement has been, and at or prior to the Closing the Purchaser Ancillary Agreements shall be, duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and entry of the Sale Order) this Agreement constitutes, and of each of the Purchaser Ancillary Agreements when so executed and delivered shall constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

5.3.    Consents and Approvals; No Violation.

(a)    Except as set forth in Section 5.3(a) of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or the Purchaser Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof shall conflict with, result in a violation of, or default (with or without notice or lapse of time, or both) under, cause additional fees or other payments to be due under, increase, change or modify rights, benefits or obligations under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of (i) the certificate of formation or the limited liability company agreement (or similar organizational documents) of Purchaser, (ii) any Contract (including, without limitation, any Contracts related to financing) or Permit to which Purchaser is a party or by which Purchaser or its properties, assets or business are bound or subject, (iii) any order of any Governmental Body applicable to Purchaser or by which any of the properties, assets or business of Purchaser are bound, or (iv) any applicable Law, other than, in

14

the case of <u>clauses (ii)</u>, <u>(iii)</u>, and <u>(iv)</u>, such conflicts, violations, defaults, fees, payments, increases, changes, modifications, terminations, cancellations, accelerations or losses that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)     Except as set forth in <u>Section 5.3(b)</u> of the <u>Purchaser Disclosure Schedule</u>, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Ancillary Agreements, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to operate the Purchased Assets, except for such approvals, orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.4.     <u>Brokers and Finders</u>.  Purchaser has not employed, and to the knowledge of Purchaser, no other Person has made any arrangement by or on behalf of Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would give rise to any valid claim against Seller or its Affiliates for investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.5.     <u>Sufficiency of Funds</u>.  Purchaser has and shall have at the Closing funds that are sufficient to pay the Purchase Price and all related fees, expenses and obligations for which Purchaser shall be responsible hereunder.

5.6.     <u>Investigation</u>.  In entering into this Agreement, Purchaser has relied upon its own investigation and analysis as well as the representations and warranties made by Seller in <u>Article 4</u>, and Purchaser acknowledges that neither Seller nor any of their respective Affiliates makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Purchaser or any of its Affiliates, except as and only to the extent expressly set forth in <u>Article 4</u>.

## ARTICLE VI.

## BANKRUPTCY COURT MATTERS

6.1.     Certain Motions and Orders.

(a)     Seller shall use its commercially reasonable efforts to:  (i) obtain entry by the Bankruptcy Court of the Sale Order no later than August 23, 2012, and (ii) subject to the satisfaction of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Order.

(b)     The Sale Order, including any exhibits thereto and any notices or other materials in connection therewith, must be in form and substance reasonably satisfactory to Purchaser.

(c)     If the Bid Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement (all such orders, the "Bankruptcy Court Orders") shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any Bankruptcy Court Order), Seller shall diligently defend against any such appeal, petition or motion and shall use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion. Seller shall keep Purchaser reasonably informed and updated regarding the status of any such appeal, petition or motion.

(d)     Prior to the Closing, Seller shall, except where not practicable, exercise commercially reasonable efforts to provide draft copies of all responses, notices, statements, schedules, applications, reports and other papers Seller intends to file with the Bankruptcy Court in connection with the Sale Order or any other Bankruptcy Court Order to Purchaser within a reasonable period of time prior to the date Seller intends to file any of the foregoing and consult in advance in good faith with Purchaser regarding the form and substance of any such proposed filing with the Bankruptcy Court.

## ARTICLE VII.

## COVENANTS AND AGREEMENTS

7.1.    Operation of the Purchased Assets.

(a)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (2) as required by applicable Law, the Bankruptcy Court or the Bankruptcy Code, (3) as otherwise expressly contemplated by this Agreement or as set forth in Schedule 7.1(a) or (4) with the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), Seller shall use its reasonable best efforts to:

(i)     maintain and keep the tangible Purchased Assets in good repair, working order and condition (normal wear and tear excepted); and

(ii)    maintain in full force and effect the Insurance Policies.

(b)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) as a result of the commencement of the Chapter 11 Case, (2) for any limitations on operations imposed by, or actions required by, the Bankruptcy Court or the Bankruptcy Code, (3) as required by applicable Law, the Bankruptcy Court or the Bankruptcy Code, (4) as otherwise expressly contemplated by this Agreement or as set forth in Schedule 7.1(b), or (5) with the prior

written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), Seller shall not:

        (i)     sell, lease, transfer or assign any Purchased Assets;

        (ii)    impose, suffer or create any Encumbrances (other than Permitted Encumbrances) upon any of the Purchased Assets;

        (iii)   make any distributions or dividends of the Purchased Assets in respect of outstanding securities of Seller; and

        (iv)   enter into any Contract or commitment with respect to any of the foregoing.

7.2.    Pre-Closing Access to Information. Seller agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, Purchaser and the directors, officers, employees, counsel, professionals, advisors, accountants, agents, contractors and other representatives (the "Representatives") of Purchaser, shall be entitled to have, and Seller shall afford, such reasonable access to, and make such reasonable, non-invasive investigation and examination of the Purchased Assets and the Assumed Liabilities as Purchaser or any of Purchaser's Representatives may reasonably request. Any such investigations and examinations shall be conducted during regular business hours and upon reasonable advance notice to Seller.

7.3.    Assignability of Certain Contracts, Etc.

(a)    To the extent that the assignment to Purchaser of any Purchased Asset pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained prior to the Closing or overridden or canceled by the Sale Order or other related order of the Bankruptcy Court (such Purchased Assets, the "Nonassignable Assets"), then this Agreement shall not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with Law.

(b)    If any such consent, waiver, confirmation or other approval or such waiver is not obtained prior to the Closing Date in respect of a Nonassignable Asset, then, solely to the extent not prohibited under applicable Law (including, without limitation, the Bankruptcy Code) or the terms of such Nonassignable Asset, Purchaser and Seller shall reasonably cooperate with each other, as of and after the Closing Date, in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of such Nonassignable Asset (an "Interim Arrangement"). Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by Seller after the Closing Date to the extent that if such Nonassignable Asset were purchased by Purchaser as of the Closing Date, the obligations thereunder would have constituted Assumed Liabilities.

(c)    All Interim Arrangements shall be at Purchaser's sole cost and expense.

(d)    Unless Purchaser elects that it does not desire assignment of a Nonassignable Asset (which for avoidance of doubt shall not reduce Purchase Price), following the Closing, Seller and Purchaser shall cooperate using their respective commercially reasonable efforts (at Purchaser's sole cost and expense) to obtain as expeditiously as possible the applicable consent, waiver, confirmation or other approval with respect to each Nonassignable Asset and/or a waiver of any prohibition under applicable Law necessary for the assignment thereof to Purchaser.

7.4.    Further Agreements.    After the Closing, Seller shall (i) promptly deliver to Purchaser any mail or other communication received by Seller and relating to the Purchased Assets or the Assumed Liabilities, (ii) promptly transfer in immediately available funds to Purchaser any cash, electronic credits or deposits received by Seller but solely to the extent that such cash, electronic credits or deposits are Purchased Assets, and (iii) promptly forward to Purchaser any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Purchased Assets.    After the Closing, Purchaser shall (x) promptly deliver to Seller any mail or other communication received by Purchaser and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to Seller, any cash, electronic credits or deposits received by Purchaser but solely to the extent that such cash, electronic credits or deposits are Excluded Assets, and (z) promptly forward to Seller any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets. From and after the Closing Date, Seller shall refer all inquiries with respect to the Purchased Assets, the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.

7.5.    Consent and Approvals.    Prior to Closing, Purchaser shall, at Purchaser's sole cost and expense: (i) use its commercially reasonable efforts, as promptly as practicable, to obtain all approvals, authorizations, clearances, consents and waivers of, and to file all notices and other filings with, regulatory and other Governmental Bodies and all other Persons (including, without limitation, those set forth in Section 4.3(a) and 4.3(b) of the Seller Disclosure Schedule) that are necessary or required of Seller to consummate the transactions set forth herein; (ii) provide such other information and communications to regulatory and other Governmental Bodies and other Persons as Purchaser or such Governmental Bodies or other Persons may reasonably request; and (iii) provide reasonable cooperation to Purchaser in obtaining or making, as soon as practicable, all approvals, authorizations, clearances, consents, waivers, notices and filings of or with regulatory and other Governmental Bodies and all other Persons required of Purchaser to consummate the transactions set forth herein.

7.6.    Preservation of Records; Post-Closing Access to Information.

(a)    Seller and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Purchased Assets and the Assumed Liabilities until the later of the closing of the Chapter 11 Case and the liquidation and winding up of Seller's estates (but in no event later than three (3) years after the Closing Date except, in the case of Tax matters, until thirty (30) days following the expiration of the period of any applicable

statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of Seller or Purchaser or any of their respective Affiliates, administration of Seller's Chapter 11 Case, or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby. In the event Seller or Purchaser wishes to destroy such records at the end of such preservation period, such party shall first give sixty (60) days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estates shall permit.

(b) Until the closing of the Chapter 11 Case, Purchaser shall give Seller and Seller's Representatives reasonable access, during normal business hours, upon reasonable advance written notice (which notice shall specify the intended use or purpose of such access) and in a manner as would not be unreasonably disruptive to the business or operations of Purchaser or any of its subsidiaries, to Purchaser's offices, facilities, plants, properties, assets, employees and Documents that were included in the Purchased Assets pertaining to (A) the conduct of the Purchased Assets prior to the Closing Date or (B) the Excluded Assets and the Excluded Liabilities, to the extent necessary for, and solely in order for, Seller to effect the wind down of its Chapter 11 estates, including, without limitation, reconciling and objecting to claims in the Chapter 11 Case, pursuing preference actions or avoidance actions pursuant to Chapter 5 of the Bankruptcy Code, and compiling and filing tax returns. Subject to the terms of a mutually acceptable services agreement providing for the reimbursement to Purchaser for its reasonable costs and expenses and the payment to Purchaser of reasonable fees and expenses for services provided by Purchaser thereunder, Purchaser shall use commercially reasonable efforts to cause its Representatives to furnish to Seller such financial, technical, operating and other information pertaining to (i) the conduct of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and the Excluded Liabilities, in each case, as Seller's Representatives shall from time to time reasonably request in a written notice (which notice shall specify the intended use or purpose of any such information) and to discuss such information with such Representatives to the extent necessary for, and solely in order for, Seller to effect the wind down of its Chapter 11 estates. Notwithstanding the foregoing, Purchaser shall not be required to provide any such access, or cause its Representatives to furnish any such information, to the extent that doing so, in the reasonable judgment of Purchaser, would (I) constitute a waiver of the attorney-client privilege or (II) be detrimental to Purchaser or its assets, properties, condition or operations. Seller acknowledge and agree that any and all information received from or on behalf of, or made available by or on behalf of, Purchaser pursuant to this Section 7.6(b) shall be used solely as specified in any applicable written notice requesting such information. In addition, Seller agree that only those Representatives who require the receipt of information for the purposes allowed hereunder and who have been informed by Seller of the confidential nature of such information shall be provided access to such information.

(c) Purchaser and Seller shall enter into a Lease Agreement at Closing leasing to Seller the use of the space that is currently occupied by the Accounting and IT departments at the Facility, access to the IT Assets and the use of standard office equipment and existing

19

computer equipment as necessary to complete the Chapter 11 Case at the Facility ("Leased Premises"). Seller shall pay to Purchaser the sum of $10,000 per month for the lease of the Leased Premises plus utilities, insurance and common area maintenance expenses (snow removal, landscaping, cleaning services, and building maintenance) pro rated based upon the total number of employees of Seller occupying the Leased Premises divided by the total number of persons occupying the Leased Premises at the Facility. The term of the lease shall commence on the date of Closing and extend until December 31, 2012.

7.7.   Publicity.   Seller and Purchaser agree to communicate with each other and cooperate with each other prior to any public disclosure of this Agreement or the transactions contemplated hereby. Each of Seller and Purchaser agrees that it shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party, except as such release or announcement may be required by applicable Law or by the Bankruptcy Court (which shall include the filings to be made with the Bankruptcy Court in connection with this Agreement), in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance. Unless otherwise required by the Bankruptcy Court, this Agreement shall be filed with the Bankruptcy Court without Disclosure Schedules designated by Purchaser. For purposes of this Section 7.7, Seller may freely communicate with its employees regarding this Agreement and the sale of the Purchased Assets; provided, however, that prior to making any written communications to its employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, Seller shall provide Purchaser with a copy of the intended communication, Purchaser shall have a reasonable period of time to review and comment on the communication.

7.8.   Notification of Certain Matters.

(a)   Seller shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Seller, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing and (ii) any written objection or Action that challenges the transactions contemplated hereby or the entry of any Bankruptcy Court Order.

(b)   To the extent permitted by applicable Law, Seller shall give prompt notice to Purchaser of any event or circumstance that would result in any representation or warranty of Seller being untrue or any covenant or agreement of Seller not being performed or complied with such that the conditions set forth in Section 8.3(a) or Section 8.3(b) would not be satisfied if such event or circumstance existed on the Closing Date.

7.9.   Mineral Interests.   Purchaser hereby acknowledges that in any deed or other document of conveyance pursuant to this Agreement, Seller shall convey the the Mineral Interests.

20

7.10.   Insurance Policies. Purchaser hereby acknowledges that, as of and following the Closing, it shall be responsible for securing and maintaining insurance policies to cover the Purchased Assets.

7.11.   Inventory Maintenance. On or before August 17, Seller shall have removed all processed scrap (approximately 100 to 150 tons) that was included in Inventory from the Facility. All remaining Inventory except for Iron Ore and Coke/Coal shall be removed within thirty (30) days of the Closing. Purchaser shall store and hold Inventory for, and on behalf of, Seller, which Inventory shall be stored and held separate and apart from any inventory of Purchaser in substantially the same conditions, and at the same facility, as stored by Seller as of Closing and, if requested by Seller, identified as the exclusive property of Seller. In addition, Purchaser shall afford, or cause to be afforded to, Seller, Seller's representatives and any prospective purchasers of any such Inventory reasonable access to the Inventory (including to inspect and remove such Inventory) at no cost to Seller, Seller's representatives or any such prospective purchaser. Purchaser will permit Seller to store the Iron Ore for a period of ninety (90) days from the Closing at no cost. If Seller has not removed, the Iron Ore, Seller shall pay to Purchaser $10,000 per month for the each month or portion thereof that Iron Ore remains on the Owned Real Property for a maximum of three (3) months. Purchaser will permit Seller to store the Coke/Coal for a period of ninety (90) days from the Closing at no cost. If Seller has not removed, the Coke/Coal, Seller shall pay to Purchaser $10,000 per month for the each month or portion thereof that Coke/Coal remains on the Owned Real Property for a maximum of three (3) months. Seller agrees that it will use Purchaser's equipment and personnel to load the Iron Ore and Coke/Coal and shall pay to Purchaser the market rate for such services at the time the services are rendered.

7.12.   Production at the Facility. For a period of nine (9) months after the Closing Date, Purchaser covenants not to remove or sell (other than to an Operating Purchaser (as defined below)) any assets used as of May 15, 2012 (or the sixty (60) days preceding such date) in the steel production process up through and including the hot strip mill at the Facility (including, without limitation, material handling equipment, blast furnace, oxygen converter, ladle metallurgical furnace, vacuum degasser, casters, reheat furnace, and the hot strip mill) (collectively, the "Covered Assets") so that a subsequent purchaser of the Facility (or such assets) who intends to operate the Facility (or such assets) as a going concern (an "Operating Purchaser") may operate the assets. Purchaser shall have no obligation to maintain the assets during the 9 month period and may allow them to fall into disrepair. Purchaser further agrees to make good faith efforts during such period to facilitate a sale of such assets to a purchaser who will resume steel production operations at the Facility. Notwithstanding the foregoing, prior to the expiration of such nine (9) month period, Purchaser may with the prior, written consent of the official committee of unsecured creditors appointed in the Chapter 11 Case, which consent shall not be unreasonably withheld, remove, sell or otherwise dispose of the Covered Assets.

7.13.   Further Assurances.

(a)   Subject to the terms and conditions of this Agreement and applicable Law, Seller and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other party's obligations hereunder set forth in this

Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

(b)     Subject to the terms and conditions of this Agreement, neither Seller nor Purchaser shall take any action or refrain from taking any action the effect of which would be to materially delay or impede the ability of Seller or Purchaser to consummate the transactions contemplated by this Agreement unless taking such action or refraining from taking such action is required by applicable Law.

(c)     Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to Purchaser and its successors and assigns, all of the Purchased Assets, and for Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby. Nothing in this Section 7.13 shall obligate any party hereto to waive any right or condition under this Agreement.

(d)     The obligations of Seller pursuant to this Section 7.13 shall be subject to any orders, approvals or authorizations granted or required by the Bankruptcy Court or under the Bankruptcy Code (including in connection with the Chapter 11 Case), and Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court (including the Bid Procedures Order), and Seller's duty to the estate and their creditors including the duty to seek and obtain the highest or otherwise best price for the Purchased Assets in compliance with, and not in a manner inconsistent with, the Bid Procedures, as approved by the Bid Procedures Order.

7.14.   Pre-Closing Security. Purchaser shall be permitted to place security on site from the date of this Agreement until the earlier of (i) termination of this Agreement or (ii) Closing subject to Seller's reasonable approval of the security company. Such security shall be at no cost to Seller and shall be placed on site solely for the purpose of observing, and shall not disturb, the business or operations of the Facility.

7.15.   Certain Contractual Rights. Prior to Closing, the Purchaser shall deliver to Seller a list of Contracts of Seller solely related to the Purchased Assets which Purchaser believes contains provisions pursuant to which Seller may have claims pursuant to specific contribution or indemnity provisions related to environmental matters related to the Owned Real Property that may be assigned to Purchaser. Seller shall use reasonable best efforts to assign Seller's right to such contribution or indemnity related to environmental matters to Purchaser at Closing. Such assignment shall occur only to the extent permissible under Law and this Agreement (including Section 7.3 hereof) and shall not limit the Seller's right to reject any Contract pursuant to Section 365 of the Bankruptcy Code.

7.16.   Letter of Credit. Purchaser and Seller acknowledge that the LOC may be drawn by the Ohio Environmental Protection Agency at anytime.

22

## ARTICLE VIII.

## CONDITIONS TO CLOSING

8.1.   Conditions Precedent to the Obligations of Purchaser and Seller.   The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller and Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)   no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order or other Law promulgated, enacted, entered or enforced which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)   all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body, set forth on Schedule 8.1(b), shall have been filed, occurred or been obtained;

(c)   the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each such order shall be a Final Order; provided, however, if the Sale Order as entered contains a waiver of the requirements under the Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed; and

8.2.   Conditions Precedent to the Obligations of Seller.   The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller, in whole or in part, to the extent permitted by applicable Law):

(a)   each of (i) the representations and warranties of Purchaser in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (ii) the representations, warranties of Purchaser in this Agreement that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of clauses (i) and (ii), at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and Seller shall have received a certificate signed by an authorized person of Purchaser, dated the Closing Date, to the foregoing effect;

(b)   Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;  and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller (or at the direction of Seller) all of the items set forth in Section 3.3.

8.3.    Conditions Precedent to the Obligations of Purchaser.    The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)     each of (i) the representations and warranties of Seller set forth in Section 4.1, Section 4.9 and Section 4.10(a) shall be true and correct in all respects and (ii) the other representations and warranties of Seller in this Agreement shall be true and correct in all respects (without regard for any "materiality" or "material adverse effect" qualifiers set forth therein) except where the failure of such representations and warranties to be so true and correct would not, in the aggregate, have materially and adversely effect the value or the intended use of the Purchased Assets taken as a whole, in each case of clauses (i) and (ii), at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Seller on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect; and

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2.

## ARTICLE IX.

## DEFINITIONS

9.1.    Certain Definitions.  As used herein:

(a)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(b)     "Ancillary Agreements" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(c)     "Bid Procedures" has the meaning ascribed to such term in the Bid Procedures Order.

24

(d)     "Bid Procedures Order" means an order of the Bankruptcy Court that, among other things, approves the Bid Procedures.

(e)     "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(f)     "Code" means the Internal Revenue Code of 1986, as amended.

(g)     "Contract" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement primarily related to the Purchased Assets.

(h)     "DIP Credit Agreement" means that certain Ratification and Amendment Agreement, dated as of May 31, 2012, among Seller and certain Affiliates of Seller, Wells Fargo Capital Finance, LLC as administrative agent, Wells Fargo Capital Finance, LLC and General Electric Capital Corporation, as co-collateral agents, Ableco Finance, LLC, in its capacity as agent for the Revolving Loan B Lenders, and the lenders party thereto from time to time, as the same may be amended, supplemented or otherwise modified from time to time.

(i)     "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form primarily related to or primarily used, or held for use, in connection with the Purchased Assets.

(j)     "Encumbrance" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(k)     "Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or release of, or exposure to, Hazardous Materials, including, without limitation, the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), Safe Drinking Water Act (42 U.S.C. § 3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), Clean Air Act (42 U.S.C. § 7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.).

(l)     "Equipment" means all equipment, buildings, machinery, vehicles, storage tanks, furniture, fixtures and other tangible and intangible personal property of every kind and description and improvements and tooling owned by or primarily used, or held for use, in connection with the business or operation of the Facility by Seller, wherever located.

(m)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(n)     "Excluded IT Assets" means all IT Assets used or held for use in connection with the business of an Affiliate of Seller and set forth on Schedule 9.1 hereto.

(o)     "Facility" means the facility located at 999 Pine Avenue SE, Warren, Ohio 44483.

(p)     "Final Order" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (i) is in full force and effect and (ii) has not been stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

(q)     "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(r)     "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature or any self-regulatory agency, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private).

(s)     "Hazardous Materials" means asbestos and asbestos containing materials, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(t)     "Indebtedness" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services and goods acquired in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any other Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations;

26

and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances), on any property or asset of such Person (whether or not such obligation is assumed by such Person), in each case, only if related to the Purchased Assets.

(u)    "Intellectual Property" means all intellectual property of any kind primarily related to or primarily used, or held for use, in connection with the business or operation of the Purchased Assets, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including, without limitation, any registrations and applications for any of the foregoing); (iv) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, technical data, financial, marketing and business data), proprietary processes, formulae, algorithms, models, and methodologies (the "Trade Secrets"); (v) computer software, computer programs, and databases (whether in source code, object code or other form); and (vi) similar proprietary rights.

(v)    "Inventory" means all of Seller's inventories (including, without limitation, raw materials (i.e. zinc and other alloys used in production at the Facility), processed scrap, packaging materials, supplies used in the maintenance and operation of the Facility and Equipment, work in process, finished goods and fuel (but not including spare parts, replacement and component parts or scrap equipment) that are primarily used, or held for use, in connection with the Facility.

(w)    "IT Assets" means all of Seller's computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are located at the Facility.

(x)    "Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge of the principal executive officers of Seller.

(y)    "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law.

(z)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or

unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(aa)    "Mineral Interests" means all coal, oil, gas, and other minerals and mineral rights owned by Seller whether (i) acquired by Seller separate from the surface of any real property, (ii) previously severed from any real property once owned and transferred by Seller with a reservation, or (iii) or otherwise acquired, in each case, appurtenant to the Owned Real Property. Mineral Interests also includes all rights owned or retained by Seller in prior deeds for ingress and egress and for the purpose of drilling, exploring, mining, and in every way operating for coal, oil, gas, and other minerals subject only to the limits of applicable law.

(bb)    "Ordinary Course of Business" means the ordinary and usual course of normal day to day operation of the Facility subject to the DIP Credit Agreement.

(cc)    "Owned Intellectual Property" means all Intellectual Property owned by Seller, and primarily used, or held for use, in connection with the business or operation of the Purchased Assets.

(dd)    "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to Seller and primarily used, or held for use, in connection with the business or operation of the Facility or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(ee)    "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Case; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Facility and, in the case of the Owned Real Property, which do not, individually or in the aggregate, materially adversely affect the use or occupancy of such Owned Real Property as it relates to the operation of the Facility or materially detract from the value of the Owned Real Property, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv), Encumbrances reflected in title or other public records relating to, or that would be disclosed by an accurate survey of, the Owned Real Property, (v) such other Encumbrance, title exceptions or imperfections of title as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially adversely affect the value or the intended use of the Purchased Assets taken as a whole and (vi) any Liabilities created by this Agreement or any of the Ancillary Agreements.

(ff)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

28

(gg)    "Purchaser Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that Purchaser is required to execute and/or deliver in connection with this Agreement.

(hh)    "Purchaser Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by Purchaser.

(ii)    "Purchaser Parties" means, collectively, Purchaser and its Subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(jj)    "Sale Order" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to Purchaser, which shall, among other things, (i) authorize the sale of the Purchased Assets to Purchaser pursuant to this Agreement free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and all other transactions and agreements contemplated hereby or thereby.

(kk)    "Seller Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that Seller is required to execute and/or deliver in connection with this Agreement.

(ll)    "Seller Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by Seller.

(mm)    "Seller Intellectual Property" means any Intellectual Property that is owned by, licensed to, or primarily used, or held for use by, Seller relating to the Purchased Assets.

(nn)    "Subsidiary" means, with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person, are held by the Owner and/or one or more of its Subsidiaries.

(oo)    "Tax" and "Taxes" mean (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever; (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (i); and (iii) any Liability in respect of any items described in clauses (i) and/or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury

Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

        (pp) "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

    9.2.   Additional Defined Terms.  The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
| --- | --- |
| Actions | Section 4.5 |
| Agreement | Preamble |
| Allocation | Section 10.1(b) |
| Assumed Intellectual Property | Section 1.1(h) |
| Assumed Intellectual Property Contracts | Section 1.1(h) |
| Assumed Liabilities | Section 1.3 |
| Assumed Permits | Section 1.1(d) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Court Orders | Section 6.2(c) |
| Closing Date | Section 3.1 |
| Deposit | Section 2.2(a) |
| Escrow Account | Section 2.2(a) |
| Escrow Agent | Section 2.2(a) |
| Escrow Agreement | Section 2.2(a) |
| Excluded Assets | Section 1.2 |
| Excluded Liabilities | Section 1.4 |
| Execution Date | Preamble |
| Filing Date | Recitals |
| Insurance Policies | Section 4.14 |
| Interim Arrangement | Section 7.3(b) |
| Material Permits | Section 4.8(a) |
| LOC | Section 1.1(f) |
| Nonassignable Assets | Section 7.3(a) |
| Outside Date | Section 3.4(b) |
| Owned Real Property | Section 1.1(c) |
| Purchase Price | Section 2.1 |
| Purchased Assets | Section 1.1 |
| Purchaser | Preamble |
| Registered IP | Section 4.6(a) |
| Representatives | Section 7.2 |
| Seller | Preamble |
| Trade Secrets | Section 9.1 |
| Transfer Taxes | Section 10.1(a) |

## ARTICLE X.

### TAXES

10.1.   Additional Tax Matters.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall indemnify, defend (with counsel reasonably satisfactory to Seller), protect, and save and hold Seller harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes.

(b)    Purchaser shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to Seller for its consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax to be treated as Purchase Price) among Seller and the Purchased Assets (such schedule, the "Allocation"). If Seller raises any objection to the Allocation within twenty (20) days of the receipt thereof, Purchaser and Seller shall negotiate in good faith to resolve such objection(s). If Seller does not raise any objection to the Allocation within twenty (20) days of the receipt thereof, Seller shall be deemed to have conclusively accepted the Allocation. Purchaser and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Body or any other proceeding) without first giving the other party prior written notice; provided, however, that nothing contained herein shall prevent Purchaser or Seller from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither Purchaser or Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging such Allocation. Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price. If and to the extent the parties are unable to agree on the Allocation, the parties shall retain a mutually agreed upon accounting firm of national repute to resolve such dispute. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 10.1(b) shall survive the Closing without limitation.

## ARTICLE XI.

### MISCELLANEOUS

11.1.   Payment of Expenses.   Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall

bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; provided, however, that (a) all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne solely by Purchaser and (b) all filing fees (but not the costs and expenses of preparing any applicable filings) in connection with any required filings or submissions under any competition Law shall be borne by Purchaser.

11.2.    Survival of Representations and Warranties; Survival of Post-Closing Covenants. The parties hereto agree that the representations and warranties contained in this Agreement shall expire automatically and immediately upon the Closing Date. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

11.3.    Entire Agreement; Amendments and Waivers. This Agreement (including the Schedules hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective. No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.4.    Counterparts. For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.5.    Governing Law. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF TO THE EXTENT THAT THE LAW OF ANOTHER JURISDICTION WOULD APPLY AS A RESULT THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

11.6.    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE

PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED, HOWEVER,</u> THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.7.    <u>Notices</u>. Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile or e-mail transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to Seller:

> RG Steel Warren, LLC
> c/o RG Steel, LLC
> 1430 Sparrows Point Boulevard
> Sparrows Point, MD 21219
> Attention:    Richard D. Caruso
> Vice President and Chief Financial Officer
>
> Howard E. Japlon
> Vice President & General Counsel
> Facsimile No:    410-388-5288

with a copy (which shall not constitute effective notice) to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York 10019
> Attn:  Matthew A. Feldman, Esq.
> Attn:  Shaunna D. Jones, Esq.
> Attn:  Thomas Mark, Esq.
> Facsimile No.: 212-728-8111

If to Purchaser:

CJ Betters
c/o Robert O Lampl,
960 Penn Ave, Ste 1200
Pittsburgh PA 15222
Facsimile No.: 412-392-0335

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

11.8.  Binding Effect; Assignment.   This Agreement shall be binding upon Purchaser and, subject to entry of the Bid Procedures Order (with respect to the matters covered thereby) and the Sale Order, Seller, and inure to the benefit of the parties and its respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed, and any attempted assignment without the required consents shall be void.  Notwithstanding anything contained herein to the contrary, Purchaser shall have the right to assign this Agreement to a related entity or Affiliate of Purchaser; provided, that any such assignee of Purchaser shall provide proof that the assignee has the financial resources to pay the Purchase Price; provided further, however, in the event of any assignment by Purchaser of its rights pursuant to this Agreement (including pursuant to the foregoing proviso),  Purchaser shall not be relieved or excused from any of its obligations arising under this Agreement until immediately following Closing, after which time Purchaser shall be relieved of any further liabilities or obligations.

11.9.  Severability.   If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

11.10.  Injunctive Relief.  The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the parties, and, accordingly, each of Seller and Purchaser shall be entitled to injunctive relief with respect to any such breach, including, without limitation, specific performance of such covenants, promises or agreements or an order enjoining the other party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such party, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.  The rights set forth in this Section 11.10 shall be in addition to any other rights which Seller or Purchaser may have at Law or in equity pursuant to this Agreement.

34

11.11. _Time of the Essence_. Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

11.12. _Third Party Beneficiaries_. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns (including, for the avoidance of doubt, any chief restructuring officer or similar officer administering Seller's assets in their Chapter 11 Case), any legal or equitable rights hereunder.

11.13. _Certain Interpretations_. (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

    (i)    All references in this Agreement to Articles, Sections, clauses, parts and Schedules shall be deemed to refer to Articles, Sections, clauses, parts and Schedules to this Agreement unless otherwise specified.

    (ii)    All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

    (iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

    (iv)    The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

    (v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

    (vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER:**</u>

**RG STEEL WARREN, LLC**

By: _____
Name:
Title:

**PURCHASER:**

CJ BETTERS ENTERPRISES INC.

By: Charles J Betters
Title: President

**BDM WARREN STEEL HOLDINGS, LLC**

By: Charles J Betters
Title: Manager

**RG Steel**

**Warren**

**Schedules**

**Section 4.3(a)**

None.

**Section 4.3(b)**

None.

**Section 4.4**

(a) through (c) – None.

(d) Indebtedness relating to the loans evidenced and/or secured by that certain Credit Agreement, by and among RG Steel, LLC, RG Steel Sparrows Point, LLC, RG Steel Warren, LLC, RG Steel Wheeling, LLC as Borrowers, Cerberus Business Finance, LLC as Agent, and the various Lenders that are signatories thereto, dated as of January 17, 2012.

Indebtedness relating to the loans evidenced and/or secured by that certain Credit Agreement, by and among RG Steel, LLC, Severstal Sparrows Point, LLC, Severstal Warren, LLC, Severstal Wheeling, LLC as Borrowers, Wells Fargo Capital Finance, LLC as Administrative Agent and Co-Collateral Agent, General Electric Capital Corporation as Syndication Agent and Co-Collateral Agent, UBS Securities LLC and Bank of America, N.A. as Co-Documentation Agents, Wells Fargo Capital Finance, LLC, GE Capital Markets, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and UBS Securities, LLC as Joint Lead Arrangers and Joint Bookrunners, and the Lenders that are signatories thereto, dated as of March 31, 2011.

Indebtedness relating to the loans evidenced and/or secured by that certain Security Agreement, by and among RG Steel, LLC, RG Steel Sparrows Point, LLC, RG Steel Wheeling, LLC, RG Steel Wheeling Steel Group, LLC, RG Steel Railroad Holding, LLC, RG Steel Warren, LLC, WP Steel Venture LLC, Metal Centers, LLC, as grantors and The Renco Group, Inc. as the secured party, dated as of July 5, 2011, and that certain Security Agreement, by and among RG Steel Sparrows Point, LLC and RG Steel Wheeling, LLC as grantors and The Renco Group, Inc. as the secured party, dated as of December 19, 2011.

(e) through (g) – None.

**Section 4.5**

RG Steel Warren, LLC v. Cliffs Sales Company, LLC, Case No. 53 501 Y 00465 11 AAA Arbitration (Cleveland, OH).

U.S. EPA Region 5 Violation Notice (Notice of MACT Violations), penalty for MACT violations.

Tolling Agreement for Claims under the Clean Air Act relating to the RG Steel Warren Facility by and between the United States, and RG Steel Warren LLC, dated July 19, 2012.

Finding of Violation from U.S. EPA on July 27, 2012 relating to an alleged failure to comply with a September 30, 2011 Information Request directing the installation of a Particulate Matter Continuous Emission Monitoring System on the Seller's Basic Oxygen Furnace Electrostatic Precipitator Emission Stack.

**Section 4.12(a) – Real Estate**

999 Pine Avenue SE, Warren, OH 44483

**Section 4.13**

Section 4.15 is incorporated herein by reference.

## Section 4.14

Note: Please note, for the avoidance of doubt, that the insurance policies scheduled below will not be transferred pursuant to the Asset Purchase Agreement, and, accordingly Purchaser shall be responsible for obtaining insurance for the Purchased Assets as of the Closing.

Worker's Compensation
- Insurer – Chartis
- Expiration – 3/31/13
- Policy Number(s) - WC 033464543; WC 033464546; WC 033464544; WC 033464544

Excess Workers' Compensation
- Insurer - National Union Fire Insurance Company of Pittsburgh, Pa. (Chartis)
- Expiration – 3/31/13
- Policy Numbers(s) - WC 1192504

General Liability
- Insurer - Lexington Insurance Company (Chartis)
- Expiration – 3/31/13
- Policy Number(s) – 001322602

Automobile Liability
- Insurer - National Union Fire Insurance Company of Pittsburgh, Pa. (Chartis)
- Expiration – 3/31/13
- Policy Number(s) - CA 4982739; CA 4982740

Umbrella Liability
- Insurer - National Union Fire Insurance Company of Pittsburgh, Pa. (Chartis)
- Expiration – 3/31/13
- Policy Number(s) – 13273140

Excess Liability
- Insurer - XL Insurance America, Inc.
- Expiration – 3/31/13
- Policy Number(s) – US00027011LI12A

Property
- Insurer - Allied World Assurance Company
- Expiration – 3/31/13
- Policy Number(s) - P015994/001

Property
- Insurer - Aspen Specialty Insurance Company
- Expiration – 3/31/13
- Policy Number(s) - PRA8AHN12

<u>Property</u>
- Insurer - Axis Insurance Company
- Expiration – 3/31/13
- Policy Number(s) - MNG 759025-12

<u>Property</u>
- Insurer - HDI Gerling Insurance Company
- Expiration – 3/31/13
- Policy Number(s) – 01608461

<u>Property</u>
- Insurer - HDI Gerling Insurance Company
- Expiration – 3/31/13
- Policy Number(s) – 01608461

<u>Property</u>
- Insurer - Houston Casualty Company
- Expiration – 3/31/13
- Policy Number(s) - H12-TP10104-00

<u>Property</u>
- Insurer - International Insurance Company of Hannover Ltd. Marsh Ltd. (UK)
- Expiration – 3/31/13
- Policy Number(s) - PR 0124612000

<u>Property</u>
- Insurer - International Insurance Company of Hannover Ltd. Marsh Ltd. (UK)
- Expiration – 3/31/13
- Policy Number(s) - PR 0124512000

<u>Property</u>
- Insurer - Ironshore Insurance Ltd.
- Expiration – 3/31/13
- Policy Number(s) - 443160812A

<u>Property</u>
- Insurer - Lexington Insurance Company
- Expiration – 3/31/13
- Policy Number(s) – 25031958

<u>Property</u>
- Insurer - Lexington Insurance Company
- Expiration – 3/31/13
- Policy Number(s) – 25031958

Property
- Insurer - Liberty Surplus Insurance Corporation
- Expiration – 3/31/13
- Policy Number(s) - LIUESP00248861P

Property
- Insurer - Lloyds of London Marsh Ltd. (UK)
- Expiration – 3/31/13
- Policy Number(s) - DP875012

Property
- Insurer - Lloyds of London Marsh Ltd. (UK)
- Expiration – 3/31/13
- Policy Number(s) - DP907912

Property
- Insurer - Lloyds of London Marsh Ltd. (UK)
- Expiration – 3/31/13
- Policy Number(s) - DP907912

Property
- Insurer - Lloyds of London (Underwriting Risk Services - Validus)
- Expiration – 3/31/13
- Policy Number(s) - AJD121345B12

Property
- Insurer - Montpelier Reinsurance Ltd
- Expiration – 3/31/13
- Policy Number(s) - B12FA72110-10

Property
- Insurer - Northbridge Indemnity Insurance Corp
- Expiration – 3/31/13
- Policy Number(s) - US 9639

Property
- Insurer - Partner Re Ireland Insurance Ltd
- Expiration – 3/31/13
- Policy Number(s) - F500814

Property
- Insurer - Scottsdale Insurance Company
- Expiration – 3/31/13
- Policy Number(s) - RBS 0003769

Property
- Insurer - Steadfast Insurance Company
- Expiration – 3/31/13
- Policy Number(s) - XPP-6549944-00

Property
- Insurer - Swiss Re International SE Marsh Ltd. (UK)
- Expiration – 3/31/13
- Policy Number(s) - MH 86836

Primary D&O Runoff
- Insurer – ACE
- Expiration – 3/31/17
- Policy Number(s) - DON G2563794A 001

First Excess D&O Runoff
- Insurer – Chubb
- Expiration – 3/31/17
- Policy Number(s) - 8223-5718

Second Excess D&O Runoff
- Insurer – Chartis
- Expiration – 3/31/17
- Policy Number(s) - 01-686-03-45

Fiduciary Liability
- Insurer - Westchester Fire Insurance Co. Inc.
- Expiration – 3/31/13
- Policy Number(s) - G25039300 002

D&O Go-forward
- Insurer - Westchester Fire Insurance Co. Inc.
- Expiration – 3/31/13
- Policy Number(s) - G25039300 002

EPL Go-forward
- Insurer – Axis
- Expiration – 3/31/13
- Policy Number(s) - MNN759549012012

Cargo
- Insurer - XL Specialty Insurance Company (Leader) 50%; AXA Insurance Company 50%
- Expiration - Continuous until cancelled

- Policy Number(s) - UM00021233MA12AMAR001595 (12)

Charters Liability
- Insurer - National Union Fire Insurance Company of Pittsburgh, PA
- Expiration - 2/1/2013
- Policy Number(s) – TBA

**Section 4.15**

1. The Seller is subject to ongoing obligations pursuant to a consent decree with US EPA and the Department of Justice regarding migratory bird issues, entered into as of February 5, 2007.

2. The Seller is a defendant in a lawsuit brought by the State of Ohio against Re-Gen Inc. and RG Steel, LLC regarding an idled acid regeneration facility at the Warren facility. The Seller may have liability for RCRA closure in the event Re-Gen is unable to perform its obligations.

3. In September, 2009, the Seller received a Finding of Violation ("FOV") letter from the U.S. EPA alleging violation of opacity limits at the basic oxygen process furnace ("BOPF") electrostatic precipitator ("ESP") and the BOPF roof monitor. Both allegations of excess opacity involved standards established by the U.S. EPA in its Maximum Available Control Technologies ("MACT") regulations. In October, 2009, a meeting was held with the U.S. EPA and information was provided to the U.S. EPA to demonstrate that, except for one instance, there had not been any violations of the MACT standard at the ESP. The U.S. EPA indicated the intent to request additional information from the Company. The Seller has executed a tolling agreement with US EPA regarding this matter.

4. Since 2008, U.S. EPA has issued four information requests to the facility seeking the collection, compilation and submittal of data regarding particulate emissions from the BOF ESP stack (February 17, 2008, May 8, 2009, December 20, 2010 and May 31, 2011). Additionally, U.S. EPA has issued three NOVs to this facility with respect to emissions from the BOF ESP stack. The September 9, 2009, NOV primarily alleges violations of the 10 percent hourly opacity particulate matter emission limitation contained in the Iron and Steel Maximum Achievable Control Technology regulations (I&S MACT). The June 16, 2011, NOV alleges violation of the State of Ohio's 20 percent opacity 6-minute block average particulate matter emission limit. The December 16, 2011 NOV/FOV alleges violations of the State of Ohio's 20 percent opacity 6-minute block average particulate matter emission limit. RG Steel Warren has requested a Section 113 conference with the U.S. EPA to discuss the allegations contained in the December 16, 2011 NOV/FOV.

5. RG Steel Warren maintains a licensed on-site landfill for the disposal of "residual waste" generated by the facility in accordance with Ohio regulations, including a newly constructed seven-phase landfill and an older grandfathered landfill. A pre-existing portion of the licensed residual waste landfill (the grandfathered landfill) is subject to a Director's Final Findings and Orders ("DFFO") issued on June 12, 2002. The DFFO represents a settlement of the Ohio EPA's allegations that the landfill height exceeded allowed vertical and horizontal limitations. Under the DFFO, RG Steel Warren is required to remove the excess waste material from this older section of the landfill – recycling some and disposing of the rest in the new constructed sections of the licensed landfill – over a period of 23 years (by January 1, 2025). RG Steel Warren conducts aerial fly-overs each year to measure the height and to demonstrate compliance with the

required removal schedule and is currently ahead of schedule. The Seller received several information requests and notices of violation from the Trumbull County Health Depatment and Ohio EPA in 2010 and 2011. The Seller was recently fined in the amount of $24,000 for a compliance issue relating to the grade of the landfill's slope. The Seller also anticipates material costs associated with construction of the remaining phases of the landfill, and both closure and post-closure costs for the final closure of the landfill, and maintains a financial assurance in the form of a Letter of Credit for the landfill's closure and post-closure care. The Seller is required under applicable regulations to increase the existing financial assurance of $5.5 million for landfill closure costs by an additional amount of approximately $836,000 to a total of $6.34 million. This increase is overdue as of July 31, 2012. Accordingly, Ohio EPA could take enforcement action, including issuing a violation, revoking or suspending the license for the landfill, and/or initiating closure proceedings for the landfill.

6. RG Steel Warren holds a Hazardous Waste Installation and Operation Permit associated with the storage of hazardous waste (spent pickle liquor) at the on-site Acid Regeneration Plant. This Part B Permit was issued on November 11, 1993, with an initial ten-year term and includes the obligation to perform corrective action activities. RG Steel Warren has not owned or operated the storage unit or the Acid Regeneration Plant since 1999 and no longer needs an operating permit. Nevertheless, the Part B Permit was renewed in 2003 with the concurrence of U.S. EPA Region V in light of the ongoing corrective action activities. The Part B Permit will continue in force until either a new permit is issued (which is not expected to occur) or the corrective action obligations are complete. The Part B Permit contains no deadlines for completion of the RCRA Facility Investigation, Corrective Measures Study, or final remediation (if necessary). The revised Supplemental RFI Report with the agreed upon changes were submitted to the EPA March of 2009. This report identified the Acid Regeneration facility and associated area as the only Solid Waste Management Unit which requires further investigation and corrective action. EPA has yet to respond to this submittal and a Corrective Measures Study has not yet been planned. Final corrective measures, if any, would then be implemented thereafter.

7. In May 2010 a CERCLA Section 104 information request was received from U.S. EPA seeking information related to contamination at the S&R Recycling Superfund Site in Kensington, Ohio. The information requests seeks information about any materials that may have been sent for disposal or treatment at the S&R Site. On June 10, 2010 the Company responded and indicated that no information has been located in the company's files regarding any such activity.

8. The Seller also potentially has continuing obligations under past consent decrees that may be re-opened but are not currently active.

9. The Seller received a Finding of Violation from U.S. EPA on July 27, 2012 relating to an alleged failure to comply with a September 30, 2011 Information Request directing the installation of a Particulate Matter Continuous Emission Monitoring System on the Seller's Basic Oxygen Furnace Electrostatic Precipitator Emission Stack.

**Section 7.1(a)**

None.

**Section 7.1(b)**

None.

**Section 8.1(b)**

None.

**Schedule 9.1**

Excluded IT Assets

| Type | Name of Application | Language | .Net Content | .Net Technology | Operating System |
|------|---------------------|----------|--------------|-----------------|------------------|
| Application | Consolidated Employees | SSIS 2008, GNU PGP | SSIS, VB.Net | SQL 2008 R2 | Database - Windows 2003 Enterprise |
| Application | Corporate Phone Directory | ASP.net, VB.net | .net Framework 2 | .net Framework 2 | Web - Windows 2003 Standard<br>Database - Windows 2003 Enterprise |
| Application | Injury Tracking | ASP.Net, SSRS 2008 | .Net Framework 4, SSRS 2008 | .Net Framework 4, SSRS 2008 | Web - Windows 2003 Standard<br>Database - Windows 2008 Enterprise |
| Application | Contacts and Observations | ASP.Net, SSRS 2008 | .Net Framework 4, SSRS 2008 | .Net Framework 4, SSRS 2008 | Web - Windows 2003 Standard<br>Database - Windows 2008 Enterprise |
| Application | Customer Contacts | ASP Maker | .net Framework 2 | .net Framework 2 | Web - Windows 2003 Standard<br>Database - Windows 2003 Enterprise |
| Application | Forecasting System | ASP.net, VB.net | .net Framework 2 | AJAX, SQL Reporting Services (2005), SQL Analysis Services, SQL Integration Services | Web - Windows 2003 Standard<br>Database - Windows 2003 Enterprise |

| Type | Name of Application | Language | Environment | Technology | Operating System |
|---|---|---|---|---|---|
| Application | Reports - All (SSRS) | SSRS | SSRS | SSRS | Database - Windows 2008 Enterprise, 64 bit, and Windows 2003 Standard, 32 bit; Web - Windows 2003 Standard |
| Application | Salary Time and Attendance | ASP.net, VB.net | .net Framework 2 | | Web - Windows 2003 Standard; Database - Windows 2003 Enterprise |
| Application | Sales Itinerary | ASP.net, VB.net | .net Framework 2 | Windows Service Running on each client | Web - Windows 2003 Standard; Database - Windows 2003 Enterprise |
| Application | Sparrows Point Safety System | ASP.net, VB.net | .net Framework 2 | ASPOSE.net, AJAX, SQL Server Reporting Services (2005), | Windows 2003 Standard |
| SharePoint Site | A3 | | | | |
| SharePoint Site | Document Management Site (Site with workflows but no documents) | | | | |
| SharePoint Site | Environmental Corrective Actions | SharePoint Services 2007 (MOSS) | | SQL Server 2005; SharePoint | Sharepoint Windows 2003 Standard, Database - Windows 2003 Enterprise |
| Application | DRO | SQL Server 2008R2 SSRS, SSIS | SQL Server 2008R2 SSRS, SSIS | SQL Server 2008R2 SSRS, SSIS | Web - Windows 2003 Standard; Database - Windows 2008 Enterprise |

| Types | Name of Application | Specifications | Development Environment | Technology | Operating System |
|---|---|---|---|---|---|
| Application | SCR 2 (Sales Consolidated Reporting 2) | ASP.net, VB.net | .net Framework 3.5 | AJAX, SQL Reporting Services (2008), SQL Analysis Services, SQL Integration Services | Database - Windows 2008 Enterprise, 64 bit, Web - Windows 2003 Standard |
| Application | SCR Maintenance Utility | ASP.net Maker Version 8 | .net Framework 2 | SQL Server 2005 | Web - Windows 2003 Standard Database - Windows 2003 Enterprise |
| SharePoint Site | Sales Consolidation Reporting | SharePoint Services 2007 (MOSS) | .net Framework 2 | SQL Server 2005; SharePoint | Sharepoint Windows 2003 Standard, Database - Windows 2003 Enterprise |
| SharePoint Site | Sales Portal | SharePoint Services 2007 (MOSS) | .net Framework 2 | SQL Server 2005; SharePoint | Sharepoint Windows 2003 Standard, Database - Windows 2003 Enterprise |
| 3rd Party | Ceridian | NA | NA | NA | NA |

19