## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WP STEEL VENTURE LLC, *et al.,* [1] | Case No. 12-11661 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 2582, 2798, 2813, 2814, 2815, 2816, and 2822** |

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF ITS MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 1103(c) AND 1109(b) FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number (if applicable) are as follows: (i) WP Steel Venture LLC (7095); (ii) Metal Centers LLC; (iii) RG Steel, LLC (1806); (iv) RG Steel Railroad Holding, LLC (4154); (v) RG Steel Sparrows Point, LLC (3633); (vi) RG Steel Warren, LLC (0253); (vii) RG Steel Wheeling, LLC (3273); and (viii) RG Steel Wheeling Steel Group, LLC (9927).

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................2

ARGUMENT.................................................................................................................5

I.      UNDER CYBERGENICS THE COMMITTEE MAY BE GRANTED
STANDING TO BRING CLAIMS ON BEHALF OF DEBTORS THAT ARE
DELAWARE LLCS..............................................................................................5

II.     THE CLAIMS MEET THE COLORABILITY TEST ...............................11

       A.     The Proposed Claims Are Not Barred by the Exculpatory Provisions in
the LLC Agreements....................................................................................11

       B.     The Objectors Raise Factual Issues That Are Not Properly Addressed on a
Standing Motion...........................................................................................17

       C.     Count I Sufficiently Alleges Harm to the Debtors.................................21

       D.     The Complaint Adequately Alleges That Mr. Goodwin Was Motivated by
Self-Interest..................................................................................................23

       E.     Count II Is Not Barred by Preclusion Principles ..................................26

       F.     Count IV of the Complaint States a Colorable Claim for Aiding and
Abetting.........................................................................................................32

III.    THE CLAIMS WILL BENEFIT THE DEBTORS' ESTATES...................33

IV.    THE COMMITTEE SHOULD NOT BE REQUIRED TO BRING THE
CLAIMS IN BANKRUPTCY COURT ........................................................36

V.     THE COST OF LITIGATING THE CLAIMS WILL NOT BE BORNE BY
SECURED CREDITORS...................................................................................37

VI.    CONCLUSION ...................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.),
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) .................................................................10, 17, 18, 19

Alberts v. Tuft (In re Greater S.E. Cmty. Hosp. Corp. I),
    353 B.R. 324 (Bankr. D.C. 2006) .........................................................................................22

Am. Specialty Cars Holdings, LLC v. Official Comm. of Unsecured Creditors of ASC
Inc. (In re ASC Inc.),
    386 B.R. 187 (E.D. Mich. 2008).........................................................................................9, 10

Babcock v. Official Comm. of Admin. Claimants,
    No. 06-1081, 2007 WL 950336 (N.D. Ohio March 27, 2007) ...............................................10

Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortg. Corp.),
    514 F.2d 400 (2d Cir. 1975)..................................................................................................15

Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,
    No. 3658-VCS, 2009 WL 1124451 (Del. Ch. April 20, 2009).........................................14, 15

Benihana of Tokyo, Inc. v. Benihana, Inc.,
    891 A.2d 150 (Del. Ch. 2005), aff'd, 906 A.2d 114 (Del. 2006) ...........................................24

Bliss Techs., Inc. v. HMI Indus. In re Bliss Techs., Inc.),
    307 B.R. 598 (Bankr. E.D. Mich. 2004)..................................................................................9

Burtch ex rel Estate of Opus East L.L.C. v. Opus East L.L.C. (In re Opus East, L.L.C.),
    480 B.R. 561 (Bankr. D. Del. 2012) ......................................................................................12

Butner v. United States,
    440 U.S. 48 (1979)................................................................................................................8, 9

Caplin v. Marine Midland Grace Trust Co.,
    406 U.S. 416 (1972)..................................................................................................................7

Cirka v. Nat'l Union Fire Ins. Co.,
    No. Civ.A. 20250-NC, 2004 WL 1813283 (Del. Ch. Aug. 6, 2004).........................................7

Citicorp Acceptance Co. v. Robinson (In re Sweetwater),
    884 F.2d 1323 (10th Cir. 1989) ..............................................................................................36

CML V, LLC v. Bax,
    28 A.3d 1037 (Del. 2011) (en banc) ...............................................................................3, 5, 11

E. Pilots Merger Comm. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.),
    279 F.3d 226 (3d Cir. 2002)......................................................................................32

Fedders N. Am., Inc. v. Goldman Sachs Credit Partners (In re Fedders N. Am., Inc.),
    405 B.R. 527 (Bankr. D. Del. 2009) ...........................................................................11

Feeley v. NHAOCG, LLC,
    62 A.3d 649 (Del. Ch. 2012)...................................................................13, 14, 15, 16

Fox v. Congress Fin. Corp. (In re Target Indus., Inc.),
    328 B.R. 99 (Bankr. D.N.J. 2005) ..............................................................................28

G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.),
    313 B.R. 612 (Bankr. D.N.J. 2004) ......................................................................17, 19

Gatz Props., LLC v. Auriga Capital Corp.,
    59 A.3d 1206, 1218 (Del. 2012) .................................................................................16

Goodwin v. Live Entm't, Inc.,
    No. Civ.A. 15765, 1999 WL 64265 (Del. Ch. Jan. 25, 1999),
    aff'd, 741 A.2d 16 (Del. 1999) ....................................................................................24

Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.),
    355 B.R. 438 (Bankr. D. Del. 2006) ................................................................27, 28, 29

In re ALH Holdings LLC,
    675 F. Supp. 2d 462 (D. Del. 2009)............................................................................15

In re Centaur, LLC,
    No. 10-10799, 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) (Carey, J.) .............12, 17, 19

In re Dewey & Leboeuf LLP,
    No. 12-12321, 2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29, 2012)...........................9

In re iPCS, Inc.,
    297 B.R. 283 (Bankr. N.D. Ga. 2003) ...........................................................................6

In re The Limited, Inc. S'holders Litig.,
    No. Civ.A. 17148-NC, 2002 WL 537692 (Del. Ch. March 27, 2002) .........................24, 25, 26

In re Midway Airlines, Inc.,
    167 B.R. 880 (Bankr. N.D. Ill. 1994) .........................................................................17

In re Times Sales Fin. Corp.,
    491 F.2d 841 (3d Cir. 1974) .......................................................................................15

In re Tribune Co.,
    No. 08-13141 (Bankr. D. Del. Oct. 27, 2010) (Carey, J.)............................................9

iii

Johnson v. Nextel Commc'ns, Inc.,
  660 F.3d 131 (2d Cir. 2011) ....................................................................................34

Joseph v. Frank (In re Troll Commc'ns, LLC),
  385 B.R. 110 (Bankr. D. Del. 2008) ........................................................................23

Kennedy Inn Assocs. v. Perab Realty Corp. (In re Kennedy Inn Assocs.),
  221 B.R. 704 (Bankr. S.D.N.Y. 1998) ..............................................................35, 36

Lazard Debt Recovery GP, LLC v. Weinstock,
  864 A.2d 955 (Del. Ch. 2004)..................................................................................20

Louisiana World Exposition v. Fed. Ins. Co.,
  858 F.2d 233 (5th Cir. 1988) .................................................................................8, 9

Mediators, Inc. v. Manney (In re Mediators, Inc.),
  105 F.3d 822 (2d. Cir. 1997)......................................................................................7

Mediators, Inc. v. Manney (In re Mediators, Inc.),
  190 B.R. 515 (S.D.N.Y. 1995)...................................................................................7

Mellon Bank, N.A. v. Dick Corp.,
  351 F.3d 290 (7th Cir. 2003) ...................................................................................35

Mervyn's Holdings, LLC v. Lubert-Alder Grp. IV, LLC (In re Mervyn's Holdings, LLC),
  426 B.R. 488 (Bankr. D. Del. 2010) ..................................................................10, 12

Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Servs., Inc.),
  361 B.R. 747 (Bankr. D. Del. 2007) ........................................................................33

Miller v. McCown DeLeeuw & Co. (In re The Brown Schs.),
  368 B.R. 394 (Bankr. D. Del. 2007) ............................................................12, 32, 33

Miller v. McCown DeLeeuw & Co. (In re The Brown Schs.),
  386 B.R. 37 (Bankr. D. Del. 2008) ..........................................................................22

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),
  478 F.3d 452 (2d Cir. 2007)....................................................................................6, 7

Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr. v. Hudson United Bank (In re Am.'s Hobby Ctr.),
  223 B.R. 275 (Bankr. S.D.N.Y. 1998) ................................................................17, 18

Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),
  226 F.3d 237 (3d Cir. 2000)......................................................................................10

iv

Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re
Cybergenics Corp.),
   330 F.3d 548 (3d Cir. 2003) (*en banc*) ............................................................................... passim

Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge
Co.),
   326 B.R. 532 (W.D. Pa. 2005).................................................................................................19

Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.),
   330 B.R. 67 (Bankr. D. Del. 2005).........................................................................................31

Official Comm. of Unsecured Creditors v. Cerberus Bus. Fin., LLC,
   No. 13-50918 (Bankr. D. Del. 2013) ......................................................................................37

Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co., Inc.),
   371 B.R. 589 (Bankr. D.N.H. 2007).......................................................................................10

Official Comm. of Unsecured Creditors v. Pardee (In re Stanwich Fin. Servs. Corp),
   317 B.R. 224 (Bankr. D. Conn. 2004) ....................................................................................10

Orman v. Cullman,
   794 A.2d 5 (Del Ch. 2002)......................................................................................................25

Paloian v. LaSalle Bank Natl. Assn. (In re Doctors Hosp. of Hyde Park, Inc.),
   474 B.R. 576 (Bankr. N.D. Ill. 2012) .....................................................................................34

Rales v. Blasband,
   634 A.2d 927 (Del. 1993) ........................................................................................................24

Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,
   68 F.3d 1478 (2d Cir. 1995).....................................................................................................31

Richardson v. Monaco (In re Summit Metals, Inc.),
   477 B.R. 484 (Bankr. D. Del. 2012) .......................................................................................28

Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.,
   113 F.3d 405 (3d Cir. 1997).....................................................................................................20

Seitz v. Detweiler, Hershey & Assocs. (In re CitX Corp.),
   448 F.3d 672 (3d Cir. 2006).....................................................................................................22

Silverman ex rel. Allou Distribs., Inc. v. KPMG LLP (In re Allou Distribs., Inc.),
   395 B.R. 246 (Bankr. E.D.N.Y. 2008).....................................................................................22

Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating
LLC),
   285 B.R. 822 (S.D.N.Y. 2002).................................................................................................10

Stern v. Marshall,
    131 S. Ct. 2594 (2011)...................................................................................................36

Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.),
    163 B.R. 964 (Bankr. D. Del. 1994) ..............................................................................36

Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.),
    327 B.R. 719 (Bankr. D. Del. 2005) ..............................................................................31

Wood v. Baum,
    953 A.2d 136 (Del. 2008) ..............................................................................................15

## STATUTES

Section 510(c) of the Bankruptcy Code....................................................................................33

Section 1103(c) of the Bankruptcy Code....................................................................................5

Section 1107(a) of the Bankruptcy Code....................................................................................3

Section 1107(b) of the Bankruptcy Code....................................................................................7

Section 1109(b) of the Bankruptcy Code.................................................................................2, 5

New York Uniform Commercial Code § 9-102(a)(13) ..............................................................34

New York Uniform Commercial Code § 9-108(e) .....................................................................34

## OTHER AUTHORITIES

Daniel J. Bussel, Creditors' Committees As Estate Representatives in Bankruptcy
Litigation, 10 STAN. J. L. BUS. & FIN. 28, 37 (2004) ..............................................................7, 8

Delaware Court of Chancery Rule 23.1 .....................................................................................26

Federal Rule of Civil Procedure 12(b)(6) .............................................................................12, 17

RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) ................................................................31

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
                                                                  :
In re:                                                            :
                                                                  :  Chapter 11
                                                                  :  Case No. 12-11661 (KJC)
WP Steel Venture LLC, *et al.*,                                   :  Jointly Administered
                                                                  :
                                                                  :  **Re: Docket Nos. 2582, 2813,**
                    Debtors.                                      :  **2814, 2815, 2816, 2822, 2798**
                                                                  :  **and 2822**
                                                                  :
---------------------------------------------------------------- x

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**IN SUPPORT OF ITS MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 1103(c) AND**
**1109(b) FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND**
**AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE**
**CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

The Committee respectfully submits this omnibus reply ("Reply") in further support of its

motion (the "Motion")[1] for standing and authority to prosecute and settle certain claims (the

"Claims") on behalf of the Debtors' estates (the "Estates") against Renco, and Messrs. Rennert

and Goodwin, and in response to: (1) the objections filed by Mr. Ira L. Rennert and Renco [D.I.

2814] (the "Renco Objection") and Mr. Vincent J. Goodwin [D.I. 2813] (the "Goodwin

Objection" and together with the Renco Objection, the "Objections"); and (2) the responses filed

by the Debtors [D.I. 2822] (the "Debtors' Response"), Wells Fargo Capital Finance, LLC

("Wells Fargo") [D.I. 2798] (the "Wells Fargo Response"), and Cerberus Business Finance, LLC

("Cerberus") [D.I. 2816] (the "Cerberus Response"). In support of the Reply and the Motion, the

Committee respectfully states as follows:

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Motion.

## PRELIMINARY STATEMENT

The Motion demonstrates that the Committee satisfies each of the requirements to obtain standing under the Third Circuit's controlling precedent of <u>Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)</u>, 330 F.3d 548 (3d Cir. 2003) (*en banc*): colorable claims exist that may provide a recovery in excess of $238 million for the Estates; the Debtors, controlled by the proposed defendants (defined below), are inherently conflicted and have predictably refused to pursue the Claims; the Claims are the only potentially significant source of recovery for general unsecured creditors; the Committee is the only unconflicted fiduciary able to pursue and settle the Claims; and denial of the Motion would either result in the abandonment of the valuable Claims or require the appointment of a Chapter 11 or Chapter 7 Trustee to pursue them – outcomes <u>Cybergenics</u> seeks to avoid. <u>Id.</u> at 578.

The Debtors and Cerberus, while weighing in with their responses, do not oppose the Committee's request for standing. The only objections to the Committee's standing come from the proposed defendants themselves, Renco and Messrs. Rennert and Goodwin (the "<u>Proposed Defendants</u>" or "<u>Objectors</u>"). However, the Objectors have no interest in maximizing the value of the Estates at their own expense, and naturally seek to defeat the Claims at the outset. Mr. Goodwin, moreover, is not a creditor or a party in interest in this bankruptcy case under section 1109(b) of the Bankruptcy Code and does not have any right to be heard on the issue of Committee's standing to pursue the Claims. Wells Fargo, like Mr. Goodwin, has no right to be heard and its response is particularly odd, insofar as the first lien lenders were paid in full and granted releases long ago and it no longer has any conceivable legitimate interest in this matter. That it chose to weigh in at all, for no purpose other than to make meaningless non-evidentiary factual assertions, serves only to prove the truth of the Committee's allegation of a cozy relationship between Renco and Wells Fargo.

On the merits, the issues raised in the Objections were anticipated in the Motion and are now well-joined. Two important and relatively novel legal issues must be determined at the outset. First, the Objectors assert that the Delaware Supreme Court's decision in CML V, LLC v. Bax precludes a creditors' committee's standing to bring suit on behalf of a Delaware limited liability company ("LLC"). 28 A.3d 1037 (Del. 2011) (*en banc*). As shown below, the Bax decision addressed only the issue of when an individual creditor may obtain derivative standing under Delaware state law; it has no relevance to the entirely distinct question of whether a bankruptcy court may exercise its equitable powers to allow a creditors' committee – which is *not* a creditor but rather an estate fiduciary – to exercise a bankruptcy trustee's power, which ordinarily the debtor-in-possession is authorized to bring under section 1107(a) of the Bankruptcy Code. That question was answered dispositively in the affirmative by the Third Circuit in Cybergenics, which embraced "the received wisdom that '[n]early all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession if the committee is able to establish' that a debtor is neglecting its fiduciary duty." 330 F.3d at 553 (quoting 7 COLLIER ON BANKRUPTCY ¶ 1103.05[6][a] (15th rev. ed. 2002)).

The second issue, which is really a mixed issue of fact and law, concerns the effect of the purported "exculpatory clauses" in the various Debtors' LLC agreements. As a threshold matter, invocation of such clauses is an affirmative defense not properly addressed on this Motion. In any event, while the Committee acknowledges that the Delaware Limited Liability Company Act ("LLC Act") permits companies to disclaim managerial fiduciary duties, the case law requires completely clear and unambiguous language not present in any of the Debtors' LLC agreements. With respect to the exculpation of liability for breach of such fiduciary duties, the LLC

3

agreements governing each of the Debtor subsidiaries solely managed by Mr. Goodwin on their face contemplate potential liability for "willful misconduct, bad faith or gross negligence," a standard satisfied by the conduct alleged in the Claims. By contrast, the language of the LLC agreement governing the parent Debtor managed by Mssrs. Rennert and Goodwin is ineptly drafted and makes no reference to exculpating liability for improper conduct at all. Read literally, the clause leaves all existing duties intact, and recent decisions of the Delaware Court of Chancery have held that these include fiduciary duties. At worst the clause is ambiguous; if so, any purported ambiguity should be resolved after discovery only and not on this Motion.

The remaining issues raised by the Objectors all raise issues of fact which they improperly ask the Court to resolve in their favor, as if on summary judgment. The law is well-settled that the Court should not conduct a mini-trial on a standing motion or assess competing evidence; at this stage, the truth of the Committee's allegations must be assumed, and measured against the relatively low "colorability" threshold. Nonetheless, we address these factual issues below, demonstrating among other things that:

- the theories underlying the Claims do make sense and are more than plausible, according both with the facts as uncovered during the Committee's investigation (admittedly constrained as it was due to a severely limited budget) and with the Proposed Defendants' rational self-interest.

- Mr. Goodwin's employment contract, far from shielding him from allegations of fealty to Renco and Mr. Rennert, actually emphasize that reality.

- The Committee is not asserting any phantom claim for "deepening insolvency" – i.e., prolonging operations in the good faith hope of a turnaround – but has pled valid claims against the defendants for embarking on costly programs they knew to be futile for purposes entirely unrelated to the best interests of the enterprise, in breach of their fiduciary duties. "Deepening insolvency" was the result, a valid form of damage (but not the only form of damage here), and not the legal basis for the Claims.

- Finally, no one disputes that litigation success could yield a benefit of approximately $236 million for the Estates, and the Committee has shown that the unsecured creditors stand a reasonable chance of benefiting from that recovery.

4

For the foregoing reasons, as well based on the reasons set forth below, the Court should overrule the Objections and grant the Committee's Motion.

## ARGUMENT

**I.      UNDER CYBERGENICS THE COMMITTEE MAY BE GRANTED STANDING TO BRING CLAIMS ON BEHALF OF DEBTORS THAT ARE DELAWARE LLCS**

1.      The Objectors contend that the Committee's motion to bring the Claims on behalf of the Estates pursuant to Cybergenics is precluded by § 18-1002 of the LLC Act, which permits only a member or an assignee of an LLC to be a plaintiff in a derivative action, as construed by the Delaware Supreme Court in Bax. The question of whether Bax deprives a creditors' committee of Cybergenics standing where the debtor happens to be an LLC is an issue of first impression with significant implications for bankruptcy jurisprudence. The Committee submits that careful analysis of Cybergenics demonstrates that creditors' committee standing – while frequently referred to as "derivative" in the sense that the power granted *derives* from rights of the estate – is entirely distinct from, and not dependent upon, the somewhat analogous state law doctrines governing when and if a stakeholder may bring suit on behalf of a company.

2.      In Judge Becker's extensive and thoroughly reasoned Cybergenics opinion, the Third Circuit *en banc* relied exclusively on sections of the Bankruptcy Code, pre-Code practice, and federal bankruptcy policy to hold that "the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers" – *not* an implementation of existing state law doctrines. Cybergenics, 330 F.3d at 568. Among other things, the Third Circuit found precedent for the view that section 1109(b) of the Bankruptcy Code supports the authority of bankruptcy courts to grant committees the right to bring claims on behalf of the debtor (id. at 560-61); observed that section 1103(c)(5) "suggests that Congress intended for creditors' committees to perform services on behalf of the estate, and

5

that Congress consciously built a measure of flexibility into the scope of those services" (id. at 563); found that "the pre-Code tradition of allowing courts to confer derivative standing upon creditors is compelling" (id. at 570); and stressed that the ability to grant committee standing is essential to avoid "the proverbial problem of the fox guarding the henhouse," to wit: "One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it." Id. at 573.

3.       Significantly, in this comprehensive analysis the Court of Appeals makes no mention whatsoever of state law doctrines governing stakeholder derivative standing, and cites not a single state law case. This is because creditors' committee standing under Cybergenics and its counterparts in other Circuits is a creation of federal bankruptcy law, not state law governing shareholder or creditor standing. Indeed, a creditors' committee could not obtain standing under such state law doctrines for the simple reason that it is neither a shareholder nor a creditor. The creditors' committee, like a Chapter 7 or Chapter 11 trustee, is a special creation of the Bankruptcy Code whose duties and powers are therefore a matter of bankruptcy, not state, law. The Committee's Cybergenics standing does not depend – could not depend – on its fictional status as a stakeholder; instead, it depends on the Committee's status as a fiduciary of the Estates charged with representing the interests of stakeholders.

4.       One of the basic principles of bankruptcy is that fiduciaries of an estate (i.e., a trustee or a debtor in possession and a creditors' committee) should maximize the value of the estate's assets. See In re iPCS, Inc., 297 B.R. 283, 287 (Bankr. N.D. Ga. 2003) (stating that ensuring that an estate fiduciary is permitted to prosecute valuable claims against the debtor's officers and directors for mismanagement is crucial to the success of the bankruptcy process); see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),

6

478 F.3d 452, 466 (2d Cir. 2007) (noting that a creditor's committee "has a fiduciary duty to maximize the recovery of the Estate's assets"). A principal means of maximizing value is by initiating and prosecuting the estate's causes of action. The Bankruptcy Code vests all such powers, including standing to assert the estate's causes of action, in the trustee. See Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 428-29 (1972) (claims for breach of fiduciary duty to the corporation are enforceable by trustee); Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 825-26 (2d. Cir. 1997) (Bankruptcy Code affords trustee standing to assert any claims that the corporation could have instituted prior to filing its petition).

5.      Under section 1107(b) of the Bankruptcy Code, the powers of the chapter 11 bankruptcy trustee are in the first instance delegated to the debtor in possession. This delegation is not irrevocable, however, and may be rescinded or re-delegated in certain circumstances where the debtor in possession is unable (e.g., because of a conflict) to pursue the estate's valuable causes of action. The most drastic of such remedies is the appointment of a Chapter 11 trustee, or potentially conversion to Chapter 7, both of which are highly disfavored. See Cybergenics, 330 F.3d at 573-74. A more salutary and less-drastic remedy is for the bankruptcy court to use its equitable powers to re-delegate solely that portion of the trustee's power necessary to prosecute claims the debtor-in-possession is unwilling or unable to pursue. Id. at 579-80; see also Cirka v. Nat'l Union Fire Ins. Co., No. Civ.A. 20250-NC, 2004 WL 1813283, at *7 (Del. Ch. Aug. 6, 2004) (committee's standing to bring breach of fiduciary duties claims was simply "enforcing right belonging to the Estate that the Debtor in Possession could have enforced"); Mediators, Inc. v. Manney (In re Mediators, Inc.), 190 B.R. 515, 526 n.6 (S.D.N.Y. 1995) (in suing on behalf of the debtors' estates, committee stood in position "analogous to that of a trustee"); Daniel J. Bussel, Creditors' Committees As Estate Representatives in Bankruptcy

7

Litigation, 10 STAN. J. L. BUS. & FIN. 28, 37 (2004) (in granting standing to the creditors'
committee "[t]he bankruptcy court has simply substituted one estate fiduciary (the creditors'
committee) for another (the trustee or debtor-in-possession) as the appropriate representative of
the estate for this particular purpose").

6.      Granting the Committee standing to pursue the Claims on behalf of the Estates is
thus a proper exercise of the Court's equitable power under Cybergenics; it is not governed by
state law.   This same conclusion was reached, under circumstances very similar to those
presented here, by the Fifth Circuit Court of Appeals in Louisiana World Exposition v. Fed. Ins.
Co., 858 F.2d 233, 251-52 (5th Cir. 1988).   There, the bankruptcy court granted a creditors'
committee standing to pursue claims against the debtors' management for gross negligence,
mismanagement, and breach of fiduciary duty.  The district court, however, dismissed the claims
on the grounds that Louisiana law "does not give a creditor a direct claim against a director of an
insolvent corporation for damages for gross negligence, mismanagement or breach of fiduciary
duty." Id. at 239-40.  The Fifth Circuit reversed and reinstated the claims,  reasoning that the
creditors' committee was *not* suing on behalf of creditors; rather, it was bringing a claim that
undeniably belonged to the trustee and "[t]he law is well-settled that in some circumstances, a
creditors' committee has standing . . . to file suit on behalf of a debtor-in-possession or a
trustee." Id. at 247.

7.      The Fifth Circuit in Louisiana World Exposition went on to reject the argument,
also pressed by the Objectors here, that a contrary result is dictated by the Supreme Court's
decision in Butner v. United States, 440 U.S. 48 (1979).  In Butner, the Supreme Court had to
answer the question whether state or bankruptcy law would be applied to decide if a security
interest in estate's property extends to rents and profits derived therefrom.   In concluding that

8

state law applied, the Supreme Court held that "Congress has generally left the determination of

property rights in the assets of a bankruptcy's estate to state law." Id. at 54.    Under Butner,

federal law must be deferential to state law where either (a) state law property rights are affected

or (b) application of federal law creates a new property right. See id.; see also Louisiana World

Exposition, 858 F.2d at 252. As the Fifth Circuit aptly observed, neither of these principles are

implicated by allowing a committee to prosecute claims instead of a debtor in possession:

> State law property interests are not disturbed . . . and no
> substantive interests are created by allowing the Committee to
> pursue [the debtor's] state law created cause of action. . . . That
> change is, at most, a procedural device, authorized by the Code,
> which does not affect state created property interests. To the extent
> that Louisiana has any interest whatsoever in the identity of the
> agent who actually asserts [the debtor's] state law rights where [the
> debtor] is unable to do so, that interest must yield to the procedural
> needs and dictates of federal bankruptcy law. Butner is simply not
> implicated.

858 F.2d at 252; see also Bliss Techs., Inc. v. HMI Indus. (In re Bliss Techs., Inc.), 307 B.R.

598, 609 (Bankr. E.D. Mich. 2004) ("The fact that the Committee has standing to pursue the

Debtor's state law breach of fiduciary action, on behalf of the Debtor and for the benefit of the

estate, does not equate to the creation of [a state law] substantive right").

    8.    As evidenced by Louisiana World Exposition and numerous other cases, equitable

delegation of the bankruptcy trustee's powers to the creditors' committee is not limited to

avoidance actions under the Bankruptcy Code, but can be applied to any cause of action

belonging to the estate, including actions based on fiduciary duties arising under state law. See,

e.g., In re Dewey & Leboeuf LLP, No. 12-12321, 2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29,

2012) (breach of fiduciary duties); In re Tribune Co., No. 08-13141 (Bankr. D. Del. Oct. 27,

2010) (Carey, J.) [D.I. 6150] (aiding and abetting breach of fiduciary duty and certain

bankruptcy causes of action); Am. Specialty Cars Holdings, LLC v. Official Comm. of

9

Unsecured Creditors of ASC Inc. (In re ASC Inc.), 386 B.R. 187 (E.D. Mich. 2008) (breach of fiduciary duties as well as certain bankruptcy causes of action); Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co., Inc.), 371 B.R. 589 (Bankr. D.N.H. 2007) (breach of fiduciary duties); Babcock v. Official Comm. of Admin. Claimants, No. 06-1081, 2007 WL 950336 (N.D. Ohio March 27, 2007) (breach of fiduciary duties); Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.), 330 B.R. 364 (Bankr. S.D.N.Y. 2005) (aiding and abetting breaches of fiduciary duties and fraudulent conveyance); Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC), 285 B.R. 822, 827 (S.D.N.Y. 2002) (breach of contract, breach of fiduciary duty, and certain bankruptcy causes of action). Indeed, in Cybergenics itself the creditors' committee was granted standing to bring "a *state law* fraudulent transfer action on behalf of the bankruptcy estate in Cybergenics' stead." Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 240 (3d Cir. 2000) (emphasis added).

9.      The cases cited by the Objectors, to the extent they are applicable at all, are not to the contrary, standing only for the unremarkable proposition that Delaware law governs the substantive aspects of the Claims – that is, whether the Estates own the Claims (see, e.g., Official Comm. of Unsecured Creditors v. Pardee (In re Stanwich Fin. Servs. Corp), 317 B.R. 224, 228 (Bankr. D. Conn. 2004) (applying state law to determine whether the debtor could commence and prosecute the claims at issue in order to determine whether the committee could do so in debtor's stead)), whether the Proposed Defendants owed duties to the Debtors and what legal standards should be applied in determining whether those duties were violated. See, e.g., Mervyn's Holdings, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 501 (Bankr. D. Del. 2010) (holding that state of incorporation should govern statute of

limitations and scope of fiduciary duties); Fedders N. Am., Inc. v. Goldman Sachs Credit
Partners (In re Fedders N. Am., Inc.), 405 B.R. 527, 539 (Bankr. D. Del. 2009) (applying state
law with respect to what constitutes a breach of fiduciary duties). None of these cases addressed
the relevant issue of whether this Court may grant the Committee Cybergenics standing to
exercise the trustee's powers with regard to the Claims; and none suggested that this is an issue
governed by Delaware state law. As shown above, it is not.

10.       Finally, we note that denying the Committee standing to pursue the Claims on
Bax grounds would lead to unpalatable consequences. As Renco and Mr. Rennert concede, "all
four fiduciary duty and aiding and abetting causes of action in the draft Complaint *belong to the
Debtors.*" (Renco Obj. ¶ 35). As such, it is beyond debate that such Claims could be pursued by
a bankruptcy trustee. If the Committee were denied standing, the only way for creditors to
ensure that these potentially valuable claims are pursued on behalf of the Estates would be to
move for appointment of a Chapter 11 trustee, or move to convert this case to a Chapter 7
liquidation, and provide the resulting trustee with the draft Complaint and associated work
product. These alternatives would amount to "replac[ing] the scalpel of a derivative suit with a
chainsaw" – precisely the result that the Third Circuit has sought to avoid. Cybergenics, 330
F.3d at 578.

## II.       THE CLAIMS MEET THE COLORABILITY TEST

### A.       The Proposed Claims Are Not Barred by the Exculpatory Provisions in the LLC Agreements

11.       The Objectors argue that the Committee's Claims are barred by the exculpatory
clauses contained in the Debtors' LLC agreements. As a threshold matter, the exculpatory
clauses have no bearing on the Committee's request for standing. Courts in this circuit,
including this Court, have repeatedly held that invocation of a putative exculpatory clause is an

11

affirmative defense which cannot provide a basis for dismissal under Federal Rule of Civil Procedure 12(b)(6). See In re Mervyn's Holdings, LLC, 426 B.R. at 502 (refusing to consider exculpatory clause on motion to dismiss, as "[t]he Third Circuit has been clear that 'protection of an exculpatory charter provision appears to be in the nature of an affirmative defense . . . [which] generally will not form the basis for dismissal under Rule 12(b)(6)) (citing Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 242 (3d Cir. 2005)); Miller v. McCown DeLeeuw & Co. (In re The Brown Schs.), 368 B.R. 394, 401 (Bankr. D. Del. 2007) (denying motion to dismiss and explaining that an "exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at this stage"); see also Burtch ex rel Estate of Opus East L.L.C. v. Opus East L.L.C. (In re Opus East, L.L.C.), 480 B.R. 561, 571 (Bankr. D. Del. 2012) (same).

12.     While there is no motion to dismiss currently before the Court, the "colorable claim" analysis for standing purposes is much the same as the analysis made on such a motion – except, of course, that it is even more preliminary in nature. See In re Centaur, LLC, No. 10-10799, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (Carey, J.). If the viability of an exculpatory clause as an affirmative defense cannot be determined on a motion to dismiss under Rule 12(b)(6), as the courts have clearly held, surely the issue is not ripe for determination on a motion for standing. Indeed, the Court need not even reach the question of the potential effect of the exculpatory clauses in determining whether the Committee's Claims are colorable.

13.     If the Court does reach the merits on this Motion, it should find that this prospective affirmative defense does not preclude Committee standing to pursue the Claims. Two putative exculpation clauses are potentially at issue: (a) the identically-worded exculpation clauses that are found in the LLC agreements of each of the so-called Goodwin-managed

12

Debtors – that is, the subsidiaries of RG Steel LLC where Renco installed Mr. Goodwin as the sole manager, presumably in an attempt to shield Mr. Rennert from potential liability (Ryan Dec. Exhs. B through H); and (b) the differently-worded exculpation clauses in the LLC agreement for RG Steel LLC (the "Company"), where at all relevant times both Messrs. Rennert and Goodwin were managers (Ryan Dec. Exh. A).

14.    With regard to the Goodwin-managed Debtors, the Objectors acknowledge that each clause exculpates managers from liability for "any act or omission . . . *provided* such act or omission does not constitute fraud, willful misconduct, bad faith, or gross negligence." (Ryan Dec. Exhs. B through G, § 8.1) (emphasis added). It is well-settled that such a proviso (i.e., exclusion from exculpation) implicitly acknowledges the existence of potential liability for conduct satisfying the thresholds of the exclusion. See, e.g., Feeley v. NHAOCG, LLC, 62 A.3d 649, 664 (Del. Ch. 2012) ("Rather than eliminating fiduciary duties," language precluding liability subject to exceptions for gross negligence or willful misconduct "recognizes their continuing existence."). Mr. Goodwin does not dispute this, but argues that the Committee's allegations fail to meet the "very high standard" of pleading that is required under Delaware law, asserting that "even gross negligence is insufficient to plead bad faith." (Goodwin Obj. ¶ 35.) In so arguing, Mr. Goodwin seems to have forgotten that the exculpatory clauses for the Goodwin-managed entities do *not* "limit liability to instances in which it can be established that he acted in 'bad faith'" (id.); to the contrary, these clauses expressly preserve liability in instances of "fraud, *willful misconduct, bad faith, or gross negligence.*" (e.g., Ryan Dec. Exh. B ¶ 8.1 (emphasis added)). As noted in Feeley, this essentially amounts to no limitation at all, because "[g]ross negligence is the standard for evaluating a breach of the duty of care." 62 A.3d at 664.

13

15.     The Objectors' argument regarding the clause contained in the Company's LLC agreement presents an admittedly more complex issue because the exculpation clause at issue is inartfully drafted, providing only that "No Manager . . . shall be liable to the Company . . . in damages or otherwise except as otherwise required by the Act." (Ryan Dec. Exh. A ¶ 12). The Objectors assert that this language amounts to an exculpation from all potential claims except for breaches of the implied contractual covenant of good faith and fair dealing. (Renco Obj. ¶ 45-56). They base this assertion on the observation – which the Committee does not dispute – that the Delaware LLC Act allows parties to an LLC agreement to contractually eliminate potential liability for breaches of duties, with the sole exception of the implied covenant, and (though they never say so explicitly) the implicit assertion that the clause as drafted was intended to exercise this right to the fullest extent allowed. (Renco Obj. ¶ 48). In other words, the Objectors *wish* the clause stated that "Managers' liability for all acts and omissions is eliminated to the fullest extent allowed under the LLC Act."

16.     That is not, however, what the clause says. "Drafters of an LLC agreement 'must make their intent to eliminate fiduciary duties plain and unambiguous.'" Feeley, 62 A.3d at 664 (quoting Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC, No. 3658-VCS, 2009 WL 1124451, at *9 (Del. Ch. April 20, 2009)). At all times Renco has been represented by highly sophisticated counsel who knew how to draft a clear and explicit exculpation clause, and had many examples of such clauses they could have followed. The Objectors cite cases in which an exculpatory clause was held to preclude liability for any and all claims except for those expressly carved out by the clause. The clauses at issue in those cases are in fact instructive examples by way of contrast. None involved language remotely resembling "except as otherwise required by the Act"; all either expressly referred to elimination of duties or expressly

14

stated that no acts or omissions could give rise to liability. See In re ALH Holdings LLC, 675 F.

Supp. 2d 462, 478 (D. Del. 2009) (no "Manager . . . shall be liable . . . for any failure to take any

action or the taking of any action . . ."); Wood v. Baum, 953 A.2d 136, 139 (Del. 2008) ("[n]o

director or officer shall be liable . . . for any act or omission . . ."); Feeley, 62 A.3d at 664 ("no

Member shall be . . . liable . . . for any act or failure to act . . .").

17.    On its terms, the clause at issue here merely provides that there shall be no

theories of liability other than those ordinarily "required by the Act." The Committee submits

that, read literally, this means merely that the LLC agreement itself shall not give rise to

liabilities over and above the default liabilities under the Act. At the very least, this is a plausible

interpretation of the provision, and where the attempted disclaimer of liability is not clear and

explicit it is unsuccessful.[2] As Chancellor Strine observed in Bay Center, "the interpretive scales

also tip in favor of preserving fiduciary duties under the rule that the drafters of chartering

documents must make their intent to eliminate fiduciary duties plain and unambiguous." 2009

WL 1124451, at *9. Bay Center applied this principle to the following purported elimination of

duties clause, which is structurally very similar to that at issue here: "Except for any duties

imposed by this Agreement . . . each Member shall owe no duty of any kind towards the

---

[2]    The rationale behind the "plain and unambiguous" requirement is that where parties are given contractual flexibility to alter a default rule of law, they must create a contract that is sufficiently explicit to provide notice to those that would be affected by such alternation. The same rationale underlies the so called "rule of explicitness" requiring a subordination agreement to be plain and unambiguous as to its intent to suspend the default rule of law that unsecured creditors are not entitled to post-petition interest. Under the rule of explicitness, which was first articulated by the Third Circuit Court of Appeals in In re Times Sales Fin. Corp., a subordination agreement can effectively subordinate junior unsecured creditors to the payment of post-petition interest to the senior unsecured creditors only if the language is sufficiently explicit to apprise the junior creditors of such effect. 491 F.2d 841 (3d Cir. 1974). Language in a subordination agreement that the senior unsecured creditor be "paid in full" before a junior creditor can receive payment is not sufficiently explicit to overcome the default rule of law because it does not explicitly refer to post-petition interest. Id. at 845; see also Bankers Life Co. v. Mfrs. Hanover Trust Co (In re Kingsboro Mortg. Corp.), 514 F.2d 400, 401 (2d Cir. 1975) (holding that language of subordination agreement requiring payment in full of "all principal and interest on all Senior Debt" was insufficiently express to apply to post-petition interest). By the same reasoning, for an exculpation clause to eliminate default fiduciary duties it must explicitly refer to those duties – or at the very least refer to the conduct that is being exculpated. The Company's LLC agreement does neither.

15

Company or the other Members . . ." (Id. at \*8). (Indeed, that clause was arguably more explicit in that it expressly referred to limiting "duties.") Read in conjunction with another clause that provided that "Members shall have the same duties and obligations to each other that members of a limited liability company formed under the Delaware Act have to each other" – analogous to the "except as required by the Act" language here – Vice Chancellor Strine found the most reasonable interpretation to be the one the Committee now advances: that the parties intended to preserve, but not expand upon, the default liability under the Act. Id.

18.    This raises an issue that has recently received a great deal of attention, namely: what *are* the default duties under the Delaware LLC Act?    In his objection, Mr. Goodwin acknowledges that the Delaware Chancery Court has recognized the existence of traditional ("default") fiduciary duties of loyalty and care in the limited liability company context. (Goodwin Obj. ¶¶ 48-56). He accurately notes that the question has not yet been resolved by the Delaware Supreme Court, and urges this Court to rule that such fiduciary duties do not exist. This issue is not appropriately determined on the Committee's motion for standing, where the Court is required only to determine whether the Committee's Claims are plausible on their face. (See Point II.B below.) In any event, numerous decisions from the Chancery Court – both before and after the Delaware Supreme Court in Gatz Props., LLC v. Auriga Capital Corp. emphasized that it has not yet resolved the issue, 59 A.3d 1206, 1218 (Del. 2012) – have held that such default duties exist, and set out compelling reasons for this conclusion. See, e.g., Feeley, 62 A.3d at 660 (noting that, while "the long line of Chancery precedents holding that default fiduciary duties apply to the managers of an LLC are not binding on the [Delaware] Supreme Court, [they] are appropriately viewed as *stare decisis* by this Court"). No court has ever held to the contrary, and this Court should not do so.

16

**B.    The Objectors Raise Factual Issues That Are Not
        Properly Addressed on a Standing Motion**

19.    The showing required to establish a colorable claim "is a relatively easy one to

make." Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.), 330

B.R. 364, 376 (Bankr. S.D.N.Y. 2005); see also In re Midway Airlines, Inc., 167 B.R. 880, 884

(Bankr. N.D. Ill. 1994) ("A colorable claim (one seemingly valid and genuine) is not a difficult

standard to meet."); Motion ¶¶ 15-16. The standard does not require the Committee to present

proof, and it does not require the Court to conduct a mini-trial; instead, it merely requires the

Court to decide whether the Committee has asserted "claims for relief that on appropriate proof

would support a recovery." G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I

Holdings, Inc.), 313 B.R. 612, 631 (Bankr. D.N.J. 2004) (citation and internal quotation marks

omitted).

20.    Even a claim that may be vulnerable to attack on legal or factual grounds is

properly deemed to be colorable so long as the claim is plausible and not "facially defective."

See Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr. v. Hudson United Bank (In re

Am.'s Hobby Ctr.), 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998). For example, in In re Centaur,

LLC, this Court, in granting standing to the committee, acknowledged certain issues raised by

the debtors' expert but explained that "legal challenges . . . are more appropriately decided by

way of a "Rule 56" Motion, and factual disputes are more appropriately resolved after a record is

fully developed." 2010 WL 4624910, at *6 (citation omitted). Similarly, in Adelphia Commc'ns

Corp., where the objectors simultaneously opposed the committee's request for standing and

moved to dismiss the complaint on various legal grounds, the court granted standing and

deferred a decision on the motion to dismiss, noting that "[d]efendants' legal contentions, while

they will likely result in 12(b)(6) dismissal of some of the claims, fall far short of being 'show-

17

stopper' issues that could presage defeat for the Committee in the litigation as a whole, especially before factual inquiry." Adelphia Commc'ns, 330 B.R. at 378; see also In re America's Hobby Center, Inc., 223 B.R. at 275 (authorizing creditors' committee to pursue all claims that were not facially deficient, including ones with a mere twenty-five percent chance of recovery). Thus, while the Committee is confident that its Claims would survive a motion to dismiss, there is no need for the Court to reach such a conclusion in order to find that the Claims are merely colorable.

21.     The Objectors assert that the Committee's Claims are not colorable because they supposedly "make no sense." (Renco Obj. ¶ 57.) They challenge various aspects of the Committee's allegations as "illogical" or "inaccurate," and ask the Court to look beyond the proposed Complaint to consider extraneous facts and alternative explanations for the Proposed Defendants' behavior as alleged in the Complaint. See, e.g., Renco Obj. ¶ 59 (allegation that Mr. Rennert delayed bankruptcy and entered into the Cerberus transaction to avoid controlled group liability supposedly "makes no sense" because Mr. Rennert "would [not] have subordinated a $130 million claim to $218 million in new debt in order to 'avoid' a potential $70 million liability"); id. ¶ 66 (Committee's assertion that an earlier filing would have benefitted the Debtors is "devoid of logic"); id. ¶ 81 (allegations of a "sweet-heart" deal between Mr. Rennert and Wells Fargo supposedly have been refuted by Wells Fargo, which "emphatically denies" any such deal and gives its own "explanation of events" in its response to the standing motion); id. ¶ 82 (allegation that Mr. Rennert allowed Coke Supply Agreement to terminate in exchange for a deal to protect Renco Cash Collateral supposedly is "illogical" in light of "later events").

22.     These are precisely the sort of fact-based challenges that have repeatedly been rejected by the courts as inappropriate to resolve as part of a standing motion. In Adelphia

Commc'ns Corp., the court considered similar objections to a proposed complaint by the

creditors' committee and concluded that that the committee's claims were colorable, explaining

that:

> Of course, the Defendants have already asserted numerous
> defenses, and undoubtedly will have those and more things to say
> as the litigation goes on. The Creditors' Committee's allegations
> have not yet been proven, if they ever will be, and some of its
> claims . . . may turn out to rest on predicates that may not be
> established . . . . But the great bulk of the matters that underlie the
> Creditors' Committee's claims will involve issues of fact and
> context, all requiring further factual development and inquiry, and,
> quite possibly, trial.
>
> In opposing the motion, the Defendants . . . challenged or sought to
> advance their explanations as to aspects of the Creditors'
> Committee's allegations or proof, or to argue additional facts . . . .
> But the Defendants' arguments . . . relating to factual challenges,
> factual explanations, and factual supplements, are, as the Court has
> just noted, simply one side's position on disputed issues of fact.

Adelphia Commc'ns, 330 B.R. at 377-78; see also In re Centaur, LLC, 2010 WL 4624910, at *6

(finding that committee's proposed claims were plausible and granting standing even though

debtors' expert showed that "tweaking the underlying assumptions of the Committee's expert

could significantly alter the potential . . . recoveries"); G-I Holdings, 313 B.R. at 642-43 (holding

that creditors' committee established a colorable fraudulent transfer claim while noting that "the

parties obviously disagree as to the characterization of and motivation behind the

[conveyance]"); Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l

Forge Co.), 326 B.R. 532, 547-48 (W.D. Pa. 2005) (finding that proposed claim was colorable

even though "there may be adequate defenses which come to light when answers . . . are filed,"

19

and noting that "Defendants' challenges to the Committee's . . . assertions are in the nature of

factual disputes more appropriately resolved on a fully developed record").[3]

23.    Here, too, it is hardly surprising that the Proposed Defendants have a different

view as to the proper characterization of the relevant events and the motivations behind their

actions as alleged in the Complaint. They will undoubtedly assert defenses to the Committee's

Claims, and they will have ample opportunity to develop in discovery any facts that may support

those defenses, and to challenge the Committee's allegations as a matter of fact and law, whether

on motion or at trial. But they cannot successfully conflate the Committee's motion for standing

with a trial on the merits or a motion for summary judgment, or even a motion to dismiss.

Simply put, the Proposed Defendants' alternative explanations and assertions as to the supposed

"illogic" of the Claims have no bearing on the Committee's motion for standing.

24.    At the appropriate time, the Committee will show that the Proposed Defendants'

factual challenges are without merit. While the Committee should not have to make, and the

Court should not evaluate, such showing at this juncture, the Committee is nonetheless

compelled to respond to the various arguments raised by the Objectors. Renco and Mr. Rennert

argue that it would have been irrational to subordinate Renco's $130 million claim to $218

million in new Cerberus debt in order to avoid $70 million in potential controlled group liability.

(Renco Obj. ¶ 59.) In fact, the evidence obtained by the Committee during its initial

investigation suggests that by January 2012, when the Debtors entered into the Cerberus

---

[3]    The cases cited in paragraph 57 of the Renco Objection are inapposite here – *first*, because they involved
motions to dismiss rather than standing motions, and *second*, because the complaints at issue in those cases either
contained flatly contradictory allegations, see Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405
(3d Cir. 1997) (dismissing antitrust claims where, although plaintiff alleged that the parties were competitors, other
allegations showed that the defendant was not plaintiff's competitor but rather its supplier), or lacked any factual
allegations at all as to key elements of the plaintiff's claims, see Lazard Debt Recovery GP, LLC v. Weinstock, 864
A.2d 955 (Del. Ch. 2004) (dismissing breach of fiduciary duty claim based on fund managers' having left company
without notice to create a competing business, where complaint failed to allege that defendants had any duty,
contractual or otherwise, to refrain from such actions).

20

transaction, Mr. Rennert no longer had any realistic expectation of recovering Renco's $130 million investment in the Debtors, whereas the prospect of controlled group liability for the Debtors' underfunded pensions was very real. (See Compl. ¶¶ 26-28.) And while it is true that Renco, by providing "substantial credit support and guarantees with respect to the Cerberus Facility" (Renco Obj. ¶ 59) – which in fact amounted to Renco being the real party in interest to the large majority of the putative Cerberus investment – assumed risk of potential additional losses that *in the end* turned out to be greater than the controlled group liability it hoped to evade, the Committee expects the evidence to demonstrate that *at the time of* the transaction nobody contemplated that the Company's losses would turn out to be as horrifically large as actually occurred.

25.     In sum, if allowed to proceed with the Claims the Committee expects to demonstrate that the Proposed Defendants caused the Debtors to engage in courses of action that they fully expected would result in further erosion of estate value, in the belief that doing so would on balance benefit Renco and Rennert by avoiding greater liability for them. Such conduct constitutes a breach of the duties of care and loyalty.

### C.     Count I Sufficiently Alleges Harm to the Debtors

26.     The Objectors assert that Count I, arising out of the Proposed Defendants' failure to file for bankruptcy in December 2011, does not sufficiently allege that the Debtors were harmed. To do so, they seize on two words from the Committee's allegation that the Cerberus transaction "only served to deepen the Debtors' insolvency" (Compl. ¶ 4), to suggest that the Committee is actually pursuing a "deepening insolvency claim" and "Delaware law does not recognize deepening insolvency as a cause of action or as a theory of damages." (Renco Obj. ¶ 62.) This mischaracterizes both the Committee's claim and the governing law.

21

27.     Count I of the draft Complaint is not, either in words or substance, a claim for deepening insolvency. It is a claim for breach of the fiduciary duty of loyalty based on Messrs. Rennert's and Goodwin's actions in entering into a transaction with Cerberus – instead of filing for bankruptcy – which furthered the personal interests of the Proposed Defendants at the expense of the Debtors. As a result, the draft Complaint alleges, the Debtors incurred massive additional costs (such as the cost of restarting the Sparrows Point blast furnace) that the Proposed Defendants knew were likely to, and did, result in additional losses to the enterprise, whereas a rational manager would at that point have staunched the bleeding and engaged in an orderly liquidation of their assets. (Compl. ¶ 29.)

28.     These allegations state a cognizable claim under Delaware law. While it is true that simply "prolonging an insolvent corporation's life, without more, will not result in liability," allegations that a defendant "prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation, and its increased debt," states a valid theory of *damages* arising from a cause of action for breach of fiduciary duty and self-dealing. See Silverman ex rel. Allou Distribs., Inc. v. KPMG LLP (In re Allou Distribs., Inc.), 395 B.R. 246, 265 (Bankr. E.D.N.Y. 2008) (surveys caselaw of various jurisdictions, including Delaware); Miller v. McCown De Leeuw & Co. (In re The Brown Schools), 386 B.R. 37, 48 (Bankr. D.Del. 2008) (losses resulting from alleged breach of fiduciary duty and self-dealing that deepen the debtors' insolvency are a viable damage claim); Alberts v. Tuft (In re Greater S.E. Cmty. Hosp. Corp. I), 353 B.R. 324, 336 (Bankr. D.C. 2006) (analyzing Seitz v. Detweiler, Hershey & Assocs. (In re CitX Corp.), 448 F.3d 672, 677 (3d Cir. 2006), and holding that deepening insolvency is a valid theory of damages where directors

allegedly breached fiduciary duties of care and loyalty by allowing company to take on additional debt in a fiscally irresponsible manner and by misusing corporate assets).[4]

**D.      The Complaint Adequately Alleges That**
         **Mr. Goodwin Was Motivated by Self-Interest**

29.     The Objectors also argue that the Claims against Mr. Goodwin are not colorable because they supposedly fail to allege sufficiently that Mr. Goodwin "lacked independence." This argument, too, has no merit.   (Renco Obj. ¶ 67; Goodwin Obj. ¶ 36-38.)   The Committee's proposed Complaint alleges that Ira Rennert hired and installed Mr. Goodwin as the sole manager of each of the five Goodwin-managed LLC's; that Mr. Goodwin served at all times under the direction and control of Ira Rennert; and that he acted in blind compliance with Ira Rennert and merely rubber-stamped the decision to delay the bankruptcy filing due to his desire to appease Ira Rennert and ensure his continued employment.   (Compl. ¶¶  26-29.)   These allegations are sufficient – especially at the pleading stage – to establish that Mr. Goodwin was beholden to Ira Rennert and lacked independence.   See, e.g., Troll Commc'ns, 385 B.R. at 119

---

[4]      Joseph v. Frank (In re Troll Commc'ns, LLC), 385 B.R. 110 (Bankr. D. Del. 2008), cited by the Proposed Defendants, is not to the contrary. There, the trustee alleged as an alternative ground for its breach of fiduciary duty claim that the debtors' directors had "caused the corporate life of the debtors to be artificially extended beyond the point of economic viability," and "fail[ed] to take prompt corrective action in the face of [the debtor's] rapidly declining financial situation."   Id. at 121. While the Court dismissed these allegations, noting that the Delaware Supreme Court had "extinguish[ed] . . . deepening insolvency [as] a valid cause of action under Delaware law," the Court explained that "rejecting deepening insolvency as a cause of action 'does not absolve directors of insolvent corporations of responsibility,' because a plaintiff retains the ability to bring an action for breach of fiduciary duty or fraud." Id. at 121-22 (quoting Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 204-05 (Del. Ch. 2006)). The Court went on to quote the Third Circuit's decision in In re CitX, explaining that "[w]here an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation." 385 B.R. at 122 (quoting In re CitX Corp., 448 F.3d at 678).

         Here, the Complaint does not allege merely that Messrs. Rennert and Goodwin allowed the Company to fall deeper into insolvency, but that they breached their fiduciary duty of loyalty by entering into a specific transaction which was designed to, and did, further their own self-interest at the Debtors' expense.     That independent cause of action allows the Committee to recover for the increase in the Company's debt resulting from the Cerberus transaction, and for the damage sustained due to the lost opportunity to pursue an orderly liquidation of the Debtors' assets which would have yielded higher prices and a better chance of effecting sales on a going-concern basis. (Compl. ¶ 29, 59-60.)

23

(allegations that one director "was hired by [the interested directors], was beholden to their interests, and lacked independence," and that he "failed to undertake an independent and good faith review of" the transaction at issue, were sufficient to plead that director was not independent); Rales v. Blasband, 634 A.2d 927, 937 (Del. 1993) (finding reasonable doubt that director employed as President and CEO could act independently of two interested directors who, by virtue of their positions as board chair and chair of executive committee, "place[d] them in a position to exert considerable influence over [him]"); In re The Limited, Inc. S'holders Litig., No. Civ.A. 17148-NC, 2002 WL 537692, at \*5 (Del. Ch. Mar. 27, 2002) (allegation of director's long-term board service and employment as president and CEO of subsidiary was sufficient to generate reasonable doubt as to his ability to make independent decisions about board chair/CEO's interests).[5]

30.    The Objectors point to the existence of a five-year employment agreement as evidence that Mr. Goodwin's decision-making was not afflicted by any threat of termination. Here, again, the Objectors seek to introduce extraneous factual matter that is not appropriately considered in the context of the Committee's motion for standing.[6]    Even if considered at this

---

[5]    Discovery is needed to fully establish whether Mr. Goodwin in fact exercised any independent judgment in connection with the events at issue. The limited discovery obtained during the Committee's investigation, which included hundreds of Mr. Goodwin's e-mails from late 2011 through mid-2012, contains no indication of any significant participation or independent decision-making by Mr. Goodwin.

[6]    The mere existence of an employment agreement is insufficient to refute an allegation that a director lacked independence, especially at the pleading stage. The cases cited in the Proposed Defendants' objections involved decisions after trial or on summary judgment upon a full discovery record, in which the protections afforded by a particular employment contract were considered as only one item of evidence contradicting the plaintiff's allegation that the director was beholden to a controlling director or otherwise lacked independence. See Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150 (Del. Ch. 2005), aff'd, 906 A.2d 114 (Del. 2006) (decision after trial); Goodwin v. Live Entm't, Inc., No. Civ.A. 15765, 1999 WL 64265 (Del. Ch. Jan. 25, 1999), aff'd, 741 A.2d 16 (Del. 1999) (summary judgment motion). In fact, in Benihana, the Delaware Chancery Court expressly acknowledged that at the pretrial stage, in order to sustain the pleading, the court need only determine that reasonable doubt exists as to a director's independence. Thus the court distinguished the case before it which involved a "post-trial assessment of independence" made on a "full record," including "the opportunity to consider [the director's] trial testimony and review [another's] deposition." 891 A.2d at 176. The Proposed Defendants cite no authority holding or even suggesting that the mere existence of an employment agreement could provide a basis for denying standing or even for granting a motion to dismiss.

24

stage, the employment agreement actually undercuts the Objectors' argument, as it provides that

## [REDACTED][7]

See Ryan Decl. Ex. K, § 2(b).

## [REDACTED].[8]

## [REDACTED]

See Orman v. Cullman, 794 A.2d 5, 30 (Del Ch. 2002) (finding plaintiff had pled sufficient facts to show a lack of independence where the director in question had received $75,000 in consulting service fees, and was beholden to company's directors for renewal of his consulting contract); In re The Limited, Inc. S'holders Litig., 2002 WL 537692, at *6 (finding that director's annual compensation of $150,000 for consulting services provided to the company was sufficiently material to make him beholden to company's CEO).

31.     Moreover, insofar as Mr. Goodwin's employment agreement is with RG Steel, LLC, one of the Debtors, it is not sensible to suggest that this "long-term employment agreement guaranteeing his salary" could somehow have given Mr. Goodwin the confidence to go against Ira Rennert's wishes.   One of the fundamental premises of the Claims is that at least since

---

[7]     As the Court is aware, Mr. Rennert and Renco have requested the Court's authority to file (among other documents) Mr. Goodwin's employment agreement under seal [D.I. 2817].  While the Committee disagrees that such agreement should be sealed – and has thus objected to this relief [D.I. 2846] – it is nonetheless redacting portions of the Reply relating to Mr. Goodwin's employment agreement (that were not otherwise disclosed in the Objections) to honor the parties' pending request. If the Court ultimately authorizes Mr. Goodwin's employment agreement to remain under seal, the Committee will request that Court's order granting the motion to seal also authorize the Committee to file an unredacted copy of the Reply under seal. If, however, the Court does authorize sealing of Mr. Goodwin's agreement, the Committee will file the unredacted Reply on the docket.

[8]     **[REDACTED]** See Ryan Decl. Ex. K, § 2(a).

December 2011 it was clear that the Debtors would end up in bankruptcy, with unsecured creditors – such as, say, an executive with a rejected long-term employment agreement – receiving little if anything on their claims. (See Compl. ¶¶ 24-25.). Certainly this was true by the time the Proposed Defendants allowed the Debtors to miss the cure period on the Coke Supply Agreement, days before the bankruptcy filing. It is reasonable to assume that during this time Mr. Goodwin attached far greater importance to the future favors he might receive from Renco and Ira Rennert than to any recovery he might receive on his "long-term employment contract." Indeed, a review of the claims register reveals that Mr. Goodwin has never even bothered to file a claim in this bankruptcy case, with the bar date long past.[9]

### E.    Count II Is Not Barred by Preclusion Principles

32.    The Objectors contend that Count II of the Complaint is barred by principles of res judicata, judicial estoppel, and the law of the case doctrine in light of the Court's prior order approving the Debtors' request for DIP financing (the "DIP Order"). Because the DIP Order included findings that the requested financing was "necessary" and would "benefit the Debtors," the Objectors assert that Count II is doomed to fail because it supposedly "stands or falls" on the factual allegation that the DIP facility was unnecessary and provided no benefit to the Debtors.

---

[9]    The Proposed Defendants further argue that the Committee's claims against Mr. Goodwin are not colorable because the Complaint lacks "particularized" factual allegations establishing that Mr. Goodwin was dominated or controlled by Ira Rennert. "Particularized" allegations are not required to proceed on the theory that Mr. Goodwin's (otherwise inexplicable) actions were motivated by disloyal self-interest and a desire to appease Mr. Rennert. The sole case that the Proposed Defendants cite for that proposition, In re The Limited, Inc. S'holders Litig., involved a motion to dismiss a shareholder derivative action based on the plaintiffs' failure to meet the pre-suit demand requirement of Del. Chanc. Ct. R. 23.1, which requires a plaintiff to "allege with particularity" the reasons for failing to make pre-suit demand. In that context, the court explained, in order to meet the "'heavy burden' of pleading demand futility," the plaintiff's claim that demand was futile because a majority of directors was not disinterested and independent is required to be supported by particularized allegations demonstrating the directors' lack of independence. This heightened pleading requirement has no application outside of the demand futility issue, as the Chancery Court itself noted in *denying* the Proposed Defendants' motion to dismiss claims for breach of fiduciary duty *"under Court of Chancery Rule 12(b)(6)'s more lenient pleading standards."* 2002 WL 537692, at *7 (emphasis added).

26

(Renco Obj. ¶ 71.)  This argument mischaracterizes the claim in Count II and misapplies the governing law.

33.     The claim in Count II does not seek to challenge or "relitigate" the DIP Order. Regardless of outcome, litigating this Claim will have no impact whatsoever on the DIP facility, nor will it in any sense "undo" the Court's findings or any other terms of the DIP Order.  The Committee seeks to prove that the Proposed Defendants' failure to cause the Debtors to file for bankruptcy prior to the expiration of the cure period under the Coke Supply Agreement was motivated by self-interest as described in the Complaint, and further, that the proffered justification for delaying the filing at that time – *i.e.*, the need to complete negotiations on a DIP financing facility with Wells Fargo – was in reality a sham and a pretext. [10]  For the reasons that follow, the various preclusion doctrines invoked by the Objectors have no application here.

(i)     Res Judicata

34.     Res judicata, or claim preclusion, requires "(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.), 355 B.R. 438, 448 (Bankr. D. Del. 2006) (citing Bd. of Trs. of Trucking Emps. of N.J. Welfare Fund, Inc. v. Centra, 983 F.2d 495, 504 (3d Cir. 1992)).  None of these elements is present here.

35.     First, the DIP Order – whether or not it is "final" for purposes of appeal (Renco Obj. ¶ 74) – is not a "final judgment," nor is it even the type of final order that is properly given

---

[10]     In its entirety, Count II of the Complaint alleges that: (i) the Objectors delayed the filing purportedly in order to complete negotiations on a DIP financing facility with Wells Fargo, (ii) the DIP facility in fact produced no actual financing for the Debtors and was not necessary for them to commence and conduct a bankruptcy, (iii) in reality, the purpose of the DIP financing was to induce Wells Fargo – Mr. Rennert's long-time favored lender and the party controlling the Renco Cash Collateral – to forbear from drawing down on the Renco Cash Collateral by providing Wells Fargo with an opportunity to earn fees and obtain swift repayment of the obligations under the First Lien Credit Facility, and (iv) while the delay in the bankruptcy personally benefitted Mr. Rennert and Renco, it was contrary to the Debtors' interests as it resulted in the expiration of the contractual cure period under the Coke Supply Agreement which in turn caused MSC to terminate the agreement.  (Compl. ¶¶ 24-27.)

27

preclusive effect in the bankruptcy context. Virtually all of the cases cited in Renco's objection involved post-confirmation claims which the courts held were barred by final orders that were entered in conjunction with plan confirmation. In that context, it is hardly surprising that the courts – citing both principles of res judicata and also the terms of releases that were included in the courts' confirmation orders – rejected claims that either were or could have been raised in connection with the plan approval process. See Richardson v. Monaco (In re Summit Metals, Inc.), 477 B.R. 484 (Bankr. D. Del. 2012) (state law claims alleging deceit and collusion on the part of trustee and its counsel, which either were or could have been asserted during the main bankruptcy case, were barred by release contained in confirmation order and also by res judicata and collateral estoppel); In re Genesis Health Ventures, Inc., 355 B.R. 438 (post-confirmation claims alleging EBITDA manipulations could have been raised at confirmation hearing and therefore were barred by confirmation order); Fox v. Congress Fin. Corp. (In re Target Indus., Inc.), 328 B.R. 99 (Bankr. D.N.J. 2005) (trustee's post-confirmation breach of fiduciary duty claims arising out of pre-petition misconduct were barred by res judicata in light of plan confirmation order containing broad release of claims). Here, in contrast, the DIP Order was limited to matters relating directly to the Debtors' request for DIP financing and did not contain any release at all.

36.    Second, the Debtors' prior DIP financing motion and the Committee's claims for breach of fiduciary duties do not involve the same parties. The DIP financing motion involved the following two parties: the Debtors (who sought approval of the financing) and the DIP lenders (who were providing such financing). Neither of them, however, would be parties in the Committee's litigation of the Claims. Needless to say – and none of the Objectors even attempt to argue – that the Objectors were not parties to the DIP financing motion and do not stand in the

28

shoes of the DIP lenders. The Objectors, however, do argue that Debtors would be parties to the Committee's litigation because the Committee will bring the claims derivatively on the Debtors' behalf, "standing in the Debtors' shoes." (Renco Obj. ¶ 77.) As discussed in Point I above, this is wrong: the Committee will prosecute its claims against the Proposed Defendants not "on behalf of the Debtors" or "standing in the Debtors' shoes," but on behalf of the Estates, in its statutory, fiduciary capacity as the representative of the Debtors' unsecured creditors. The Objectors can cite no authority for the novel proposition that the Debtors and the Committee could possibly be viewed as the "same party" for purposes of res judicata analysis.

37.    Third, the DIP financing motion and the Committee's proposed claim do not involve the same cause of action. In fact, the DIP financing motion did not involve a "cause of action" at all, but a request by the Debtors for court approval of DIP financing. "[A] claim should not be barred unless the factual underpinnings, theory of the case, and the relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum." In re Genesis Health Ventures, 355 B.R. at 449 (internal quotation marks omitted). Here, that is not the case. The nature and premise of the DIP financing motion was entirely different from that of the Committee's Claims against the Proposed Defendants for breach of fiduciary duties. Further, the relief sought by the Debtors in connection with the DIP financing motion – i.e., approval of the DIP facility – bears no relationship to the relief that would be sought by the Committee in the litigation of the Claims, which includes monetary damages against the Proposed Defendants. Nor would it have been possible for the Committee to bring its claims against the Proposed Defendants in the context of the Debtors' DIP financing motion.

29

(ii)    Collateral Estoppel

38.    The Objectors focus on the Court's finding in the DIP Order that the requested financing was "necessary" and would "benefit the Debtors," arguing that Committee "is precluded from re-litigating those issues." (Renco Obj. ¶ 77.)  To the extent that the Objectors are suggesting the application of collateral estoppel ("issue preclusion") based on this finding, the argument fails.  This finding was not based on any evidence presented to or considered by the Court, in fact no such evidence was presented because the issue of the necessity of the DIP financing was not contested at the time.  The lack of contest, however, was not because the Committee believed the DIP financing to be necessary.  On the contrary, even then the Committee was convinced that the Debtors could finance the bankruptcy process using solely their cash collateral (as in fact happened); the Committee even stated this in its objection to the DIP motion.[11]  But by the time the Committee was appointed, the Debtors already obtained interim approval for the DIP motion and the Committee had a very limited period (approximately a week), and a constrained budget, to object to the final approval.  Faced with these constraints, the Committee determined that it was most prudent to focus its energy on the most urgent issue at hand: obtaining a reasonable timeframe for conducting a sale of the Debtors' operating assets in order to maximize the possibility that purchasers would continue at least some portion of the ongoing operations.  Ultimately, the parties came to a consensual resolution and therefore the Court had no occasion to hear any of the issues relating to the DIP facility, especially the issue of its necessity and benefit.  Accordingly, the finding in the DIP Order as to the purported necessity

---

[11]    In its objection to the DIP motion, the Committee stated that the DIP facility "extends no new credit" and was "merely consent to use cash collateral in in return for extremely rapid principal paydowns of the first lien obligations" and that "the Debtors' moderate current cash requirements could be funded by use of cash collateral alone." Corrected Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtors' Motions For (a) Final Order Authorizing Postpetition Financing and Granting Security Interests and Superpriority Administrative Expense Status and (b) an Order Approving Bidding Procedures in Connection with the Sale(s) of Substantially All of the Debtors' Assets [D.I. 284], ¶¶ 2, 7.

of the DIP financing cannot be the basis for issue preclusion with respect to the claim in Count

II.  See Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1486 (2d

Cir. 1995) (rejecting use of collateral estoppel where defendants "had little incentive to litigate

the issues fully" in prior proceeding); RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) (issue

preclusion may not apply where "the party sought to be precluded . . . did not have an adequate

opportunity or incentive to obtain a full and fair adjudication in the initial action").

       (iii)    Judicial Estoppel

39.    The doctrine of judicial estoppel is equally inapplicable here.  The Objectors

argue that the Committee is judicially estopped from taking the position that the DIP financing

was unnecessary and provided no benefit to the Debtors because the Debtors themselves

previously took a contrary position in connection with the DIP financing motion.  The premise

for this argument – that the Committee now "stands in the shoes of the Debtors" for purposes of

the proposed claim – lacks merit for the reasons discussed in paragraph 36 above.  The Objectors

can cite no case in which a court applied judicial estoppel in these circumstances, nor can they

provide any authority supporting the far-flung notion that the Committee, acting in its

independent fiduciary capacity, is bound by any and all positions that were previously taken by

the Debtors.[12]

       (iv)    Law of the Case Doctrine

40.    Finally, the law of the case doctrine does not bar the Committee from "arguing

the facts" that support Count II of the Complaint.  (Renco Obj. ¶ 79.)  As the cases cited by the

---

[12]    In each of the cases cited by the Objectors, the creditors' committee was held to be judicially estopped based on fact that the committee *itself* had affirmatively taken a contrary position during prior litigation.  See Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67 (Bankr. D. Del. 2005) (committee initially supported the assumption of certain agreements and later sought to challenge the same agreements as fraudulent transfers); Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.), 327 B.R. 719 (Bankr. D. Del. 2005) (same).

Objectors make perfectly clear, the doctrine applies only to issues of *law*. See, e.g., E. Pilots Merger Comm. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 279 F.3d 226, 232-33 (3d Cir. 2002) (explaining that "when a court decides *upon a rule of law*, that decision should continue to govern . . . in subsequent stages in the same case") (emphasis added) (citing Christianson v. Colt Indus. Op. Corp., 486 U.S. 800, 815-16 (1988)).  Whether the DIP facility provided any benefit to the Debtors, and whether the facility was necessary to preserve the assets of the Estates, are questions of *fact*, as the Objectors explicitly acknowledge in their objection. See Renco Obj. ¶¶ 71-72 (referring to the Committee's *"factual allegations* that the DIP facility provided no benefit to the debtors and was not necessary") (emphasis added).

### F.   Count IV of the Complaint States a Colorable Claim for Aiding and Abetting

41.   As to Count IV, alleging that Ira Rennert and Renco aided and abetted Mr. Goodwin's breaches of fiduciary duty with regard to the Goodwin-managed Debtors, the Objectors first argue that the Committee has failed to allege a colorable claim for primary liability against Mr. Goodwin. (Renco Obj. ¶ 85.)  This argument fails for the reasons discussed in Point II above.  Mr. Rennert and Renco go on to argue that the Committee has failed to plead the "knowing participation" element of their secondary liability for Mr. Goodwin's actions. (Renco Obj. ¶¶ 86-88.)  This is equally unpersuasive:  the same actions by Ira Rennert that constitute breaches of his own fiduciary duty with regard to the Company, which he co-managed with Goodwin, establish his (and Renco's) "knowing participation" in Mr. Goodwin's breaches with regard to the Goodwin-managed Debtors.[13]  Those actions are alleged extensively in the Complaint (see Compl. ¶¶ 24-40, 77-82), and, when read together with Count IV, are more than

---

[13]     Mr. Rennert's actions – and by extension, those of his alter-ego Renco – give rise to aiding and abetting liability rather than primary liability with regard to the Goodwin-managed Debtors only because, unlike with the Company, Ira Rennert installed Mr. Goodwin as the sole manager of the Goodwin-managed Debtors and therefore cannot be charged with a primary violation of duty with regard to those entities.

32

sufficient to state a colorable claim for aiding and abetting. See Miller v. McCown DeLeeuw & Co. (In re The Brown Schs.), 368 B.R. 394, 403 (Bankr. D. Del. 2007) (complaint that incorporated by reference allegations of a primary violation and further alleged that "[e]ach non fiduciary Defendant substantially and knowingly participated in, benefitted from and aided and abetted the breach of fiduciary duty engaged in by the officers, directors and controlling shareholders," sufficiently stated a claim for aiding and abetting a breach of fiduciary duty).

## III.   THE CLAIMS WILL BENEFIT THE DEBTORS' ESTATES

42.     Successful litigation of the Claims may yield a benefit to the Estates in an estimated amount of approximately $236 million – a figure that has not been contested in any of the Objections or other responses. The Renco Objectors argue that because certain of the proceeds may not be paid directly to the unsecured creditors, the Estates will not receive any benefit from such proceeds. This argument is premised on flawed reasoning.

43.     First, the Objectors' argument assumes that all of the proceeds of the Claims are subject to prepetition liens of the Debtors' secured creditors, namely Cerberus, Renco and Severstal. That is untrue. With respect to Renco's purported interest in the Claims as the third lien lender, the Committee will seek to equitably subordinate such interests because the type of inequitable conduct that the Committee outlined in its Complaint (i.e., Renco aiding and abetting breaches of fiduciary duties) will also support equitable subordination under section 510(c) of the Bankruptcy Code. See, e.g., Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Servs., Inc.), 361 B.R. 747, 763 (Bankr. D. Del. 2007) (concluding that because the court found sufficient factual allegations in a complaint to support the trustee's breach, and aiding and abetting, of fiduciary duties, "the factual allegations in the Complaint allege sufficient inequitable conduct that, if proven, would support a claim for equitable subordination").

44.    Moreover, the Committee believes that the same grounds that would justify equitably subordinating Renco's third lien interests will also support equitable subordination of the Renco-guaranteed portion of the second lien loans insofar as Renco is the true party in interest on those loans. Indeed, by Renco's own admission (Renco Obj. ¶ 59), Renco provided "substantial credit support and guarantees" with respect to such claims, amounting to "three or four times . . . $70 million," which represents the vast majority of Cerberus's outstanding claims.

45.    Second, with respect to the purported interests of both Cerberus and Renco, at the appropriate time, the Committee will seek a determination that such secured lenders were never granted a security interest in the Claims. Claims that arise out of the Proposed Defendants' breaches of fiduciary duties are "commercial tort claims" as outlined in New York Uniform Commercial Code § 9-102(a)(13),[14] which defines a "commercial tort claim" as "a claim arising in tort with respect to which the claimant is an organization." See, e.g. Johnson v. Nextel Commc'ns., Inc., 660 F.3d 131, 142 (2d Cir. 2011) (treating aiding and abetting of breach of fiduciary duty as a tort). Under New York Uniform Commercial Code § 9-108(e), for a secured lender to take a security interest in a commercial tort claim, the security agreement must specifically identify such claim (i.e., describe the collateral more specifically than just the type). Accordingly, the security agreements of Cerberus and Renco did not purport to grant a security interest in the Claims because neither of them described the Claims (at all) and the general "all commercial tort claims" description is insufficient. See Paloian v. LaSalle Bank Natl. Assn. (In re Doctors Hosp. of Hyde Park, Inc.), 474 B.R. 576, 593-94 (Bankr. N.D. Ill. 2012) (finding that lien did not attach to proceeds of commercial tort claims arising out of fraudulent and preferential transfers because under New York law the security agreement's description of only

---

[14]    Pursuant to the security agreements of both Cerberus and Renco, New York law governs the interpretation and construction of the scope of the collateral covered by such agreements. (Ryan Dec. Exhs. I, § 23 and J, § 23.)

34

the type of claims – i.e., "commercial tort claims," without more, was insufficient to describe claims with requisite detail to secure interest therein).

46.     With respect to Severstal's interest in a portion of the Claims (on account of Count II), the Objectors  argue that such recovery would be subject to a $100 million lien of Severstal and a $25 million setoff on account of outstanding cure damages relating to the Coke Supply Agreement. As this Court and the Renco Objectors are aware, the Debtors are engaged in multiple ongoing litigations and other disputes with Severstal. Until such litigations and disputes are resolved, the parties cannot estimate what stake Severstal will have with respect to the recovery on account of Count II. Even absent those litigations and the uncertainty as to the extent (if any) of the Severstal liens, any Severstal recovery from Count II would reduce Severstal's unsecured deficiency claim and accordingly benefit both the Estates and unsecured creditors.

47.     Resolution of the above issues will affect how much of the Claims will be paid to the unsecured creditors. Regardless of how these issues are ultimately resolved, however, the Debtors' *Estates* will benefit from the Committee's pursuit of the Claims. In evaluating whether an action will "benefit the estate," bankruptcy courts interpret the term "estate" to encompass more than merely one set of creditors. See Mellon Bank, N.A. v. Dick Corp., 351 F.3d 290, 293 (7th Cir. 2003) ( "benefit to the estate . . . in bankruptcy parlance denotes the set of all potentially interested parties—rather than to any particular class of creditors."). "What matters is whether creditors will receive some benefit from the recovery of the challenged transfers, even if it is not an increase in the amount the creditors will receive, but in the form of a debtor increasing its assets and improving its financial health so that its prospects of being able to satisfy its obligations to its creditors under the plan are improved." Kennedy Inn Assocs. v. Perab Realty

Corp. (In re Kennedy Inn Assocs.), 221 B.R. 704, 715 (Bankr. S.D.N.Y. 1998) (internal quotation and punctuation marks omitted). See also Citicorp Acceptance Co. v. Robinson (In re Sweetwater), 884 F.2d 1323, 1327 (10th Cir. 1989) (even though debtors could not pay administrative claims in full, such that proposed avoidance actions proceeds would go to satisfy the administrative claimants, such claims provide benefit to the estate); Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964 (Bankr. D. Del. 1994) (finding benefit to estate even if all preference recoveries would be turned over to unsecured creditors).

## IV.    THE COMMITTEE SHOULD NOT BE REQUIRED TO BRING THE CLAIMS IN BANKRUPTCY COURT

48.    The Renco Objectors ask the Court to "condition" any grant of standing on the Committee bringing its claims in this Court. (Renco Obj. ¶¶ 95-98.) This request is utterly inappropriate, particularly insofar as the same Objectors refuse to waive their right to *object* to this Court's jurisdiction pursuant to Stern v. Marshall, 131 S. Ct. 2594 (2011). In order to determine whether the Committee should be granted standing, the Court is required to consider *only* whether the Committee's Claims are colorable and will provide a benefit to the Estates. It is *not* required to determine the proper jurisdiction or venue for the Committee's action, and the Renco Objectors cite no authority for the proposition that directing the Committee, in advance, to bring its claims in a particular court could possibly constitute a proper exercise of the Court's discretion.

49.    The Committee, as noted in its Motion, has not yet determined the jurisdiction in which it will prosecute its Complaint. Once the Motion is decided, the Committee – assuming that this Court grants it standing – will make that determination and commence its action. If the Objectors disagree with the Committee's choice of forum, they can object at that time and the

36

issue will be litigated.   The Objectors' request that the Committee be ordered to bring its litigation in this Court is clearly premature at this time.

## V.   THE COST OF LITIGATING THE CLAIMS WILL NOT BE BORNE BY SECURED CREDITORS

50.   The Committee does not intend to fund the prosecution of the Claims with the proceeds of the collateral of either Cerberus or Renco.   Instead, it will utilize any unencumbered assets of the Estates for such purpose, which the Committee believes include proceeds of preference litigation.   The Renco Objectors seek to undermine the Committee's functional ability to litigate the Claims by asserting that preference action proceeds are encumbered by the adequate protection liens under the DIP and cash collateral orders and thus cannot be used for the Committee's litigation.   The Committee disagrees and has commenced a declaratory judgment action to determine whether Cerberus and Renco have an adequate protection lien on the preference action proceeds.   Official Comm. of Unsecured Creditors v. Cerberus Bus. Fin., LLC, No. 13-50918 (Bankr. D. Del. 2013).

51.   The outcome of the declaratory judgment action will determine what estate assets are available to fund the Committee's pursuit of the Claims.   If the Court finds that all or at least a portion of the preference proceeds are unencumbered, the Committee (as the fiduciary of the only real stakeholders of such unencumbered assets) has determined that a portion of such proceeds may be used to prosecute the Claims in order to procure potential benefit for the Estates.   See Reply ¶¶ 41-46, 49.   If, in the alternative, the Court finds that the preference action proceeds are encumbered, the Committee will investigate litigation funding alternatives or, if necessary, seek to have the Claims prosecuted by a trustee.

37

## VI.    CONCLUSION

52.    For the reasons set forth above, the Motion should be granted without further

conditions.


Dated: Wilmington, Delaware
        May 24, 2013

**SAUL EWING LLP**

Teresa K. D. Currier (No. 3080)
Lucian B. Murley (No. 4892)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6826
Facsimile: (302) 421-5861

-and-

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Thomas Moers Mayer
Gregory A. Horowitz
Susan Jacquemot
Yekaterina Chernyak
1177 Avenue of the Americas
New York, NY  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel to the Official Committee of Unsecured Creditors of WP Steel Venture LLP*

623775.2 05/24/2013